**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**

ELECTRONICALLY FILED
10/28/2024
U.S. DISTRICT COURT
Northern District of WV

**Marshall County Board of Education and Wetzel County Board of Education, Individually and on Behalf of All Others Similarly Situated,**

**Plaintiffs,**

**v.**

**Cephalon, Inc.; Teva Pharmaceuticals USA, Inc.; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc.; Johnson & Johnson, Inc.; Noramco, Inc.; AbbVie, Inc.; Allergan plc, f/k/a Actavis plc; Allergan Finance, LLC, f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.; Allergan Sales, LLC; Allergan USA, Inc.; Watson Laboratories, Inc.; Warner Chilcott Company, LLC; Actavis Pharma, Inc., f/k/a/ Watson Pharma, Inc.; Actavis South Atlantic LLC; Actavis Elizabeth LLC; Actavis Mid Atlantic LLC; Actavis Totowa LLC; Actavis LLC; Actavis Kadian LLC; Actavis Laboratories UT, Inc., f/k/a Watson Laboratories, Inc.-Salt Lake City; Actavis Laboratories FL, Inc., f/k/a Watson Laboratories, Inc.-Florida; Viatris, Inc., f/k/a Mylan N.V.; Sandoz, Inc.; KVK-Tech, Inc.; Amneal Pharmaceuticals, LLC; Amneal Pharmaceuticals, Inc.; Amneal Pharmaceuticals of New York, LLC; Indivior, Inc.; Hikma Pharmaceuticals USA, Inc.; VistaPharm, LLC; Alvogen, Inc.; Apotex Corp.; Sun Pharmaceutical Industries, Inc.; CVS Health Corporation; CVS Indiana LLC; CVS Rx Services, Inc.; CVS TN Distribution, LLC; CVS Pharmacy, Inc.; Walgreens Boots Alliance, Inc., a/k/a Walgreen Co.; Walgreen Eastern Co., Inc.; Walmart Inc., f/k/a Wal-Mart Stores, Inc.; Wal-Mart Stores East, LP; WSE Management, LLC; WSE Investment, LLC; Wal-Mart Stores East, Inc.; and The Kroger Co.,**

**Defendants.**

**Civil Action No.** 5:24-cv-207 Bailey

**CLASS ACTION COMPLAINT AND JURY REQUEST**

**TABLE OF CONTENTS**


I. INTRODUCTION ........ 6

II. PARTIES ........ 9

A. Plaintiffs ........ 9

B. Manufacturer Defendants ........ 9

1. Janssen Entities ........ 9

2. Actavis Entities ........ 10

3. Cephalon Entities ........ 15

4. Mylan ........ 16

5. Sandoz ........ 16

6. KVK-Tech, Inc. ........ 17

7. Amneal ........ 17

8. Indivior, Inc. ........ 18

9. Hikman Pharmaceuticals USA Inc. ........ 18

10. VistaPharm, LLC ........ 18

11. Alvogen, Inc. ........ 19

12. Apotex Corp. ........ 19

13. Sun Pharmaceutical Industries, Inc. ........ 19

C. National Retail Pharmacy Defendants ........ 19

1. CVS ........ 19

2. Walgreens ........ 20

3. Walmart ........ 21

4. Kroger ........ 22

III. JURISDICTION AND VENUE ........ 22

IV. FURTHER FACTUAL ALLEGATIONS ..... 23

A. Prescription Opioids ..... 23

B. The Manufacturer Defendants, Non-Joined Manufacturers, and the Non-Joined Distributors' Misleading Marketing and Failure to Report and Halt Suspicious Orders of Opioids Fueled the Opioid Crisis Nationally and in West Virginia. ..... 35

1. Background on Opioid Overprescribing ..... 36

2. Fraudulent Sales Practices ..... 42

C. Manufacturer Defendants and Non-Joined Manufacturers Funded Front Organizations that Published and Disseminated False and Misleading Marketing Materials. ..... 42

1. Exposing the Financial Ties Between Opioid Manufacturers and Third-Party Groups ..... 54

D. The Manufacturer Defendants and Non-Joined Manufacturers Paid Key Opinion Leaders, and Sponsored Speakers' Bureau, to Disseminate False and Misleading Messaging. ..... 59

E. The Devastating Impact of the Manufacturer Defendants' and Non-Joined Manufacturers' Propaganda Campaign. ..... 64

F. The Manufacturer Defendants' Specific Unlawful Practices that Targeted Prescribers Nationwide ..... 64

1. Johnson & Johnson and Janssen ..... 64

a) Janssen ..... 65

(1) The FDA Warned Defendant Janssen Regarding Its False Messaging. ..... 66

(2) Defendant Janssen Funded False Publications and Presentations. ..... 69

b) Johnson & Johnson ..... 71

(1) Defendants Johnson & Johnson and Janssen Failed to Monitor and Report Suspicious Sales Required by Federal Law. ..... 74

c) Teva ..... 74

(1) Teva Falsely and Aggressively Marked Cancer Drug Actiq to Non-Cancer Treating Physicians. .... 77

(2) Government Investigations Found Cephalon Inappropriately Marked Actiq for Off-Label Use.... 78

(3) Cephalon Falsely and Aggressively Marked Cancer Drug Fentora to Non-Cancer Treating Physicians.... 80

(4) The FDA Warned Cephalon Regarding Its False and Off-Label Marketing of Fentora. .... 81

(5) Cephalon Funded False Publications and Presentations.... 82

(6) Teva Failed to Monitor and Report Suspicious Sales as Required. .... 91

d) Actavis .... 91

(1) The FDA Issued a Warning Letter to Actavis Concerning Extensive False and Misleading Claims in Kadian Marketing Materials.... 92

(2) Actavis Failed to Monitor and Report Suspicious Sales as Required. .... 96

e) Mylan n/k/a Viatris, Inc. .... 97

(1) Mylan Failed to Monitor and Report Suspicious Sales as Required. .... 99

f) Indivior .... 100

G. The National Retail Pharmacy Defendants Failed to Uphold Their Obligations Both to Report Suspicious Orders and to Stop Filling “Red Flag” Prescriptions. .... 100

1. The National Retail Pharmacy Defendants Have a Duty to Prevent Diversion. .... 102

2. National Retail Pharmacy Defendants Failed to Maintain Effective Controls Against Diversion. .... 108

a) CVS .... 108

(1) CVS Lacked a Genuine Suspicious Order Monitoring System for Much of the Relevant Time. .... 109

(2) CVS Failed to Remedy Fatal Flaws in the System in Slowly Developed. ..... 110

(3) CVS Failed to Perform Due Diligence. ..... 112

(4) CVS Failed to Maintain Effective Controls Against Diversion and Contributed to the Oversupply of Opioids into West Virginia. ..... 113

b) Walgreens ..... 115

(1) Walgreens Delayed Developing a SOMS Program and Instead Relied on After-the-Fact Reports of "Excessive" Orders While Ignoring Red Flags. ..... 116

(2) Walgreens Knew Its After-the-Fact Excessive Purchase Reports Failed to Satisfy Its Obligations to Identify, Report, and Halts Suspicious Orders. ..... 118

(3) Walgreens Lacked Meaningful Additional Systems to Address the Failures in Its System of After-the-Fact Reporting of Certain Orders. ..... 120

(4) Evan as It Rolled Out Its New SOM Program, Walgreens Left Significant Gaps and Loopholes in Place and Failed to Report and Perform Due Diligence on Orders It Flagged. ..... 121

(5) Walgreens Failed to Put in Place Adequate Policies to Guard Against Diversion at the Pharmacy Level. ..... 124

c) Walmart ..... 128

(1) Walmart Lacked a Suspicious Order Monitoring System for Most of the Relevant Period. ..... 128

(2) Walmart's "Enhanced" Monitoring Program Falls to Remedy Deficiencies in Its Monitoring Program. ..... 131

d) Kroger ..... 132

(1) Kroger Failed to Maintain an Effective Suspicious Order Monitoring System or to Complete Necessary Due Diligence. ..... 132

(2) Kroger Failed to Maintain an Effective Suspicious Order Monitoring System or to Complete Necessary Due Diligence. ..... 133

(3) Kroger Failed to Protect Against Diversion at Its Retail Pharmacies. .......... 135

3. The National Retail Pharmacy Defendants Put Profits Before Safety. .......... 138

a) National Retail Pharmacy Defendants Employed Performance Metrics That Inevitably Led to Diversion. .......... 138

b) The National Retail Pharmacy Defendants Worked Together to Increase Their Profits and Lobbied Against Restrictions on Opioid Use and DEA Enforcement. .......... 141

c) National Retail Pharmacy Defendants Worked with the Manufacturer Defendants to Promote Opioids and Bolster Their Profits at the Expense of Communities. .......... 143

4. Multiple Enforcement Actions Against the National Retail Pharmacy Defendants Confirms Their Compliance Failures. .......... 147

a) CVS .......... 148

b) Walgreens .......... 151

c) Walmart .......... 153

d) Kroger .......... 154

H. Plaintiffs' School Districts Have Been Damaged as A Result of Defendants' Illegal Conduct. .......... 156

V. CLASS ALLEGATIONS .......... 158

CAUSES OF ACTION .......... 160

COUNT I: CIVIL CONSPIRACY to DECEIVE the PUBLIC and VIOLATE CONTROLLED SUBSTANCE LAWS (ALL DEFENDANTS) .......... 160

COUNT II: COMMON LAW PUBLIC NUISANCE (ALL DEFENDANTS) .......... 164

COUNT III: NEGLIGENCE (ALL DEFENDANTS) .......... 170

COUNT IV: NEGLIGENCE VIOLATION OF STATUTORY DUTIES .......... 172

COUNT V: NEGLIGENCE FAILURE TO WARN (ALL DEFENDANTS) .......... 174

VI. PRAYER FOR RELIEF .......... 177

# CLASS ACTION COMPLAINT AND JURY REQUEST

## I. INTRODUCTION

1. American public schools perform an indispensable function central to the health of American democracy, by providing free education to every student who comes through their doors. For the last two decades, in addition to providing this essential and challenging governmental function, public schools have been shouldering among the most profound and enduring consequences of the nationwide opioid epidemic.

2. For years, research has reported that fetal exposure to opioids can produce changes in brain structure and function.[1] Children who are exposed to opioids *in utero* disproportionately develop cognitive and behavioral disabilities as a result, and they require extra intervention and support often from pre-school or kindergarten through the 12th grade. Today in the United States, a newborn is diagnosed with Neonatal Opioid Withdrawal Syndrome ("NOWS"), often referred to as Neonatal Abstinence Syndrome ("NAS"), every 15-25 minutes. Children living in households battling opioid addiction and children who are addicted to opioids themselves require special education intervention as well. Public schools are, in turn, required to provide special education and related services, 34 C.F.R. §§ 300.320-300.32, to multiple generations of children born with prenatal opioid exposure and to children exposed to opioid addiction.

3. Because of the Defendants' horrific wrongdoing, which created the worst man-made epidemic in history, births of children with prenatal opioid exposure have increased exponentially since the onslaught of the opioid epidemic. That has proven particularly true in West Virginia, where births of children with prenatal opioid exposure rose to 53.5 per 1,000 in 2017,

[1] *See generally* Emily J. Ross et al., *Developmental Consequences of Fetal Exposure to Drugs: What We Know and What We Still Must Learn*, 40 Neuropsychopharmacology 61, 76 (2015) (discussing research results dating back to 1994).

more than seven times worse than the national average — making the state the worst hit area in the country. As a result of the Defendants' conduct, our nation's public schools have been saddled with the extra costs of educating children with prenatal opioid exposure and postnatal opioid exposure, and will continue to be for years to come.

4. The opioid crisis has had a particularly profound effect on women, who are more likely than men to suffer from chronic pain, and who receive prescriptions for pain relievers in higher doses and use them for longer periods of time.[2] Women may become more dependent on prescription pain relievers more quickly than men.[3] Prescription pain reliever overdose deaths among women increased more than 400% from 1999 to 2010, compared to 237% among men.[4] The rates of NOWS, which occurs when a baby is born addicted to opioids as a result of use by the mother during pregnancy, have also increased dramatically.[5]

5. Plaintiffs bring this action on behalf of themselves and a statewide class of all independent public school boards in West Virginia. Plaintiffs and the proposed Class bear the substantial and steadily rising costs of providing special education and related services to children who were exposed to opioid use in utero. West Virginia Public School Boards have incurred and will need hundreds of millions of dollars for those children. Providing special education and related services roughly doubles the amount a school spends to educate a child.[6]

---

[2] *Opioid Addiction 2016 Facts & Figures,* American Society of Addiction Medicine, https://www.asam.org/docs/default-source/advocacy/opioid-addiction-disease-facts-figures.pdf.
[3] *Id.*
[4] *Id.*
[5] Hannah Rappleye et al., *Born Addicted: The Number of Opioid-Addicted Babies is Soaring*, NBC News, Oct. 9, 2017, https://www.nbcnews.com/storyline/americas-heroin-epidemic/born-addicted-number-opioid-addicted-babies-soaring-n806346; *Dramatic Increases in Maternal Opioid Use and Neonatal Abstinence Syndrome*, Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/related-topics/trends-statistics/infographics/dramatic-increases-in-maternal-opioid-use-neonatal-abstinence-syndrome (last updated Sept. 2015).
[6] Jay G. Chambers et al., *Total Expenditures for Students with Disabilities, 1999-2000: Spending Variation by Disability*, Special Education Expenditure Project 4 (June 2003), https://www.air.org/sites/default/files/SEEP5-Total-Expenditures.pdf.

6. Plaintiffs and the proposed Class are often the first to identify a student in crisis and serve as the first point of contact for students who need support in the face of crisis. Plaintiffs and the proposed Class have also borne costs due to the increased use of prescription opioids among students and amongst the family members of students, including by providing resources to teachers and administrators who are on the front lines helping students, and by providing specialized health and/or counseling programs for these students.

7. Even if the opioid crisis were abated today, Plaintiffs and the proposed Class would continue to incur millions in costs in the years to come, as the current cohort of children adversely impacted by opioids advances from lower school to high school, with special needs all along the way.

8. While great attention has been paid to the strain placed on states and local governments for their vast public health expenditures to respond to the opioid epidemic, the astounding harm caused to our nation's public schools has gone largely unnoticed. Children born with opioid exposure *in utero* are tragic victims of the opioid epidemic and they suffer from a host of developmental and behavioral problems for the rest of their lives. Children exposed to family members' addiction to or death from opioids also suffer from developmental and behavioral problems. Children addicted to opioids themselves also suffer developmental and behavioral problems. Public schools are tasked with finding the resources to provide special education, programs, services, and support to these children.

## II. PARTIES

### A. Plaintiffs

9. Plaintiffs bring this civil action against Defendants on behalf of themselves and other similarly situated public school boards in West Virginia to recoup monies they have spent because of Defendants' actions and inactions and to abate the effects of the opioid epidemic on West Virginia public schools caused by the Defendants.

10. The Marshall County Board of Education, on behalf of Marshall County Schools, an independent public school district in West Virginia, is located at 214 Middle Grave Creek Road, Moundsville, WV 26041.

11. The Wetzel County Board of Education, on behalf of Wetzel County Schools, an independent public school district in West Virginia, is located at 300 Foundry Street, New Martinsville, WV 26155.

### B. Manufacturer Defendants

#### 1. Janssen Entities

12. Defendant Johnson & Johnson, Inc. ("Johnson & Johnson") is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. At all times relevant to this Complaint, Janssen and Johnson & Johnson manufactured, marketed, or distributed opioids that were sold in West Virginia.

13. Defendant Janssen Pharmaceuticals, Inc. ("Janssen")—which was formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which, in turn, was formerly known as Janssen Pharmaceutica, Inc.—is a Pennsylvania pharmaceutical corporation with its principal place of business in Titusville, New Jersey and Raritan, New Jersey. Janssen is a wholly owned subsidiary of Johnson & Johnson, Inc.

14. Defendant Ortho-McNeil-Janssen Pharmaceuticals, Inc. ("OMP"), now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

15. Defendant Janssen Pharmaceutica, Inc. ("Janssen Pharmaceutica"), now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

16. Johnson & Johnson, Janssen Pharmaceuticals, Noramco, OMP, Janssen Pharmaceutica, and their DEA registrant subsidiaries and affiliates (collectively, "Janssen") are or have been engaged in the manufacture, promotion, distribution, and sale of opioids nationally, and in West Virginia.

17. These defendants manufacture or have manufactured the following drugs as well as generic versions of Duragesic, Nucynta, and Nucynta ER in the United States.

**2. Actavis Entities**

18. Defendant Allergan plc, (f/k/a Actavis plc) is a pharmaceutical company incorporated in Ireland, with its principal place of business in Dublin, Ireland and its administrative headquarters and all executive officers located in Madison, New Jersey. In October 2012, the Actavis Group was acquired by Watson Pharmaceuticals, Inc. and the combined company changed its name to Actavis, Inc. as of January 2013, and then to Actavis plc in October 2013. In October 2013, Actavis plc (n/k/a Allergan plc) acquired Warner Chilcott plc pursuant to a transaction agreement dated May 19, 2013. Actavis plc (n/k/a Allergan plc) was established to facilitate the business combination between Actavis, Inc. (n/k/a Allergan Finance, LLC) and Warner Chilcott plc. Following the consummation of the October 1, 2013 acquisition, defendant Actavis, Inc. (n/k/a Allergan Finance, LLC) and Warner Chilcott plc became wholly-owned subsidiaries of Actavis

plc (n/k/a Allergan plc). Pursuant to the transaction, each of Actavis, Inc.'s common shares was converted into one Actavis plc share. Further, Actavis plc (n/k/a Allergan plc) was the "successor issuer" to Actavis, Inc. and Warner Chilcott plc. Actavis plc acquired Allergan, Inc. in March 2015, and the combined company thereafter changed its name to Allergan plc.

19. AbbVie, Inc. ("AbbVie") is a Delaware Corporation. On May 8, 2020, Defendant AbbVie acquired Allergan plc in a cash and stock transaction agreement valued at $63 billion.

20. The transaction that created Actavis plc converted each share of Actavis Inc.'s Class A common shares into one Actavis plc Ordinary Share. *See City of Chicago v. Purdue Pharma L.P.*, No. 14-C-4361, 2015 WL 2208423, at *7 (N.D. Ill. May 8, 2015). Actavis Inc. and Actavis plc had the same corporate headquarters both before and after the merger; Actavis plc had the same website as Actavis Inc.; and, Actavis plc maintained all of Actavis Inc.'s officers in the same positions. *See id.* Actavis plc's SEC filings explained that "'[r]eferences throughout . . . to "we,' 'our,' 'us,' the 'Company' or 'Actavis' refer'" interchangeably to Watson Pharmaceuticals, Inc., Actavis, Inc., and Actavis plc depending on the date. *See id.* (citations omitted).

21. Defendant Allergan Finance, LLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.) is a limited liability company incorporated in Nevada and headquartered in Madison, New Jersey. Allergan Finance, LLC is a wholly owned subsidiary of defendant Allergan plc. In 2008, Actavis, Inc. (n/k/a Allergan Finance, LLC), acquired the opioid Kadian through its subsidiary, Actavis Elizabeth LLC, which had been the contract manufacturer of Kadian since 2005. Since 2008, Kadian's label has identified the following entities as the manufacturer or distributor of Kadian: Actavis Elizabeth LLC, Actavis Kadian LLC, Actavis Pharma, Inc., and Allergan USA, Inc. Currently, Allergan USA, Inc. is contracted with UPS SCS, Inc. to distribute Kadian on its behalf.

Case 5:24-cv-02070-JFW-PB Document 1 Filed 10/28/24 Page 13 of 180 Page ID #:18

22. Defendant Allergan Sales, LLC is incorporated in Delaware and headquartered in Irvine, California. Allergan Sales, LLC is the current New Drug Application ("NDA") holder for Kadian, and in 2016, Allergan Sales, LLC held the Abbreviated New Drug Applications ("ANDA") for Norco. The Norco ANDAs are currently held by non-defendant Allergan Pharmaceuticals International Limited, which is incorporated in Ireland. Allergan Sales, LLC is the wholly owned subsidiary of Allergan plc.

23. Defendant Allergan USA, Inc. is incorporated in Delaware and headquartered in Madison, New Jersey. Allergan USA, Inc. is currently responsible for Norco and Kadian sales. Allergan USA, Inc. is a wholly owned subsidiary of Allergan plc.

24. Defendant Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California. Watson Laboratories, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva. Prior to the sale, Watson Laboratories, Inc. was a direct subsidiary of Actavis, Inc. (n/k/a Allergan Finance, LLC). Between 2000 and 2015, Watson Laboratories, Inc. held the ANDAs for Norco and was the manufacturer of the drug. Watson Laboratories, Inc. was also the ANDA holder of various generic opioids.

25. Defendant Warner Chilcott Company, LLC is a limited liability company incorporated in Puerto Rico. Since 2015, Warner Chilcott Company, LLC has been the manufacturer of Norco. Warner Chilcott Company, LLC was a subsidiary of Warner Chilcott plc until Warner Chilcott plc became a wholly owned subsidiary of Allergan plc in 2013. Warner Chilcott Company LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

26. Defendant Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) is registered to do business in West Virginia as a Delaware corporation with its principal place of business in Parsippany, New Jersey. Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) was previously responsible for sales of Kadian and Norco. Actavis Pharma, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

27. Defendant Actavis South Atlantic LLC is a Delaware limited liability company with its principal place of business in Sunrise, Florida. Actavis South Atlantic LLC was listed as the ANDA holder for oxymorphone and fentanyl transdermal. Actavis South Atlantic LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

28. Defendant Actavis Elizabeth LLC is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey. From December 19, 2005, until it purchased the medication in December 2008, Actavis Elizabeth LLC served as the contract manufacturer of Kadian for Alpharma. Actavis Elizabeth LLC held the ANDA for Kadian from 2008 to 2013. Actavis Elizabeth LLC was also the holder of ANDAs for the following Schedule II opioid products: oxycodone/acetaminophen; homatropine methylbromide/hydrocodone bitartrate; morphine sulfate capsule; morphine sulfate tablet; oxycodone/hydrochloride tablet; oxycodone/ibuprofen; and oxymorphone tablet. Actavis Elizabeth LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

29. Defendant Actavis Mid Atlantic LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis Mid Atlantic LLC has held the ANDA for homatropine methylbromide/hydrocodone bitartrate. Actavis Mid Atlantic LLC was

sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

30. Defendant Actavis Totowa LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis Totowa LLC has held the ANDAs for the following Schedule II opioid products: oxycodone/acetaminophen; homatropine methylbromide; oxycodone/hydrochloride.

31. Defendant Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Defendants Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, and Actavis Totowa LLC were all direct subsidiaries of Actavis LLC, which was an indirect subsidiary of defendant Watson Laboratories, Inc. Watson Laboratories, Inc., in turn, was a direct subsidiary of Actavis, Inc. (n/k/a Allergan Finance, LLC). Actavis LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

32. Defendant Actavis Kadian LLC is a Delaware limited liability company with its principal place of business in Morristown, New Jersey. Actavis Kadian LLC has been identified on Kadian's label as a manufacturer or distributor of Kadian. Actavis Kadian LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

33. Defendant Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc.-Salt Lake City) is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah. Actavis Laboratories UT, Inc. was the Kadian ANDA holder from 2013 to 2016 and was listed as the ANDA holder for morphine sulfate capsule. Actavis Laboratories UT, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic

businesses to Teva. Prior to the sale, Actavis Laboratories UT, Inc. was a direct subsidiary of Actavis, Inc. (n/k/a Allergan Finance, LLC).

34. Defendant Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc.-Florida) is a Florida limited liability company with its principal place of business in Davie, Florida. Actavis Laboratories FL, Inc. was a Norco ANDA holder in 2015 and was the ANDA holder of the following Schedule II opioid products: hydrocodone/acetaminophen; hydrocodone/ibuprofen; oxycodone/aspirin; and hydromorphone tablet. Actavis Laboratories FL, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva. Prior to the sale, Actavis Laboratories FL, Inc. was a direct subsidiary of Andrx Corporation, which was a direct subsidiary of Actavis, Inc. (n/k/a Allergan Finance, LLC). Andrx Corporation was transferred to Teva as part of the 2016 sale.

35. Each of these defendants and entities currently is or was previously owned by defendant Allergan plc, which uses or used them to market and sell its drugs in the United States. Collectively, these defendants and entities, and their DEA registrant subsidiaries and affiliates that manufacture, promote, distribute, and sell prescription opioids, are referred to as "Actavis."

36. These defendants manufacture or have manufactured the following drugs as well as generic versions of OxyCodone, Kadian, Duragesic, and Opana in the United States.

**3. Cephalon Entities**

37. Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva USA was in the business of selling generic opioids, including a generic form of OxyContin from 2005 to 2009. Teva USA is a wholly owned subsidiary of defendant Teva Pharmaceutical Industries Ltd. ("Teva Ltd."), an Israeli corporation (collectively, "Teva").

38. Defendant Cephalon, Inc., is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. In October 2011, Teva Ltd. acquired Cephalon, Inc.

39. Teva USA and Cephalon, Inc. and their DEA registrant subsidiaries and affiliates (collectively, "Cephalon") work together to manufacture, promote, distribute, and sell both brand name and generic versions of opioids in the United States and in West Virginia, Actiq and Fentora.

40. From 2000 forward, Cephalon made thousands of payments to physicians nationwide, including those related to opioids in West Virginia, many of whom were not oncologists and did not treat cancer pain, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

**4. Mylan**

41. In November 2020, Defendant Viatris, Inc. ("Viatris"), a pharmaceutical company, was created by a merger of Mylan N.V. and its subsidiaries with Upjohn. Viatris' principal place of business is 1000 Mylan Boulevard, Canonsburg, Pennsylvania, 15317, which is with one of its three "global centers." Mylan N.V., with its numerous wholly owned subsidiaries including Mylan Laboratories, Inc., Mylan Technologies, Inc., and Mylan Institutional, Inc. (hereinafter collectively referred to as "Mylan") was a global generic and specialty pharmaceuticals company which developed, licensed, manufactured, marketed and distributed generic specialty pharmaceuticals, including opioids, nationwide and in West Virginia. Mylan N.V. group's global headquarters was also in Canonsburg, Pennsylvania.

**5. Sandoz**

42. Defendant Sandoz, Inc., ("Sandoz"), and its successors, is a manufacturer of generic pharmaceuticals, including opioids, which are distributed and sold globally, including in

West Virginia. Its principal place of business is located in Princeton, New Jersey, but it also has operations in California, Colorado, North Carolina, New York, and Pennsylvania.

**6. KVK-Tech, Inc.**

43. Defendant KVK-Tech, Inc., ("KVK-Tech") is a pharmaceutical company of generic and specialty drugs founded in 2004. Its principal place of business is in Newton, Pennsylvania. At all times relevant to this Complaint, KVK-Tech manufactured, marketed, and distributed generic opioids that were sold in West Virginia.

**7. Amneal**

44. Defendant Amneal Pharmaceuticals, LLC is a manufacturer of generic and specialty pharmaceuticals, including opioids. Its principal place of business is in Bridgewater, New Jersey. Amneal Pharmaceuticals, LLC may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

45. Defendant Amneal Pharmaceuticals, Inc. is a manufacturer of generic and specialty pharmaceuticals, including opioids. Its principal place of business is in Bridgewater, New Jersey. Amneal Pharmaceuticals, Inc. may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

46. Defendant Amneal Pharmaceuticals of New York, LLC is a manufacturer of generic pharmaceuticals, including opioids. Its principal place of business is in Hauppauge, New York. Upon information and belief, Amneal Pharmaceuticals of New York, LLC is a subsidiary of Amneal Pharmaceuticals, Inc. Amneal Pharmaceuticals of New York, LLC may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

47. Each of the Defendants and entities in paragraphs 45-47 are collectively referred to herein as "Amneal." At all times relevant to this Complaint, Amneal manufactured, marketed, and distributed opioids that were sold in West Virginia.

**8. Indivior, Inc.**

48. Defendant Indivior, Inc. ("Indivior") is a global pharmaceutical company that develops and markets medicines for the treatment of opioid addiction. Indivior was formerly incorporated under the name of Reckitt Benckiser Pharmaceuticals, Inc. In December 2014, Reckitt Benckiser Pharmaceuticals, Inc. was demerged from its prior parent, the Reckitt Benckiser Group PLC, into Indivior PLC. Its principal place of business is in North Chesterfield, Virginia. At all times relevant to this Complaint, Indivior, Inc. manufactured, marketed, and distributed opioids that were sold in West Virginia.

**9. Hikman Pharmaceuticals USA Inc.**

49. Defendant Hikma Pharmaceuticals USA, Inc. ("Hikma") develops, manufactures, markets, and sells a range of generic, branded, and in-licensed pharmaceutical products, including opioids. Its principal place of business is in Berkeley Heights, New Jersey. At all times relevant to this Complaint, Hikma manufactured, marketed, and distributed opioids that were sold in West Virginia.

**10. VistaPharm, LLC**

50. Defendant VistaPharm, LLC ("VistaPharm,") manufactures and distributes generic pharmaceutical products, including opioids. Its principal place of business is in Parsippany, New Jersey. At all times relevant to this Complaint, VistaPharm manufactured, marketed, and distributed opioids that were sold in West Virginia.

**11. Alvogen, Inc.**

51. Defendant Alvogen, Inc. ("Alvogen") is a privately owned company focused on developing, in-licensing, manufacturing, and marketing pharmaceutical products including opioids. Its principal place of business is in Morristown, New Jersey. At all times relevant to this Complaint, Alvogen manufactured, marketed, and distributed opioids that were sold in West Virginia.

**12. Apotex Corp.**

52. Defendant Apotex Corp. ("Apotex") is a global generic pharmaceutical company that manufactures many pharmaceuticals, including opioids. Its principal place of business is in Florida. At all times relevant to this Complaint, Apotex manufactured opioids that were sold in West Virginia.

**13. Sun Pharmaceutical Industries, Inc.**

53. Defendant Sun Pharmaceutical Industries, Inc. ("Sun Pharmaceutical") is a global generic pharmaceutical company that manufactures many pharmaceuticals, including opioids. Its principal place of business is Princeton, New Jersey. At all times relevant to this Complaint, Sun Pharmaceutical manufactured opioids that were sold in West Virginia.

54. Collectively, Defendants Janssen, Johnson & Johnson, Actavis, Teva, Mylan, Sandoz, KVK-Tech, Amneal, Indivior, Hikma, VistaPharm, Alvogen, Apotex, and Sun Pharmaceutical are referred to as the "Manufacturer Defendants."

**C. National Retail Pharmacy Defendants**

**1. CVS**

55. Defendant CVS Health Corporation ("CVS Health") is a Delaware corporation with its principal place of business in Rhode Island. Through its various DEA registrant subsidiaries

and affiliated entities, CVS Health conducts business as a licensed wholesale distributor and pharmacy operator. At all times relevant to this Complaint, CVS Health distributed prescription opioids throughout the United States and in West Virginia.

56. Defendant CVS Indiana LLC is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana. Defendant CVS Rx Services, Inc. is a New York corporation with its principal place of business in Chemung, New York. Defendant CVS TN Distribution, LLC is a Tennessee corporation with its principal place of business in Knoxville, Tennessee.

57. Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island and is a wholly owned subsidiary of CVS Health. Defendant CVS Pharmacy, Inc. is both a DEA registered "distributor"[7] and a DEA registered "dispenser"[8] of prescription opioids.

58. Defendants CVS Health Corporation, CVS Indiana LLC, CVS Rx Services, Inc., CVS TN Distribution, LLC, and CVS Pharmacy, Inc. are collectively referred to as "CVS." CVS conducts business as a licensed wholesale distributor and dispenser. At all times relevant to this Complaint, CVS distributed and/or dispensed prescription opioids throughout the United States, including in West Virginia.

**2. Walgreens**

59. Defendant Walgreen Co. ("Walgreens") is an Illinois corporation with its principal place of business in Deerfield, Illinois. Walgreens, through its various DEA-registered affiliated entities, conducted business throughout the United States, including in West Virginia, as a licensed wholesale distributor through mid-2014.

---

[7] 21 U.S.C. §§ 802(11), 822(a)(1).
[8] 21 U.S.C. §§ 802(1), 822(a)(2).

Case 5:24-cv-00207-JPB Document 1 Filed 10/28/24 Page 22 of 180 PageID #: 26

60. Additionally, at all relevant times, Walgreens conducted business as a dispenser of opioids through its large network of retail pharmacies throughout the United States, including in West Virginia specifically.

61. Defendant Walgreens Boots Alliance, Inc. is a Delaware corporation with its principal place of business in Deerfield, Illinois. Walgreens Boots Alliance, Inc. describes itself as the successor of Walgreen Co. In March 2018, Walgreens Boots Alliance, Inc. purchased 1,932 Rite Aid Stores and 3 distribution centers, including those in West Virginia for $4.4 billion. Defendant Walgreen Eastern Co., Inc. is a New York corporation with its principal place of business in Deerfield, Illinois. Walgreen Eastern Co., Inc. is a subsidiary of Walgreens Boots Alliance, Inc.

62. Defendants Walgreens Boots Alliance, Inc.; Walgreen Co.; and Walgreen Eastern Co., Inc. are collectively referred to as "Walgreens."

**3. Walmart**

63. Defendant Walmart Inc., formerly known as Wal-Mart Stores, Inc., is a Delaware corporation with its principal place of business in Bentonville, Arkansas.

64. Defendant Wal-Mart Stores East, LP is a Delaware limited partnership with its principal place of business in Arkansas.

65. Defendant WSE Management, LLC is a Delaware limited liability company and owns 1% of Wal-Mart Stores East, LP.

66. Defendant WSE Investment, LLC is a Delaware limited liability company, and owns 99% of Wal-Mart Stores East, LP.

67. The sole owner of both WSE Management, LLC and WSE Investment, LLC is Defendant Wal-Mart Stores East, Inc. an Arkansas corporation with its principal place of business

in Arkansas.

68. The sole shareholder of Wal-Mart Stores East, Inc. is Walmart Inc.

69. Defendants Walmart Inc., f/k/a Wal-Mart Stores, Inc.; Wal-Mart Stores East, LP; WSE Management, LLC; WSE Investment, LLC; and Wal-Mart Stores East, Inc. are collectively referred to as "Walmart."

70. Through its various DEA registrant subsidiaries and affiliated entities, Walmart conducts business as a licensed wholesale distributor and pharmacy operator. At all times relevant to this Complaint, Walmart distributed and dispensed prescription opioids throughout the United States, including West Virginia.

#### 4. Kroger

71. Defendant The Kroger Co. ("Kroger") is an Ohio corporation with headquarters in Cincinnati, Ohio. Kroger operates 2,268 pharmacies in the United States, including pharmacies in its more than 30 stores in West Virginia. At all times relevant to this Complaint, Kroger distributed and dispensed prescription opioids throughout the United States, including in West Virginia.

72. Collectively, Defendants CVS, Walgreens, Walmart, and Kroger are referred to as the "National Retail Pharmacy Defendants," or the "Pharmacy Defendants."

## III. JURISDICTION AND VENUE

73. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because: (a) Plaintiffs are all citizens of the State of West Virginia; (b) Defendants are all corporate entities that are not citizens of West Virginia; (c) there is therefore complete diversity between the parties, and (d) the amount in controversy exceeds $75,000 exclusive of interest and costs.

74. The U.S. District Court for the Northern District of West Virginia has personal jurisdiction over Defendants because they conduct business in West Virginia, purposefully direct

or directed their actions toward West Virginia, and have the requisite minimum contacts with West Virginia necessary to constitutionally permit this Court to exercise jurisdiction.

75. Venue in the Northern District of West Virginia is proper under 28 U.S.C. § 1391(b)-(d), as defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction when the action is commenced, and here, the Defendants' contacts with this District are sufficient to subject them to personal jurisdiction. *Id.* § 1391(b)(1), (c)(2), (d). Defendants specifically conduct business in this judicial district, conducted the business activities described herein in this judicial district, various actions and/or inactions sued upon occurred in this judicial district, and Plaintiffs incurred damages in this judicial district. For the same reasons, a "substantial part of the events [and] omissions giving rise" to this action occurred in this judicial district. *Id.* § 1391(b)(2).

## IV. FURTHER FACTUAL ALLEGATIONS

### A. Prescription Opioids

76. The term opioid refers to (a) all drugs derived in whole or in part from the morphine-containing opium poppy plant such as morphine, laudanum, codeine, thebaine, hydrocodone, oxycodone, and oxymorphone, and (b) synthetic opioids like fentanyl or methadone.

77. Opioids are derived from or possess properties similar to opium and heroin and are highly addictive, dangerous, and therefore are regulated by the federal government as controlled substances.

78. Although heroin and opium became classified as illicit drugs, there is little difference between them and prescription opioids. Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

79. Since passage of the Controlled Substances Act ("CSA") in 1970, 21 U.S.C. § 801, *et seq.*, controlled substances have been categorized in five schedules by the DEA, ranked in order of their potential for abuse, with Schedule I being the highest.[9] Opioids are generally categorized as Schedule II or Schedule III drugs. Schedule II drugs have "a high potential for abuse," and "may lead to severe psychological or physical dependence."[10] Schedule II drugs may not be dispensed without an original copy of a manually signed prescription, which may not be refilled, from a doctor and filled by a pharmacist who both must be licensed by their state and registered with the DEA.[11] The labels for scheduled opioid drugs carry black box warnings of potential addiction, abuse, and misuse, including "[s]erious, life-threatening, or fatal respiratory depression."[12]

80. When under the continuous influence of opioids over time, patients grow tolerant to their analgesic effects. As tolerance increases, a patient typically requires progressively higher doses to obtain the same levels of pain reduction to which he has become accustomed –including doses that are "frighteningly high."[13] At higher doses, the effects of withdrawal are more substantial, thus leaving a patient at a much higher risk of addiction. A patient can take the opioids at continuously escalating dosages to match pain tolerance, and still overdose at recommended levels. Studies on opioid use have demonstrated a correlation between high opioid dosage and poor physical function, as well as worsened overall general health.[14] Opioid use also delays injury

---

[9] Schedule I drugs are defined by the CSA as drugs with no currently accepted medical use and a high potential for abuse.

[10] 21 U.S.C. § 812(b)(2).

[11] *Id.* § 829.

[12] *See, e.g.*, March 22, 2016, Required Safety Labeling Language for Immediate Release Opioids, FDA, https://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/UCM491594.pdf.

[13] M. Katz, *Long-Term Opioid Treatment of Nonmalignant Pain: A Believer Loses His Faith*, 170 ARCHIVES OF INTERNAL MED. 1422 (2010).

[14] Kathryn Sullivan Dillie, et al., *Quality of Life Associated with Daily Opioid Therapy in a Primary Care Chronic Pain Sample*, 21 J. of the Am. Bd. Of Fam. Med. 108 (2008).

recovery and increases the risk of permanent disability. In a study of Workers Compensation claims for lower back pain, increasing a patient's opioid dosage was found to correlate with an increased risk of disability compared to non-opioid users.[15] Another study showed that prescribing opioids within six weeks of an injury doubled the risks of disability one year later.[16] Likewise, studies on opioid use prior to back surgery show poorer outcomes for patients—including increased pain, decreased function, and increased depression.[17]

81. Stopping opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms. These withdrawal symptoms include severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, all of which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

82. During much of the latter half of the 20th century, doctors used opioid pain relievers sparingly, and only in the short term, for cases of acute injury or illness, during and immediately after surgery, or for palliative cancer and end-of-life care.

83. Beginning in the late 20th century, however, and continuing through today, the Manufacturer Defendants and various non-joined manufacturers acted to dramatically expand the marketplace for opioids by promoting the idea that pain should be treated by taking long-acting opioids continuously and supplementing them by also taking short-acting, rapid-onset opioids for episodic or "breakthrough" pain. The market for short-term pain relief is significantly more

---

[15] Donald Teater, *The Psychological and Physical Side Effects of Pain Medications*, Nat. Safety Council (2016) (citing Barbara S. Webster, et al., *Relationship Between Early Opioid Prescribing for Acute Occupation Low Back Pain and Disability Duration, Medical Costs, Subsequent Surgery, and Late Opioid Use*, 32 Spine 2127 (Sept. 2007)).

[16] *Id.* (citing Gary M. Franklin, et al., *Early Opioid Prescription and Subsequent Disability Among Workers with Back Injuries: The Disability Risk Identification Study Cohort*, 33 Spine 199 (2008)).

[17] *Id.* (citing Sheyan J. Armaghani, et al., *Preoperative Opioid Use as a Predictor of Adverse Postoperative Self-Reported Outcomes in Patients Undergoing Spine Surgery*, 96 J. Bone & Joint Surgery (American) e89 (2014)).

limited than the market for long-term chronic pain relief.

84. The effects of opioids vary by duration. Long-acting opioids, such as non-joined manufacturer Purdue's OxyContin and MS Contin, Janssen's Nucynta ER and Duragesic, non-joined manufacturer Endo's Opana ER, and Actavis's Kadian, are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, 12 hours. Short-acting opioids, such as Cephalon's Actiq and Fentora, are designed to be taken in addition to long-acting opioids to address "episodic pain" (also referred to as "breakthrough pain") and provide fast-acting, supplemental opioid therapy lasting approximately 4 to 6 hours. Still other short-term opioids, such as non-joined manufacturer Insys's Subsys, are designed to be taken in addition to long-acting opioids to specifically address breakthrough cancer pain, excruciating pain suffered by some patients with end-stage cancer.

85. The Manufacturer Defendants and the non-joined manufacturers recognized that if they could sell opioids, not just for short-term pain relief but also for long-term chronic pain relief, they could achieve blockbuster levels of sales and dramatically increase their profits. They also recognized that patients develop tolerance to the analgesic effects of opioids relatively quickly. As tolerance increases, a patient typically requires progressively higher doses to obtain the same perceived level of pain reduction. The same is true of the euphoric effects of opioids – the "high." However, opioids depress respiration, and at very high doses can and often do arrest respiration altogether. At higher doses, the effects of withdrawal are more severe. Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

86. Public health officials have called the current opioid epidemic the worst drug crisis in American history.[18] On October 26, 2017, the President of the United States declared it a public

[18] Julie Bosman, *Inside a Killer Drug Epidemic: A Look at America's Opioid Crisis*, N.Y. Times (Jan. 6, 2017), https://www.nytimes.com/2017/01/06/us/opioid-crisis-epidemic.html.

health emergency. That year, opioid overdoses were responsible for more than 47,000 American deaths, and around 1.7 million people suffered from addiction related to prescription opioids.[19] According to recent estimates, as many as 130 people in the United States die every day from opioid overdoses, with as many as 35% of fatal overdoses involving prescription opioids.[20]

87. The following charts illustrate the rise of opioid-related overdose deaths in the United States:[21]




---

[19] *Opioid Overdose Crisis*, NIH: National Institute on Drug Abuse (Jan. 2019), https://www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis#one.

[20] *Id.*; *Overdose Deaths Involving Prescription Opioids*, Centers for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/data/prescribing/overdose-death-maps.html (last visited May 5, 2022).

[21] *Overdose Death Rates*, National Institute of Drug Abuse, https://www.drugabuse.gov/related-topics/ trends-statistics/overdose-death-rates (hereinafter, "*Overdose Death Rates*") (last visited May 5, 2022); *Opioids Now Kill More People than Breast Cancer*, CNN (Dec. 21, 2017), https://wtvr.com/2017/12/21/opioids-now-kill-more-people-than-breast-cancer/.




88. The opioid crisis and related expenses continue to grow. According to a report issued on February 13, 2018, by Altarum, a nonprofit health systems research and consulting organization, the cost of the country's opioid crisis is estimated to have exceeded $1 trillion from 2001 to 2017, and was projected to have cost an additional $500 billion by 2020:[22]

[22] *Economic Toll of Opioid Crisis In U.S. Exceeded $1 Trillion Since 2001*, Altarum (Feb. 13, 2018), https://altarum.org/news/economic-toll-opioid-crisis-us-exceeded-1-trillion-2001.




89. According to a Centers for Disease Control and Prevention ("CDC") report issued in March 2018, hospital emergency room visits for opioid overdoses rose 30% nationwide between July 2016 and September 2017. Over the same period, emergency room visits for opioid overdoses in large cities increased by 54%:




90. The Manufacturer Defendants' deceptive marketing and sale of opioids to treat chronic pain is a key driver of the opioid epidemic. Prescription opioids are powerful pain medications that historically have been used for short-term post-surgical or trauma-related pain, and for palliative end-of-life care primarily in cancer patients. Because opioids are highly addictive and dangerous, the U.S. Food and Drug Administration ("FDA") regulates them as Schedule II Controlled Substances, a classification reserved for drugs that have a high potential for abuse and that may lead to severe psychological or physical dependence.

91. This demonstrated need for caution reflects the historical understanding of both the medical community and American culture at large about the serious consequences of opioid use and misuse. Opioids' powerful ability to relieve pain comes at a steep price: opioids are

dangerously addictive and often lethal substances. For generations, physicians were taught that opioid painkillers were highly addictive and should be used sparingly and primarily for patients near death.[23] The medical community also understood that opioids were poorly suited for long-term use because tolerance would require escalating doses, and dependence would make it extremely difficult to stop their use.

92. Yet the prevailing — and accurate — understanding of the enormous risks and limited benefits of long-term opioid use constrained drug manufacturers' ability to drive sales. In order to suppress reasonable concerns about opioids and to maximize their profits, opioid Manufacturer Defendants Teva, Janssen, Johnson & Johnson, Actavis, Mylan, Sandoz, KVK-Tech, Amneal, Indivior, Hikma, VistaPharm, Alvogen, Apotex, and Sun Pharmaceutical (individually defined in § II(B) and hereinafter collectively referred to as the "Manufacturer Defendants") — as well as non-joined manufacturers Endo, Insys, Depomed, Mallinckrodt, Purdue and its owners, the Sacklers,[24] together with McKesson, Cardinal Health, and AmerisourceBergen, referred to herein as the non-joined distributors,[25] engaged in a concerted, coordinated strategy to recast how doctors and patients think about pain and, specifically, to encourage the use of opioids to treat not just the relative few who suffer from such things as acute post-surgical pain and end-stage cancer pain, but the masses who suffer from common chronic pain conditions.

93. Borrowing from the tobacco industry's playbook, the Manufacturer Defendants and the non-joined manufacturers employed ingenious marketing strategies, as detailed below, designed to "reeducate" the public and prescribers. They deliberately conceived these strategies

[23] Harriet Ryan et al., *OxyContin goes global – "We're only just getting started*," L.A. Times (Dec. 18, 2016), http://www.latimes.com/projects/la-me-oxycontin-part3/ (hereinafter, "Ryan, *OxyContin goes global*").
[24] Purdue, Mallinckrodt, Endo, and Insys are not joined as defendants due to bankruptcy filings. Under the Purdue bankruptcy stay, the Sacklers are also currently prevented from being joined as defendants.
[25] McKesson, Cardinal Health, and AmerisourceBergen entities are not joined as defendants in the current lawsuit due to previous global opioid settlements.

to create, and in fact did create, an entirely new "health care" narrative — one in which opioids would be considered safe and effective for long-term use, and pain would be aggressively treated at all costs. According to this newly fabricated narrative, pain had been seriously under-treated throughout the United States because opioids had been under-prescribed, and doctors came under enormous pressure to treat all kinds of pain with opioids.

94. The Manufacturer Defendants' and non-joined manufacturers' shared intention was to normalize aggressively prescribing opioids for many kinds of pain that had been treated without opioids by downplaying the very real and serious risks of opioids — especially the risk of addiction — and by misstating and exaggerating the benefits of their use. To accomplish this goal, they intentionally misled doctors and patients, including those in West Virginia, about the appropriate uses, risks, safety, and efficacy of prescription opioids. They did so directly through sales representatives and marketing materials, and indirectly through financial relationships with academic physicians, professional societies, hospitals, trade associations for state medical boards, and seemingly neutral third-party foundations.

95. The Manufacturer Defendants disseminated false messages about the safety, addictiveness, and efficacy of opioids by infiltrating professional medical societies and crafting and influencing industry guidelines with deceptive pro-opioid information under the guise of science and truth. According to a February 2018 report issued by U.S. Senator Claire McCaskill, opioid manufacturers, including several of the Manufacturer Defendants, paid nearly $9 million to advocacy groups and professional societies operating in the area of opioid policy between 2012 and 2017.[26] The opioid manufacturers got their money's worth:

---

[26] *Fueling an Epidemic, Report Two: Exposing the Financial Ties Between Opioid Manufacturers and Third-Party Advocacy Groups*, U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Member's Office at 1 (Feb. 13, 2018), https://www.hsgac.senate.gov/imo/media/doc/REPORT-

> Initiatives ***from the groups in this report often echoed and amplified messages favorable to increased opioid use*** – and ultimately, the financial interests of opioid manufacturers. ***These groups have issued guidelines and policies minimizing the risk of opioid addiction and promoting opioids*** for chronic pain, lobbied to change laws directed at curbing opioid use, and argued against accountability for physicians and industry executives responsible for overprescription and misbranding.[27]

96. When, in 2016, the CDC recommended limits on prescribing opioids for chronic pain, the purportedly neutral medical societies also strongly criticized those guidelines. Based on that and other similar conduct, the *February 2018 McCaskill Report* concluded there was "a direct link between corporate donations and the advancement of opioids-friendly messaging."

97. The Manufacturer Defendants and non-joined manufacturers falsely assured the public and prescribers that the risk of becoming addicted to prescription opioids among patients being treated for pain was less than 1%. In reality, many people with no addiction history can become addicted after just weeks or even days of use.[28] As many as 56% of patients receiving long-term prescription opioid painkillers become addicted.[29] Indeed, almost one in five people who receive an opioid prescription with a ten days' supply will still be taking opioids one year later.[30]

98. In a study published on March 6, 2018, in the *Journal of the American Medical Association* ("*JAMA*"),[31] researchers conducting the first randomized clinical trial designed to

---

Fueling%20an%20EpidemicExposing%20the%20Financial%20Ties%20Between%20Opioid%20Manufacturers%20and%20Third%20Party%20Advocacy%20Groups.pdf (hereinafter, "*February 2018 McCaskill Report*").

[27] Emphasis is added throughout unless otherwise noted.

[28] Anna Lembke, *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked, and Why It's So Hard to Stop*, 22 (Johns Hopkins University Press 2016) (hereinafter, "Lembke (2016)").

[29] Bridget A. Martell et al., *Systematic Review: Opioid Treatment for Chronic Back Pain: Prevalence, Efficacy, and Association with Addiction*, 146(2) Ann. Intern. Med. 116-27 (2007), http://annals.org/aim/article/732048/systematic-review-opioid-treatment-chronic-back-painprevalence-efficacy-association (hereinafter, "Martell, *Systematic Review*").

[30] Sarah Frostenson, *The risk of a single 5-day opioid prescription, in one chart*, Vox (Mar. 18, 2017), www.vox.com/2017/3/18/14954626/one-simple-way-to-curb-opioidoveruse-prescribe-them-for-3-days-or-less.

[31] Erin E. Krebs et al., *Effect of Opioid vs. Nonopioid Medications on Pain-Related Function in Patients with Chronic Back Pain or Hip or Knee Osteoarthritis Pain, The SPACE*

compare the efficacy of opioids and non-opioids (including acetaminophen, ibuprofen, and lidocaine) for the treatment of moderate to severe back pain, hip pain, and knee osteoarthritis pain concluded that patients who took opioids over the long term experienced no better improvement in pain-related function than patients who used safer alternatives.

99. The Manufacturer Defendants' and non-joined manufacturers' focus on driving opioid sales growth led to concomitant growth both in the deaths resulting from opioid use and in hospital admissions for opioid-related addiction treatment:[32]

**Figure 2. 12 Month-ending Provisional Number of Drug Overdose Deaths by Drug or Drug Class: United States**




Put simply, they manipulated and misrepresented medical science to increase sales and profits — at great human cost.

---

*Randomized Clinical Trial*, 319(9) JAMA 872-82 (2018) (hereinafter, "Krebs, *Effect of Opioid vs. Nonopioid Medications*").

[32] Andrew Kolodny et al., *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction*, 36 Annu. Rev. Public Health 559-74 (2015), http://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-031914-122957.

**B. The Manufacturer Defendants, Non-Joined Manufacturers, and the Non-Joined Distributors' Misleading Marketing and Failure to Report and Halt Suspicious Orders of Opioids Fueled the Opioid Crisis Nationally and in West Virginia.**

100. The Manufacturer Defendants were aware of the quantities and frequency with which prescription opioids were being distributed nationwide and in West Virginia. Yet, the Manufacturer Defendants persisted in failing to report suspicious sales as required by state and federal law. Their failures to follow the law significantly contributed to rising addiction and overdose rates nationwide.

101. Released data on the sale of prescription pain pills shows the full extent of Defendants' scheme to saturate the market with opioid medications. The Drug Enforcement Administration ("DEA") tracks the manufacturing and distribution of oxycodone and hydrocodone pills, which represent 75% of all opioid pill shipments distributed to pharmacies.[33] Between 2006 and 2014, that percentage translates to more than 12 billion prescription opioid pills.

102. The impact of opioid addiction has devastated the nation, especially West Virginia. Former FDA Commissioner David A. Kessler has called the failure to recognize the dangers of painkillers "one of the greatest mistakes of modern medicine." As alleged herein, that "mistake" was not a mistake at all. Instead, it resulted in large part from the Manufacturer Defendants' and non-joined manufacturers' false and misleading messaging, which was carefully calculated to reach as many prescribers as possible, and from the Defendants' willingness to turn a blind eye to suspicious orders.

103. Even when some Defendants were forced to admit to their unlawful marketing and excessive sale of opioids and/or their failure to report suspicious orders, the conduct did not abate,

[33] The following statistics are available through the *Washington Post*'s interactive DEA pain pill database. *Drilling into the DEA's pain pill database,* The Washington Post (Updated July 21, 2019), https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/.

because profits realized by the aggressive marketing and prescribing of opioids dwarf the penalties imposed as a result of violations found. The fines were absorbed as part of the overhead for engaging in this lawless and immoral behavior, as the incentive to push opioids remained.

104. Beginning in the late 20th century, however, and continuing through today, the Manufacturer Defendants and non-joined manufacturers acted to dramatically expand the marketplace for opioids. The market for short-term pain relief is significantly more limited than the market for long-term chronic pain relief. They recognized that if they could sell opioids, not just for short-term pain relief but also for long-term chronic pain relief, they could achieve blockbuster levels of sales and dramatically increase their profits. They also recognized that if they could cause their customers to become physically addicted to their drugs, they would increase the likelihood that their blockbuster profits would continue indefinitely.

105. Since the mid-90s the Manufacturer Defendants and non-joined manufacturers have aggressively marketed and falsely promoted liberal opioid prescribing as presenting little to no risk of addiction, even when used long-term for chronic pain. They infiltrated academic medicine and regulatory agencies to convince doctors that treating chronic pain with long-term opioids was evidence-based medicine when, in fact, they knew it was not. Huge profits resulted from these efforts, as did the present addiction and overdose crisis that has ravaged the nation and particularly West Virginia.

**1. Background on Opioid Overprescribing**

106. The Manufacturer Defendants' and non-joined manufacturers' scheme to drive their rapid and dramatic expansion of prescription opioids was rooted in two pieces of so-called

"evidence." The first was the publication of a five-sentence, 100-word letter to the editor published in 1980 in the New England Journal of Medicine ("1980 Letter to the Editor").[34]

107. That letter "was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy[,] [and] contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy."[35]

108. The second piece of "evidence" was a single medical study published by Drs. Russell Portenoy ("Portenoy") and Kathleen Foley ("Foley") ("Portenoy Publication").[36] Portenoy emerged as one of the industry's most vocal proponents of long-term opioid use. He essentially made it his life's work to campaign for the movement to increase the use of prescription opioids. He was one of Big Pharma's[37] "thought leaders" and was paid to travel the country to

[34] This very brief Letter to the Editor by Jane Porter ("Porter") and Dr. Herschel Jick ("Jick"), reported that less than 1% of patients at Boston University Medical Center who received narcotics while hospitalized became addicted. Jane Porter & Hershel Jick, *Addiction rate in patients treated with narcotics*, 302(2) New Eng. J. Med. 123 (Jan. 10, 1980). However, the letter did not support the conclusion that opioids were safe for long-term treatment of chronic pain, the conclusion for which it was often cited by the industry. Harrison Jacobs, *This one-paragraph letter was used to launch the opioid epidemic*, Bus. Insider (May 26, 2016), http://www.businessinsider.com/porter-and-jick-letter-launched-the-opioid-epidemic-2016-5. As discussed in a 2009 article in the *American Journal of Public Health*, the 1980 Letter to the Editor "shed[] some light on the risk of addiction for acute pain, [but did] not help establish the risk of iatrogenic addiction when opioids are used daily for a prolonged time in treating chronic pain. [Indeed, t]here are a number of studies . . . that demonstrate that in the treatment of chronic non-cancer-related pain with opioids, there is a high incidence of prescription drug abuse." Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99(2) Am. J. Pub. Health 221-27 (Feb. 2009) (hereinafter, "Van Zee, *Promotion and Marketing*").

[35] German Lopez, *A 5-sentence letter helped trigger America's deadliest drug overdose crisis ever,* Vox (June 1, 2017), https://www.vox.com/science-and-health/2017/6/1/15723034/opioidepidemic-letter-1980-study.

[36] In 1986, the medical journal *Pain*, which would eventually become the official journal of the American Pain Society ("APS"), published an article by Portenoy and Foley summarizing the results of a "study" of chronic non-cancer pain patients who had been treated with opioid painkillers. Portenoy and Foley concluded that, for non-cancer pain, opioids "can be safely and effectively prescribed to selected patients with relatively little risk of producing the maladaptive behaviors which define opioid abuse." However, their study was neither scientific nor did it meet the rigorous standards commonly used to evaluate the validity and strength of such studies in the medical community. For instance, there was no placebo control group, and the results were retroactive (asking patients to describe prior experiences with opioid treatment rather than less biased, in-the-moment reports). The authors themselves advised caution, stating that the drugs should be used as an "alternative therapy" and recognizing that longer-term studies of patients on opioids would have to be performed. None were. *See* Lembke (2016), *supra* n.28.

[37] "Big Pharma" is used herein to refer to large pharmaceutical companies, including, but not limited to, the Manufacturer Defendants and non-joined manufacturers, considered especially as a politically influential group.

promote more liberal opioid prescribing for many types of pain. His talks were sponsored by the Manufacturer Defendants and organizations funded by them and by the non-joined manufacturers, under the guise of continuing medical education ("CME") programs for doctors. Portenoy was a paid propagandist for Big Pharma, with financial relationships with at least a dozen pharmaceutical companies, most of which produced prescription opioids.[38]

109. On November 1, 2017, the President's Commission on Combating Drug Addiction and the Opioid Crisis noted the important and detrimental role played by the 1980 Letter to the Editor and the Portenoy Publication, in a section of the Commission's Report with the header "Contributors to the Current Crisis."[39]

110. Portenoy has now admitted that he intentionally minimized the risks of opioids.[40] In a 2011 interview released by Physicians for Responsible Opioid Prescribing, Portenoy stated that his earlier work purposefully relied on evidence that was not "real" and left real evidence behind:

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite, and I would cite six, seven, maybe ten different avenues of thought or avenues of evidence, ***none of which represented real evidence***, and yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in [total] and feel more comfortable about opioids in a way they hadn't before. ***In essence this was education to destigmatize [opioids], and because the primary goal was to destigmatize, we often left evidence behind***.[41]

---

[38] Lembke (2016), *supra* n.28, at 59 (citing Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* (St. Martin's Press, 1st ed. 2003)).
[39] *The President's Commission on Combating Drug Addiction and the Opioid Crisis* at 20 (Nov. 1, 2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-1-2017.pdf.
[40] Celine Gounder, *Who Is Responsible for the Pain-Pill Epidemic?*, New Yorker (Nov. 8, 2013), http://www.newyorker.com/business/currency/who-is-responsible-for-the-pain-pill-epidemic (hereinafter, "Gounder, *Who Is Responsible*").
[41] Jacobs, *One-paragraph letter*, *supra* n.34; Andrew Kolodny, *Opioids for Chronic Pain: Addiction is NOT Rare*, YouTube (Oct. 30, 2011), https://www.youtube.com/watch?v=DgyuBWN9D4w&feature=youtu.be.

111. The damage, however, was already done. The Manufacturer Defendants and non-joined manufacturers used the 1980 Letter to the Editor and the Portenoy Publication as the foundation for a massive, far-reaching campaign to dramatically recast the thinking of healthcare providers, patients, policymakers, and the public on the risk of addiction presented by opioid therapy. By 1997, the American Pain Society ("APS") and the American Academy of Pain Medicine ("AAPM") (both funded by the Manufacturer Defendants and non-joined manufacturers) issued a "landmark consensus," co-authored by Portenoy, stating that there was little risk of addiction or overdose for pain patients.[42]

112. In the years following publication of the 1980 Letter to the Editor and the Portenoy Publication, the Manufacturer Defendants introduced powerful prescription opioids into the market. Defendant Janssen introduced Duragesic in 1990, and Defendant Cephalon's Actiq was first approved by the FDA in 1998, followed by Defendant Janssen's Nucynta in 2008 and Nucynta ER in 2011, and Defendant Cephalon's Fentora in 2006.

113. These branded prescription opioids and their generic counterparts are highly addictive. Between doses, patients can suffer body aches, nausea, sweats, racing heart, hypertension, insomnia, anxiety, agitation, opioid cravings, opioid-induced hyperalgesia (heightened sensitivity to pain) and other symptoms of withdrawal. When the agony is relieved by the next dose, it creates a cycle of dysphoria and euphoria that fosters addiction and dependence.

114. Despite prescription opioids' highly addictive qualities, the Manufacturer Defendants and non-joined manufacturers launched aggressive pro-opioid marketing efforts that caused a dramatic shift in the public's and prescribers' perception of the safety and efficacy of opioids for chronic long-term pain and everyday use. Contrary to what doctors had understood

---

[42] Jacobs, *One-paragraph letter, supra* n.34.

before about opioid risks and benefits, they were encouraged for the last two decades by the Manufacturer Defendants and non-joined manufacturers to prescribe opioids aggressively, and were assured, based on false evidence provided directly by the Manufacturer Defendants, non-joined manufacturers, numerous medical entities funded by them, and others with financial interests in generating more opioid prescriptions, that: (a) the risk of becoming addicted to prescription opioids among patients being treated for pain was low, even under 1%; and (b) great harm was caused by "undertreated pain." These two foundational falsehoods led directly to the current opioid crisis.

115. The Manufacturer Defendants' misrepresentations fall into the following nine categories: (a) The risk of addiction from chronic opioid therapy is low; (b) To the extent there is a risk of addiction, it can be easily identified and managed; (c) Signs of addictive behavior are "pseudoaddiction," requiring more opioids; (d) Opioid withdrawal can be avoided by tapering; (e) Opioid doses can be increased without limit or greater risks; (f) Long-term opioid use improves functioning; (g) Alternative forms of pain relief pose greater risks than opioids; (h) OxyContin provides twelve hours of pain relief; and (i) New formulations of certain opioids successfully deter abuse.

116. Each of these propositions was false. The Manufacturer Defendants knew this, but they nonetheless set out to convince physicians, patients, and the public at large of the truth of each of these propositions in order to expand the market for their opioids.

117. Each Manufacturer Defendant's conduct, and each misrepresentation, contributed to an overall narrative that aimed to – and did – mislead doctors, patients, and payors about the risks and benefits of opioids. While this Complaint endeavors to document examples of each Manufacturer Defendant's misrepresentations and the manner in which they were disseminated,

they are just that – examples. This Complaint is not an exhaustive catalog of the nature and manner of each deceptive statement by each Manufacturer Defendant.

118. The Manufacturer Defendants' and non-joined manufacturers' strategy was a striking marketing success. It was designed to redefine back pain, neck pain, headaches, arthritis, fibromyalgia, and other common conditions suffered by most of the population at some point in their lives as a single malady – chronic pain – that doctors and patients should take seriously and for which opioids were an appropriate, successful, and low-risk treatment. Indeed, studies now show more than 85% of patients taking OxyContin at common doses are doing so for chronic non-cancer pain.[43]

119. This false and misleading marketing strategy continued despite studies revealing that up to 56% of patients receiving long-term prescription opioid painkillers for chronic back pain progress to addictive opioid use, including patients with no history of addiction.[44]

120. Thus, based on false and incomplete evidence, the Manufacturer Defendants and non-joined manufacturers expanded their market exponentially from patients with end-stage cancer and acute pain, a narrow customer base, to anyone suffering from chronic pain, which by some accounts includes approximately 100 million Americans – nearly one-third of the country's population.[45] The treatment of chronic pain includes patients whose general health is good enough to refill prescriptions month after month, year after year, and the promotion, distribution (without reporting suspicious sales) and rampant sale of opioids for such treatment has made the Defendants

[43] Ryan, *OxyContin goes global*, *supra* n.23.
[44] Lembke (2016), *supra* n.28, at 22 (citing Martell, *Systematic Review*, *supra* n.29); *see also* Krebs, *Effect of Opioid vs. Nonopioid Medications*, *supra* n.31 (describing JAMA study that concluded opioids were not superior to non-steroidal anti-inflammatory drugs ("NSAIDs") like ibuprofen to treat long-term pain).
[45] *AAPM Facts and Figures on Pain*, The American Academy of Pain Medicine, https://painmed.org/about/position-statements/use-of-opioids-for-the-treatment-of-chronic-pain (last visited Sept. 19, 2019).

billions of dollars. It has also led to the prevalence of opioid addiction and the overdose crisis nationwide.

### 2. Fraudulent Sales Practices

121. As set forth below, the Manufacturer Defendants and non-joined manufacturers employed various strategies to normalize the use of opioids for chronic long-term pain without informing the public and prescribers about the very significant risks of addiction, overdose, and death.

## C. Manufacturer Defendants and Non-Joined Manufacturers Funded Front Organizations that Published and Disseminated False and Misleading Marketing Materials.

122. Certain Manufacturer Defendants sponsored purportedly neutral medical boards and foundations that educated doctors and set guidelines for the use of opioids in medical treatment, to promote the liberal prescribing of opioids for chronic pain for the benefit of all the Manufacturer Defendants. These organizations, funded by certain Manufacturer Defendants, advised doctors that liberal prescribing of opioids was both safe and effective. In truth, it was neither.

123. **Federation of State Medical Boards**: The Federation of State Medical Boards ("FSMB") is a national organization that functions as a trade group representing various medical boards in the United States. The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians.

124. The FSMB finances opioid- and pain-specific programs through grants from Manufacturer Defendants.

125. Since 1998, the FSMB has been developing treatment guidelines for the use of opioids for the treatment of pain. The 1998 version, Model Guidelines for the Use of Controlled

Substances for the Treatment of Pain ("1998 Guidelines"), was produced "in collaboration with pharmaceutical companies." The 1998 Guidelines that the pharmaceutical companies helped author taught not that opioids could be appropriate in only limited cases after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option.

126. A 2004 iteration of the 1998 Guidelines and the 2007 book, Responsible Opioid Prescribing, also made the same claims as the 1998 Guidelines. These guidelines were posted online and were available to, and intended to, reach physicians nationwide, including those in West Virginia.

127. The Manufacturer Defendants relied on the 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were documented. FSMB turned doctors' fear of discipline on its head: doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with chronic pain.

128. In 2007, the FSMB printed and distributed a physician's guide on the use of opioids to treat chronic pain titled, "Responsible Opioid Prescribing" by Dr. Scott M. Fishman ("Fishman"), which was backed by Defendant Cephalon, and non-joined manufacturers Purdue and Endo. After the guide (in the form of a book, still available for sale on Amazon) was adopted as a model policy, the FSMB reportedly asked non-joined manufacturer Purdue for $100,000 to help pay for printing and distribution. Ultimately, the guide was disseminated by the FSMB to 700,000 practicing doctors.

129. The guide's clear purpose was to assert that opioid therapy to relieve pain and improve function is a legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins; that pain is under-treated; and that patients should not be denied opioid medications except in light of clear evidence that such medications are harmful to the patient. The guide contains lies such as *"Opioid therapy to relieve pain and improve function is a legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins*."[46]

130. While it acknowledges the risk of "abuse and diversion" (with little attention to addiction), the guide purports to offer "professional guidelines" that will "easily and efficiently" allow physicians to manage that risk and "minimize the potential for [such] abuse."[47]

131. The guide further warns physicians to "[b]e aware of the distinction between pseudoaddiction and addiction" and teaches that behaviors such as "[r]equesting [drugs] by name," "[d]emanding or manipulative behavior," "[o]btaining opioid drugs from more than one physician" and "[h]oarding opioids," which are, in fact, signs of genuine addiction, are all really just signs of "pseudoaddiction."[48] It defined "Physical Dependence" as an acceptable result of opioid therapy not to be equated with addiction, and it states that while "[i]t may be tempting to assume that patients with chronic pain and a history of recreational drug use who are not adherent to a treatment regimen are abusing medications," there could be other acceptable reasons for non-adherence.[49] The guide, sponsored by the Manufacturer Defendants, non-joined manufacturers, and their pain foundations, became the seminal authority on opioid prescribing for the medical profession and

[46] Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide* 8-9 (Waterford Life Sciences 2007).
[47] *Id.* at 9.
[48] *Id*. at 62.
[49] *Id*.

dramatically overstated the safety and efficacy of opioids and understated the risk of opioid addiction.

132. In 2012, Fishman updated the guide and continued emphasizing the catastrophic" "under-treatment" of pain and the "crisis" such under-treatment created:

> Given the magnitude of the problems related to opioid analgesics, it can be tempting to resort to draconian solutions: clinicians may simply stop prescribing opioids, or legislation intended to improve pharmacovigilance may inadvertently curtail patient access to care. As we work to reduce diversion and misuse of prescription opioids, *it's critical to remember that the problem of unrelieved pain remains as urgent as ever*.[50]

133. In another guide by Fishman, he continues to downplay the risk of addiction: "I believe clinicians must be very careful with the label 'addict.' I draw a distinction between a 'chemical coper' and an addict."[51] The guide also continues to present symptoms of addiction as symptoms of "pseudoaddiction."

134. **The American Pain Foundation**: The American Pain Foundation ("APF") described itself as the nation's largest organization for pain patients.[52] While APF held itself out as an independent patient advocacy organization, in reality it received 90% of its funding in 2010 from the drug and medical-device industry, including from Manufacturer Defendants Janssen and Cephalon and from non-joined manufacturer Purdue. APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. By 2011, APF was entirely dependent on incoming grants from Manufacturer Defendant Cephalon and non-joined manufacturers Endo and Purdue, and others to avoid using its line of credit. Non-joined

[50] Scott M. Fishman, *Responsible Opioid Prescribing: A Clinician's Guide* 10-11 (Waterford Life Sciences 2012).
[51] Scott M. Fishman, Listening to Pain: A Physician's Guide to Improving Pain Management Through Better Communication 45 (Oxford Univ. Press 2012).
[52] The APF was the focus of an investigation by ProPublica that detailed its close ties to drugmakers and was reported on by the *Washington Post*. *See infra* n.67.

manufacturer Endo was APF's largest donor and provided more than half of its $10 million in funding from 2007 to 2012.

135. The APF's guides for patients, journalists, and policymakers trivialized the risk of addiction and greatly exaggerated the benefits associated with opioid painkillers.[53]

136. For example, in 2001, the APF published "Treatment Options: A Guide for People Living with Pain."[54] The guide, which was produced with support from companies including Defendant Teva and non-joined manufacturer Purdue, misrepresented the risks associated with opioid use. Among other things, the guide:

- lamented that opioids were sometimes called narcotics because "[c]alling opioid analgesics 'narcotics' reinforces myths and misunderstandings as it places emphasis on their potential abuse rather than on the importance of their use as pain medicines";[55]
- stated that "[o]pioids are an essential option for treating moderate to severe pain associated with surgery or trauma";[56] and
- opined that "[r]estricting access to the most effective medications for treating pain [opioids] is not the solution to drug abuse or addiction."[57]

137. The guide included blurbs from Portenoy, who is quoted as saying, "[t]his is a very good resource for the pain patient," and Fishman, who is quoted as saying, "[w]hat a great job! Finally, a pill consumer resource created for patients with pain. A 'must have' for every physician's waiting room."[58]

[53] Charles Ornstein & Tracy Weber, *American Pain Foundation Shuts Down as Senators Launch Investigation of Prescription Narcotics*, ProPublica (May 8, 2012, 8:57 PM), https://www.propublica.org/article/senate-panel-investigates-drug-company-ties-to-pain-groups/ (hereinafter, "Ornstein, *American Pain Foundation*").
[54] *Treatment Options: A Guide for People Living with Pain*, American Pain Foundation, https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf (last visited May 5, 2022).
[55] *Id*. at 11.
[56] *Id*.
[57] *Id*. at 15.
[58] *Id.* at 76.

138. In 2009, the APF played a central role in a first-of-its-kind, web-based series called "Let's Talk Pain," hosted by veteran television journalist Carol Martin. The series brought together healthcare providers and "people with pain to discuss a host of issues from managing health care for pain to exploring integrative treatment approaches to addressing the psychological aspects associated with pain." In the very first episode of this talk show, Dr. Al Anderson of the AAPM Board of Directors stated that "the general belief system in the public is that the opioids are a bad thing to be giving a patient. Unfortunately, it's also prevalent in the medical profession, so patients have difficulty finding a doctor when they are suffering from pain for a long period of time, especially moderate to severe pain. And that's the patients that we really need to use the opioids methods of treatment, because they are the ones who need to have some help with the function and they're the ones that need to have their pain controlled enough so that they can increase their quality of life."[59]

139. In reality, there is little scientific evidence to support the contention that opioids taken long-term improve function or quality of life for chronic pain patients.[60] To the contrary, the evidence shows that opioids impose significant risks and adverse outcomes on long-term users and that they may actually reduce function.[61] As a recent article in the *New England Journal of*

---

[59] *Episode 1: Safe Use of Opioids (PainSAFE)*, Let's Talk Pain (Sept. 28, 2010), https://www.youtube.com/watch?v=zeAlVAMRgsk.

[60] Lembke (2016), *supra* n.28 at 59.

[61] Discussing the CDC's "March 2016 Guidelines for Prescribing Opioids for Chronic Pain," doctors wrote:

> Most placebo-controlled, randomized trials of opioids have lasted 6 weeks or less, and we are aware of no study that has compared opioid therapy with other treatments in terms of long-term (more than 1 year) outcomes related to pain, function, or qualify of life. The few randomized trials to evaluate opioid efficacy for longer than 6 weeks had consistently poor results. In fact, several studies have showed that use of opioids for chronic pain may actually worsen pain and functioning, possibly by potentiating pain perception.

Thomas R. Frieden & Debra Houry, *Reducing the Risks of Relief – The CDC Opioid-Prescribing Guidelines*, 374 New Eng. J. Med. 1501-04 (Apr. 21, 2016), https://www.nejm.org/doi/full/10.1056/NEJMp1515917.

*Medicine* concluded: "Although opioid analgesics rapidly relieve many types of acute pain and improve function, the benefits of opioids when prescribed for chronic pain are much more questionable." The article continues, "opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions."[62] More recently still, a study published in *JAMA* concluded that "[t]reatment with opioids was not superior to treatment with nonopioid medications for improving pain-related function over 12 months."[63]

140. The APF also developed the National Initiative on Pain Control ("NIPC"), which ran a facially unaffiliated website, www.painknowledge.org. NIPC promoted itself as an education initiative and promoted its expert leadership team, including purported experts in the pain management field. The website www.painknowledge.org promised that, on opioids "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life as a benefit of opioid therapy. In a brochure available on the website titled "Pain: Opioid Facts," the NIPC misleadingly stated that "people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted" and even refused to rule out the use of opioid pain relievers for patients who have a history of addiction to opioids.[64]

---

[62] Nora D. Volkow & A. Thomas McLellan, Opioid Abuse in Chronic Pain – Misconceptions and Mitigation Strategies, 374 New Eng. J. Med. 1253-63 (Mar. 31, 2016).
[63] Krebs, *Effect of Opioid vs. Nonopioid Medications*, *supra* n.31.
[64] *Pain: Opioid Facts*, Pain Knowledge (2007) https://web.archive.org/web/20101007102042/http://painknowledge.org/patiented/pdf/Patient%20Education%20b380_b385%20%20pf%20opiod.pdf (last visited Oct. 1, 2019).

141. In or around 2011, the APF published the "Policymaker's Guide," sponsored by non-joined manufacturer Purdue, which dispelled the notion that "strong pain medication leads to addiction" by characterizing it as a "*common misconception*[]":

> *Many people living with pain, and even some health care practitioners, falsely believe that opioid pain medicines are universally addictive*. As with any medication, there are risks, but these risks can be managed when these medicines are properly prescribed and taken as directed. For more information about safety issues related to opioids and other pain therapies, visit http://www.painsafe.org.[65]

142. The guide further falsely asserts that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic-pain patients.[66]

143. In December 2011, the *Washington Post* reported on ProPublica's investigation of the APF, which detailed the APF's close ties to drugmakers:

> *The foundation collected nearly 90 percent of its $5 million in funding last year from the drug and medical-device industry – and closely mirrors its positions*, an examination by ProPublica found.[67]

144. In May 2012, the U.S. Senate Finance Committee began looking into APF to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF then "cease[d] to

---

[65] *A Policymaker's Guide to Understanding Pain & Its Management*, American Pain Foundation, at 5 (Oct. 2011), https://assets.documentcloud.org/documents/277603/apf-policymakers-guide.pdf.

[66] The "Policymaker's Guide" cites for support "Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects," a review published in 2006 in the *Canadian Medical Association Journal*. *Id*. at 34. However, the review concludes: "For functional outcomes, *the other analgesics were significantly more effective than were opioids*." Andrea D. Furlan et al., *Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects*, 174(11) Canadian Med. Assoc. J. 1589-94 (May 23, 2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1459894/. The Purdue-sponsored guide failed to disclose both this conclusion and the fact that the review analyzed studies that lasted, on average, five weeks and therefore could not support the long-term use of opioids.

[67] Charles Ornstein & Tracy Weber, *Patient advocacy group funded by success of painkiller drugs, probe finds*, Wash. Post (Dec. 23, 2011), https://www.washingtonpost.com/national/health-science/patient-advocacy-group-funded-by-successof-painkiller-drugs-probe-finds/2011/12/20/gIQAgvczDP_story.html?utm_term=22049984c606.

exist, effective immediately." Without support from the Manufacturer Defendants, to whom APF could no longer be helpful, APF was no longer financially viable.

145. **American Academy of Pain Medicine ("AAPM") and American Pain Society ("APS")**: The Manufacturer Defendants and non-joined manufacturers contributed substantial sums of money to the AAPM and APS from 2009 to 2013.

146. In 1997, the AAPM issued a "consensus" statement that endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low. At the time, the chairman of the committee that issued the statement, Dr. J. David Haddox, was a paid speaker for non-joined manufacturer Purdue. Haddox was later hired as Purdue's vice president for health policy. The consensus statement, which also formed the foundation of the AAPM's 1998 guidelines, was published on the AAPM's website.

147. AAPM's corporate council included Manufacturer Defendants and non-joined manufacturers. AAPM's past presidents include Haddox (1998), Fishman (2005), Dr. Perry G. Fine ("Fine") (2011) and Lynn R. Webster ("Webster") (2013), all of whose connections to the opioid manufacturers are well documented.

148. Fishman, who also served as a key opinion leader ("KOL") for the Manufacturer Defendants, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[68]

149. AAPM received over $2.2 million in funding since 2009 from the Manufacturer Defendants. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The AAPM and APS issued their own guidelines in 2009 ("2009 Guidelines") that continued to recommend the use of opioids to treat chronic pain.

[68] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Med., Chief of the Div. of Pain Med., Univ. of Cal., Davis (2005), http://www.medscape.org/viewarticle/500829.

Fourteen of the twenty-one panel members who drafted the 2009 Guidelines, including KOL Dr. Fine, received funding from Manufacturer Defendants Janssen and Cephalon, and non-joined manufacturers Endo and Purdue.

150. The 2009 Guidelines falsely promoted opioids as safe and effective for treating chronic pain and concluded that the risk of addiction was manageable for patients regardless of past abuse histories.[69] The 2009 Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians but also the body of scientific evidence on opioids; they were reprinted in the journal *Pain*, have been cited hundreds of times in the academic literature, and remain available online. The Manufacturer Defendants and non-joined manufacturers widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions.

151. **The Alliance for Patient Access**: Founded in 2006, the Alliance for Patient Access ("APA") is a self-described patient advocacy and health professional organization, which styles itself as "a national network of physicians dedicated to ensuring patient access to approved therapies and appropriate clinical care."[70] It is run by Woodberry Associates LLC, a lobbying firm also established in 2006.[71] As of June 2017, the APA listed 30 "Associate Members and Financial Supporters." The list included Manufacturer Defendants Johnson & Johnson and Cephalon.

---

[69] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10(2) J. Pain 113-30 (Feb. 2009), http://www.jpain.org/article/S1526-5900(08)00831-6/pdf (hereinafter, "Chou, *Clinical Guidelines*").

[70] *About AfPA*, The Alliance for Patient Access, http://allianceforpatientaccess.org (last visited Dec. 14, 2018). References herein to APA include two affiliated groups: The Global Alliance for Patient Access and the Institute for Patient Access.

[71] Mary Chris Jaklevic, *Non-profit Alliance for Patient Access uses journalists and politicians to push Big Pharma's agenda*, Health News Review (Oct. 2, 2017), https://www.healthnewsreview.org/2017/10/non-profit-alliance-patient-access-uses-journalists-politicians-push-big-pharmas-agenda/ (hereinafter, "Jaklevic, *Non-profit Alliance for Patient Access*").

152. APA's board members have also directly received substantial funding from pharmaceutical companies.[72]

153. Among its activities, the APA issued a white paper titled "Prescription Pain Medication: Preserving Patient Access While Curbing Abuse."[73] Among other things, the white paper criticizes prescription monitoring programs, purporting to express concern that they are burdensome, not user-friendly, unfair to physicians, and of questionable efficacy.[74]

> Prescription monitoring programs that are difficult to use and cumbersome can place substantial burdens on physicians and their staff, ultimately leading many to stop prescribing pain medications altogether. This forces patients to seek pain relief medications elsewhere, which may be much less convenient and familiar and may even be dangerous or illegal. * * * In some states, physicians who fail to consult prescription monitoring databases before prescribing pain medications for their patients are subject to fines; those who repeatedly fail to consult the databases face loss of their professional licensure. Such penalties seem excessive and may inadvertently target older physicians in rural areas who may not be facile with computers and may not have the requisite office staff. Moreover, threatening and fining physicians in an attempt to induce compliance with prescription monitoring programs represents a system based on punishment as opposed to incentives. We cannot merely assume that these programs will reduce prescription pain medication use and abuse.[75]

154. The white paper also purports to express concern about policies that have been enacted in response to the prevalence of pill mills:

> Although well intentioned, many of the policies designed to address this problem have made it difficult for legitimate pain management centers to operate. For instance, in some states, [pain management centers] must be owned by physicians or professional corporations, must have a Board certified medical director, may need to pay for annual inspections, and are subject to increased record keeping and

---

[72] All information concerning pharmaceutical company payments to doctors in this paragraph is from ProPublica's Dollars for Docs database, available at https://projects.propublica.org/docdollars/.

[73] *Prescription Pain Medication: Preserving Patient Access While Curbing Abuse*, Institute for Patient Access (Oct. 2013), https://1yh21u3cjptv3xjder1dco9mx5s-wpengine.netdna-ssl.com/wp-content/uploads/2013/12/PT_White-Paper_Finala.pdf.

[74] *Id*. at 4-5 (footnote omitted).

[75] Pain Therapy Access Physicians Working Group, Prescription Pain Medication: Preserving Patient Access While Curbing Abuse (Oct. 2013), at 4-5, http://1yh21u3cjptv3xjder1dco9mx5s.wpengine.netdna-cdn.com/wp-content/uploads/2013/12/PT_White-Paper_Finala.pdf.

> reporting requirements. . . .[I]t is not even certain that the regulations are helping prevent abuses.[76]

155. In addition, in an echo of earlier industry efforts to push back against what they termed "opiophobia," the white paper laments the stigma associated with prescribing and taking pain medication:

> Both pain patients and physicians can face negative perceptions and outright stigma. When patients with chronic pain can't get their prescriptions for pain medication filled at a pharmacy, they may feel like they are doing something wrong – or even criminal. . . . Physicians can face similar stigma from peers. Physicians in non-pain specialty areas often look down on those who specialize in pain management – a situation fueled by the numerous regulations and fines that surround prescription pain medications.[77]

156. In conclusion, the white paper states that "[p]rescription pain medications, and specifically the opioids, can provide substantial relief for people who are recovering from surgery, afflicted by chronic painful diseases, or experiencing pain associated with other conditions that does not adequately respond to over-the-counter drugs."[78]

157. The APA also lobbies Congress directly. In 2015, the APA signed on to a letter supporting legislation proposed to limit the ability of the DEA to police pill mills by enforcing the "suspicious orders" provision of the Controlled Substances Act. The AAPM is also a signatory to this letter. An internal DOJ memo stated that the proposed bill "'could actually result in increased diversion, abuse, and public health and safety consequences'"[79] and, according to DEA chief administrative law judge John J. Mulrooney ("Mulrooney"), the law would make it "all but logically impossible" to prosecute manufacturers and distributors, like the Defendants here, in the federal courts.[80] The bill passed both houses of Congress and was signed into law in 2016.

---

[76] *Id*. at 5-6.
[77] *Id*. at 6.
[78] *Id*. at 7.
[79] Bill Whitaker, Ex-DEA Agent: Opioid Crisis Fueled by Drug Industry and Congress, CBS News (Oct. 17, 2017), https://www.cbsnews.com/news/ex-dea-agent-opioid-crisis-fueled-by-drugindustry-and-congress/.
[80] John J. Mulrooney, II & Katherine E. Legel, Current Navigation Points in Drug Diversion Law: Hidden Rocks in

### 1. Exposing the Financial Ties Between Opioid Manufacturers and Third-Party Groups

158. A February 12, 2018, report, titled "Fueling an Epidemic Report Two: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups," issued by the U.S. Senate Homeland Security & Government Affairs Committee, Ranking Member Claire McCaskill's Office, helps clarify the financial connections between opioid manufacturers and purportedly neutral patient advocacy organizations and medical professional societies that, unsurprisingly, have "echoed and amplified messages favorable to increased opioid use – and ultimately the financial interests of opioid manufacturers."[81]

159. According to the report, the five manufacturers whose information was subpoenaed by Senator McCaskill alone contributed almost $9 million combined to patient advocacy organizations and professional societies operating in the opioids policy area:

Shallow, Murky, Drug-Infested Waters, 101 Marquette L. Rev. 333, 346 (2017).

[81] *February 2018 McCaskill Report*, *supra* n.26.

FIGURE 1: Manufacturer Payments to Selected Groups, 2012-2017

| | Purdue[22] | Janssen[23] | Depomed | Insys | Mylan | Total |
|---|---|---|---|---|---|---|
| Academy of Integrative Pain Management | $1,091,024.86 | $128,000.00 | $43,491.95 | $3,050.00[24] | $0.00 | **$1,265,566.81** |
| American Academy of Pain Medicine | $725,584.95 | $83,975.00 | $332,100.00 | $57,750.00 | $0.00 | **$1,199,409.95** |
| AAPM Foundation | $0.00 | $0.00 | $304,605.00 | $0.00 | $0.00 | **$304,605.00** |
| ACS Cancer Action Network | $168,500.00[25] | $0.00 | $0.00 | $0.00 | $0.00 | **$168,500.00** |
| American Chronic Pain Association | $312,470.00 | $50,000.00 | $54,670.00 | $0.00 | $0.00 | **$417,140.00** |
| American Geriatrics Society | $11,785.00[26] | $0.00 | $0.00 | $0.00 | $0.00 | **$11,785.00** |
| American Pain Foundation | $25,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$25,000.00** |
| American Pain Society | $542,259.52 | $88,500.00 | $288,750.00 | $22,965.00 | $20,250.00 | **$962,724.52** |
| American Society of Pain Educators | $30,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$30,000.00** |
| American Society of Pain Management Nursing | $242,535.00 | $55,177.85[27] | $25,500.00[28] | $0.00 | $0.00 | **$323,212.85** |
| The Center for Practical Bioethics | $145,095.00 | $18,000.00 | $0.00 | $0.00 | $0.00 | **$163,095.00** |
| The National Pain Foundation[29] | $0.00 | $0.00 | $0.00 | $562,500.00 | $0.00 | **$562,500.00** |
| U.S. Pain Foundation | $359,300.00 | $41,500.00 | $22,000.00 | $2,500,000.00[30] | $0.00 | **$2,922,800.00** |
| Washington Legal Foundation | $500,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$500,000.00** |
| | **$4,153,554.33** | **$465,152.85** | **$1,071,116.95** | **$3,146,265.00** | **$20,250.00** | **$8,856,339.13** |

160. Breaking down by year the payments made by these five manufacturers is also revealing:

FIGURE 3: Manufacturer Yearly Payment Totals, 2012-2017

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|---|---|
| Purdue | $824,227.86 | $973,328.00 | $812,451.95 | $935,344.00 | $558,067.52 | $50,135.00 | $4,153,554.33 |
| Janssen | $239,902.85[36] | $99,250.00 | $126,000.00 | | | | $465,152.85 |
| Depomed | $73,080.00 | $135,300.00 | $113,600.00 | $350,000.00 | $318,257.47 | $80,879.48 | $1,071,116.95 |
| Insys | $14,040.00 | $68,000.00 | $34,200.00 | $530,025.00 | | $2,500,000.00 | $3,146,265.00 |
| Mylan | | | | $15,000.00 | $2,500.00 | $2,750.00 | $20,250.00 |
| Total | $1,151,250.71 | $1,275,878.00 | $1,086,251.95 | $1,830,369.00 | $878,824.99 | $2,633,764.48 | $8,856,339.13 |

161. Along with the nearly $9 million in payments to purportedly neutral patient advocacy organizations and medical professional societies, the five subpoenaed opioid manufacturers made an additional $1.6 million in payments to the organizations' and societies' group executives, staff members, board members, and advisory board members. When payments from all opioid manufacturers are tabulated, more than $10.6 million was paid to individuals affiliated with such organizations and societies from 2013 through the date of the report:

FIGURE 8: Payments from All Opioid Manufacturers to Group-Affiliated Individuals, 2013-Present[52]

| | Manufacturer Payments to Affiliated Individuals |
|---|---|
| The National Pain Foundation | $8,307,243.47 |
| AAPM Foundation | $798,051.22 |
| American Society of Pain Educators | $749,564.78 |
| American Academy of Pain Medicine | $204,631.53 |
| American Pain Society | $187,699.34 |
| ACS Cancer Action Network | $154,578.09 |
| American Chronic Pain Association | $145,861.30 |
| Academy of Integrative Pain Management | $82,596.98 |
| The Center for Practical Bioethics | $16,945.88 |
| American Geriatrics Society | $7,548.35 |
| U.S. Pain Foundation | $138.91 |
| American Pain Foundation | N/A |
| American Society of Pain Management Nursing | N/A |
| Washington Legal Foundation | N/A |
| Total | $10,654,859.85 |

162. Included in the above-listed payments were payments of more than $140,000 from opioid manufacturers to ten members of the American Chronic Pain Association Advisory Board, and more than $950,000 to members of the NPF board of directors from various opioid manufacturers.

163. Worse still, the organizations provided limited disclosures of these sources of funding – when they provided any information at all. The American Society of Pain Educators, the NPF, and the Academy of Integrative Pain Management provided no information concerning their policies for disclosing donors or donations, while several others stated explicitly that they did

not disclose any information about donor relationships. When the groups investigated did disclose their sources of funding, they did so without providing specifics such as donation amounts.

164. Most importantly, many groups investigated "amplified or issued messages that reinforce industry efforts to promote opioid prescription and use, including guidelines and policies minimizing the risk of addiction and promoting opioids for chronic pain." Several of the groups "also lobbied to change laws directed at curbing opioid use, strongly criticized landmark CDC guidelines on opioid prescribing, and challenged legal efforts to hold physicians and industry executives responsible for overprescription and misbranding."[82] The report provided details regarding four ways the groups investigated set about these tasks.

165. The report states that "[m]any of the groups have issued guidelines to physicians and other health practitioners that minimize the risk of opioid addiction or emphasize the long-term use of opioids to treat chronic pain."[83] The report provides examples, including the AAPM's and APS's 1997 consensus statement endorsing opioids for chronic pain and stating that the risk of addiction was low, and the 2009 guidelines by the AAPM and the APS allegedly promoting opioids as safe and effective for chronic pain and concluding the risk of addiction was manageable regardless of past abuse history.

166. In conclusion, the report found that, while health advocacy organizations are "among the most influential and trusted stakeholders in U.S. health policy," the reality is that their "positions closely correspond to the marketing aims of pharmaceutical and device companies," including in the area of opioids policy. "The findings in this report indicate that this tension exists in the area of opioids policy – that organizations receiving substantial funding from manufacturers have, in fact, amplified and reinforced messages favoring increased opioid use." This amplification

[82] *Id*. at 12.
[83] *Id*.

"may have played a significant role in creating the necessary conditions for the U.S. opioids epidemic."[84]

**D. The Manufacturer Defendants and Non-Joined Manufacturers Paid Key Opinion Leaders, and Sponsored Speakers' Bureau, to Disseminate False and Misleading Messaging.**

167. To falsely promote their opioids, the Manufacturer Defendants paid and cultivated a select circle of doctors who were chosen and sponsored by the Manufacturer Defendants for their supportive messages. Pro-opioid doctors have been at the hub of the Manufacturer Defendants' well-funded, pervasive marketing scheme since its inception and were used to create the grave misperception that science and legitimate medical professionals favored the wider and broader use of opioids. These doctors include Dr. Portenoy and Dr. Webster, as well as Dr. Fine and Dr. Fishman.

168. Although these KOLs were funded by the Manufacturer Defendants, the KOLs were used extensively to present the appearance that unbiased and reliable medical research supporting the broad use of opioid therapy for chronic pain had been conducted and was being reported on by independent medical professionals.

169. As the Manufacturer Defendants' false marketing scheme picked up steam, these pro-opioid KOLs wrote, consulted on, edited, and lent their names to books and articles and gave speeches and CMEs supportive of opioid therapy for chronic pain. They served on committees that developed treatment guidelines that strongly encouraged the use of opioids to treat chronic pain and they were placed on boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs.

[84] *Id*. at 17.

170. Through use of their KOLs and strategic placement of these KOLs throughout every critical distribution channel of information within the medical community, the Manufacturer Defendants were able to exert control of each of these modalities through which doctors receive their information.

171. In return for their pro-opioid advocacy, the Manufacturer Defendants' KOLs received money, prestige, recognition, research funding, and avenues to publish. For example, Dr. Webster received funding from Manufacturer Defendant Cephalon and non-joined manufacturers Endo and Purdue. Dr. Fine received funding from Manufacturer Defendants Janssen and Cephalon, and from non-joined manufacturers Endo and Purdue.

172. The Manufacturer Defendants carefully vetted their KOLs to ensure that they were likely to remain on-message and supportive of the Manufacturer Defendants' agenda. The Manufacturer Defendants also kept close tabs on the content of the materials published by these KOLs. And, of course, the Manufacturer Defendants kept these KOLs well funded to enable them to push the Manufacturer Defendants' deceptive message out to the medical community.

173. Once the Manufacturer Defendants identified and funded KOLs and those KOLs began to publish "scientific" papers supporting the Manufacturer Defendants' false position that opioids were safe and effective for treatment of chronic pain, the Manufacturer Defendants poured significant funds and resources into a marketing machine that widely cited and promoted their KOLs and studies or articles by their KOLs to drive prescription of opioids for chronic pain. The Manufacturer Defendants cited to, distributed, and marketed these studies and articles by their KOLs as if they were independent medical literature so that it would be well received by the medical community. By contrast, the Manufacturer Defendants did not support, acknowledge, or

disseminate the truly independent publications of doctors critical of the use of chronic opioid therapy.

174. In their promotion of the use of opioids to treat chronic pain, the Manufacturer Defendants' KOLs knew that their statements were false and misleading, or they recklessly disregarded the truth in doing so, but they continued to publish their misstatements to benefit themselves and the Manufacturer Defendants.

175. The Manufacturer Defendants and non-joined manufacturers also paid millions of dollars to physicians to promote aggressive prescribing of opioids for chronic pain. Released federal data show that they increased such payments to physicians who treat chronic pain even while the opioid crisis accelerated and overdose deaths from prescription opioids and related illicit drugs, such as heroin, soared to record rates.[85] These payments come in the form of consulting and speaking fees, free food and beverages, discount coupons for drugs, and other freebies. The total payments from the Manufacturer Defendants and non-joined manufacturers to doctors related to opioids doubled from 2014 to 2015. Moreover, according to experts, research shows even small amounts of money can have large effects on doctors' prescribing practices.[86] Physicians who are high prescribers of opioids are more likely to be invited to participate in the Manufacturer Defendants' and non-joined manufacturers' speakers' bureaus. According to a study published by the U.S. National Institutes of Health, "[s]peakers' bureau activities fall squarely within this definition of peer selling and hence product endorsement."[87]

---

[85] Joe Lawlor, *Even amid crisis, opioid makers plied doctors with perks*, Portland PressHerald (Dec. 25, 2016), http://www.pressherald.com/2016/12/25/even-amid-crisis-opioid-makers-plied-doctors-with-perks/.
[86] *Id*.
[87] Lynette Reid & Matthew Herder, *The speakers' bureau system: a form of peer selling*, 7(2) Open Med. e31-e39 (Apr. 2, 2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3863750/.

176. According to a research letter published in *JAMA Internal Medicine* on May 14, 2018, doctors' mean number of opioid prescriptions increased with the number of free meals they received from an opioid company.[88]




177. The use of speakers' bureaus has led to substantial ethical concerns within the medical field. A 2013 publication by the Institute on Medicine as a Profession summarized that the bureaus "leverage the credibility of physicians in order to promote the use of pharmaceutical products" and "[e]xposure to industry-sponsored speaking events is associated with decreased quality of prescribing."[89]

---

[88] Scott E. Hadland et al., *Association of Pharmaceutical Industry Marketing of Opioid Products to Physicians With Subsequent Opioid Prescribing*, JAMA Intern. Med. (May 14, 2018), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2681059. The study looked at the Open Payments database, which was used to pull out non-research payments to doctors in 2014. It then compared that data to claims in the Medicare Part D Opioid Prescriber Summary File from doctors who wrote opioid prescriptions in 2015, leaving in "all physicians with complete, nonduplicate information who had at least 10 opioid claims during 2015."

[89] *Speakers' Bureaus: Best Practices for Academic Medical Centers*, IMAP (Oct. 10, 2013), http://imapny.org/wp-content/themes/imapny/File%20Library/Best%20Practice%20toolkits/Best-Practices_Speakers--bureaus.pdf (citing research in *JAMA*, *The Journal of Law, Medicine & Ethics* and *Academic Psychiatry*).

178. For example, Fishman is a physician whose ties to the opioid drug industry are clear. He has served as an APF board member and as president of the AAPM and has participated yearly in many CME activities for which he received "market rate honoraria." As discussed above, he has authored publications, including the seminal guides on opioid prescribing, which were funded by the Manufacturer Defendants and non-joined manufacturers. He has also worked to oppose legislation requiring doctors and others to consult pain specialists before prescribing high doses of opioids to non-cancer patients. He has himself acknowledged his failure to disclose all potential conflicts of interest in a letter in *JAMA* titled, "Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion."[90]

179. Similarly, Fine's ties to the Manufacturer Defendants and non-joined manufacturers have been well documented.[91] He has authored articles and testified in court cases and before state and federal committees, and he, too, has served as president of the AAPM and argued against legislation restricting high-dose opioid prescription for non-cancer patients. Multiple videos feature Fine delivering educational talks about prescription opioids. He even testified at trial that the 1,500 pills a month prescribed to celebrity Anna Nicole Smith for pain did not make her an addict before her death.[92] He has also acknowledged having failed to disclose many conflicts of interest.

180. Fishman and Fine are only two of the many physicians whom the Manufacturer Defendants and non-joined manufacturers paid to promote false or biased information on the use of opioids for chronic pain.

[90] Scott M. Fishman, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306(13), JAMA 1445 (2011), https://jamanetwork.com/journals/jama/article-abstract/1104464.

[91] Tracy Weber & Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry*, ProPublica (Dec. 23, 2011, 2:14 PM), https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drug-industry (hereinafter, "Weber, *Two Leaders in Pain*").

[92] Linda Deutsch, *Doctor: 1,500 pills don't prove Smith was addicted*, Seattle Times (Sept. 22, 2010, 5:16pm), https://www.seattletimes.com/entertainment/doctor-1500-pills-dont-prove-smith-was-addicted/.

**E. The Devastating Impact of the Manufacturer Defendants' and Non-Joined Manufacturers' Propaganda Campaign.**

181. As stated, the impact of the Manufacturer Defendants' and non-joined manufacturers' false messaging has been profound. The drug companies profited handsomely as more and more people became addicted to opioids and died of overdoses.[93]

182. In 2012 alone, an estimated 259 million opioid prescriptions were filled, enough to medicate every adult in the United States for a month on around-the-clock basis.[94] The use of prescription painkillers cost health insurers up to $72.5 billion annually in direct healthcare costs.[95]

**F. The Manufacturer Defendants' Specific Unlawful Practices that Targeted Prescribers Nationwide.**

**1. Johnson & Johnson and Janssen**

183. Defendant Johnson & Johnson is the only company that owns more than 10% of Defendant Janssen Pharmaceuticals, Inc.'s stock and corresponds with the FDA regarding Defendant Janssen's products. Upon information and belief, Defendant Johnson & Johnson controls the sale and development of Defendant Janssen's drugs including opioids, and Defendant Janssen's profits inure to Defendant Johnson & Johnson's benefit. Together, Defendants Johnson & Johnson and Janssen: (1) funded the production and dissemination of and disseminated false, misleading, and deceptive information about the efficacy and addictive properties of prescription opioids; and (2) failed to monitor and report suspicious sales as required by federal law.

---

[93] German Lopez, *How big pharma got people hooked on dangerous opioids – and made tons of money off it*, Vox (Sept. 22, 2016, 3:00 PM), http://www.vox.com/2016/2/5/10919360/opioidepidemic-chart.
[94] *Opioid Painkiller Prescribing*, Centers for Disease Control and Prevention: Vital Signs (July 2014), https://www.cdc.gov/vitalsigns/opioid-prescribing/.
[95] Katherine Eban, *OxyContin: Purdue Pharma's painful medicine*, Fortune Magazine (Nov. 9, 2011), http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/ (hereinafter, "Eban, *Painful Medicine*").

Case 2:24-cv-00207-JPB Document 1 Filed 10/28/24 Page 66 of 180 PageID #: 68

a) **Janssen**

184. Janssen manufactured, marketed, sold, and distributed opioids nationwide and in West Virginia, including the following:

| | | |
|---|---|---|
| Duragesic (fentanyl) | Opioid analgesic delivered via skin patch; contains gel form of fentanyl, a synthetic opioid that is up to 100 times more potent than morphine; delivers fentanyl at egulated rate for up to 72 hours; first approved by the FDA in August 1990. | Schedule II |
| Nucynta ER (tapentadol | Opioid agonist; extended-release formulation indicated for severe pain. | Schedule II |
| Nucynta (tapentadol | Immediate-release version of tapentadol hydrochloride for the management of moderate to severe acute pain. | Schedule II |

185. Janssen introduced Duragesic in 1990. It is indicated for the "management of pain in opioid-tolerant patients, severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."[96] Janssen also marketed Nucynta, which was first approved by the FDA in 2008, formulated in tablet form and in an oral solution and indicated for the "relief of moderate to severe acute pain in patients 18 years of age or older."[97] Janssen also marketed Nucynta ER, which was first approved by the FDA in 2011 in tablet form. Initially, it was indicated for the "management of . . . pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."[98] This pain indication was later altered in 2012 to "management of moderate to

---

[96] https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/019813s081lbl.pdf
[97] https://pubmed.ncbi.nlm.nih.gov/19661853/
[98] https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/200533s014lbl.pdf

severe chronic pain in adults" and "neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults."[99] Janssen sold Nucynta and Nucynta ER to Depomed in 2015 for $1.05 billion.[100]

186. In 1997, after seeing OxyContin successfully marketed for chronic non-cancer pain, Defendants Janssen and Johnson & Johnson re-launched fentanyl-based Duragesic patch for the chronic, non-cancer market as well.

**(1) The FDA Warned Defendant Janssen Regarding Its False Messaging.**

187. On February 15, 2000, the FDA sent Janssen a letter concerning the alleged dissemination of "homemade" promotional pieces that promoted Duragesic in violation of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, *et seq.* In a subsequent letter, dated March 30, 2000, the FDA explained that the "homemade" promotional pieces were "false or misleading because they contain misrepresentations of safety information, broaden Duragesic's indication, contain unsubstantiated claims, and lack fair balance."

188. The March 30, 2000, FDA letter identified specific violations, including misrepresentations that Duragesic had a low potential for abuse.[101]

189. The March 30, 2000, FDA letter also stated that the promotional materials represented that Duragesic was "more useful in a broader range of conditions or patients than has been demonstrated by substantial evidence." Specifically, the FDA stated that Janssen was

[99] https://www.jnj.com/media-center/press-releases/fda-approves-nucynta-er-tapentadol-extended-release-oral-tablets
[100] https://www.prnewswire.com/news-releases/depomed
[101] NDA 19-813 Letter from Spencer Salis, U.S. Food & Drug Administration, to Cynthia Chianese, Janssen Pharmaceutical at 2 (Mar. 30, 2000), available at *Cnty., of Wayne and County of Oakland v. Purdue Pharma, et al.*, No. 2:17-cv-13334-JCO-EAS, Dkt. 2-10 (E.D. Mich. Oct. 12, 2017).

marketing Duragesic for indications other than the treatment of chronic pain that cannot otherwise be managed, for which it was approved.[102]

190. The March 30, 2000, FDA letter also stated Janssen failed to adequately present "contraindications, warnings, precautions, and side effects with a prominence and readability reasonably comparable to the presentation of information relating to the effectiveness of the product."[103]

191. On September 2, 2004, the U.S. Department of Health and Human Services ("HHS") sent Janssen a warning letter concerning Duragesic due to "false or misleading claims about the abuse potential and other risks of the drug, and . . . unsubstantiated effectiveness claims for Duragesic," including, specifically, "suggesting that Duragesic has a lower potential for abuse compared to other opioid products."

192. The September 2, 2004, letter warned Janssen about its claims that Duragesic had a low reported rate of mentions in the Drug Abuse Warning Network ("DAWN") as compared to other opioids. The letter stated that the claim was false or misleading because the claim was not based on substantial data and because the lower rate of mentions was likely attributable to Duragesic's lower frequency of use compared to other opioids listed in DAWN.[104]

193. The September 2, 2004, letter also detailed a series of unsubstantiated, false, or misleading claims of Duragesic's effectiveness. The letter concluded that various claims made by Janssen were insufficiently supported, including:

- "Demonstrated effectiveness in chronic back pain with additional patient benefits, . . . 86% of patients experienced overall benefit in a clinical study based on: pain control, disability in ADLs, quality of sleep."

---

[102] *Id*. at 2-3.
[103] *Id*. at 3.
[104] Warning Letter from Thomas W. Abrams, U.S. Department of Health and Human Services, to Ajit Shetty, Janssen Pharmaceutica, Inc., at 2 (Sept. 2, 2004), http://www.johnsonandtoxin.com/ 040920_duragesic_letter.pdf.

- "All patients who experienced overall benefit from DURAGESIC would recommend it to others with chronic low back pain."
- "Significantly reduced nighttime awakenings."
- "Significant improvement in disability scores as measured by the Oswestry Disability Questionnaire and Pain Disability Index."
- "Significant improvement in physical functioning summary score."
- "Significant improvement in social functioning."[105]

194. In addition, the September 2, 2004, HHS letter identified "outcome claims [that] are misleading because they imply that patients will experience improved social or physical functioning or improved work productivity when using Duragesic." The claims include "'1,360 [lives] . . . and counting,' '[w]ork, uninterrupted,' '[l]ife, uninterrupted,' '[g]ame, uninterrupted,' '[c]hronic pain relief that supports functionality,' '[h]elps patients think less about their pain,' and '[i]mprove[s] . . . physical and social functioning.'" The September 2, 2004, letter stated: "Janssen has not provided references to support these outcome claims. We are not aware of substantial evidence or substantial clinical experience to support these claims."[106]

195. On July 15, 2005, the FDA issued a public health advisory warning doctors of deaths resulting from the use of Duragesic and a generic manufactured by Mylan (n/k/a Defendant Viatris). The advisory noted that the FDA had been "examining the circumstances of product use to determine if the reported adverse events may be related to inappropriate use of the patch" and noted the possibility "that patients and physicians might be unaware of the risks" of using the fentanyl transdermal patch, a potent opioid analgesic meant to treat chronic pain that does not respond to other painkillers.[107]

196. Regardless, even after receiving these letters, Janssen instructed sales representatives nationwide to market Duragesic as having better efficacy, better tolerability, and

---

[105] *Id.* at 2-3.
[106] *Id.* at 3.
[107] https://www.drugs.com/fda-alerts/1074-614.html#a-148

better patient compliance because it was a patch instead of a pill. These sales representatives were instructed to tell doctors that the patch provided better control in the event of patient opioid abuse because patients could not increase the patch dosage. However, sales representatives were aware of patients who increased the dosage by applying more than one patch at a time and also knew that some patients abused the patch by freezing and then chewing on it.

**(2) Defendant Janssen Funded False Publications and Presentations.**

197. Defendant Janssen disseminated false information about opioids on the website "Prescribe Responsibly." According to the website's legal notice, all content on the site "is owned or controlled by Janssen."[108] The website included numerous false or misleading representations concerning the relative safety of opioids and omissions of the risks associated with taking them. For example, it stated that while practitioners are often concerned about prescribing opioids due to "questions of addiction," such concerns "are often overestimated. According to clinical opinion polls, true addiction occurs only in a small percentage of patients with chronic pain who receive chronic opioid . . . analgesic therapy."[109]

198. Prescribe Responsibly also compared the risks of opioid use favorably to those associated with nonsteroidal anti-inflammatory drugs ("NSAIDs"), such as aspirin and ibuprofen, and stated that many patients develop a tolerance for opioids' side effects: Opioid analgesics are often the first line of treatment for many painful conditions and may offer advantages over NSAIDs.

> Opioid analgesics, for example, have no true "ceiling dose" for analgesia and do not cause direct organ damage; however, they do have several possible side effects,

[108] *Legal Notice*, Prescribe Responsibly, https://web.archive.org/web/20171003192940/http://www.prescriberesponsibly.com/legal-notice (last visited Sept. 19, 2019).
[109] *Use of Opioid Analgesics in Pain Management*, Prescribe Responsibly, https://web.archive.org/web/20180714193514/http://www.prescriberesponsibly.com/articles/opioid-pain-management (last visited May 5, 2022).

> including constipation, nausea, vomiting, a decrease in sexual interest, drowsiness, and respiratory depression. With the exception of constipation, many patients often develop tolerance to most of the opioid analgesic-related side effects.[110]

199. Further, Prescribe Responsibly repeated the scientifically unsupported discussion of "pseudoaddiction" as "a syndrome that causes patients to seek additional medications due to inadequate pharmacotherapy being prescribed. Typically when the pain is treated appropriately, the inappropriate behavior ceases."[111] Thus, "pseudoaddiction" was defined as a condition requiring the prescription of more or stronger opioids.

200. Another unbranded marketing initiative that Defendant Janssen employed was the dissemination of a brochure, titled "Finding Relief," which AAPM sponsored.[112] The Finding Relief brochure, which was widely disseminated, did not differentiate between different kinds of opioids, instead discussing them as a class of drugs without reference to any of the differences between them. The Finding Relief brochure actively promoted the concept that pain was undertreated. The brochure downplayed any risks associated with opioids.

201. Defendant Janssen also made thousands of payments to physicians nationwide for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services.

202. Defendant Janssen used a sales force to promote, market, and sell various opioids, including branded opioid drugs that they manufactured: Duragesic, Ultram, and Nucynta.

203. Defendant Janssen's training of its sales representatives included teaching sales representatives to avoid the so-called "addiction ditch"—*i.e.*, to avoid the negatives (addiction)

---

[110] *Id.*

[111] *What a Prescriber Should Know Before Writing the First Prescription*, Prescribe Responsibly, https://web.archive.org/web/20180720092635/http://www.prescriberesponsibly.com/articles/before-prescribing-opioids (last visited May 5, 2022).

[112] Finding Relief: Pain Management for Older Adults (2009), available at https://docplayer.net/ 28610911- Finding-relief-pain-management-for-older-adults.html (last visited May 5, 2022).

and emphasize the positives (supposed efficacy) in sales calls—and to use a study from Dr. Portenoy "to create dialogue about Opiophobia as a barrier."[113]

204. As part of this training, Defendant Janssen trained their sales representatives that there was a 2.6% or lower risk of addiction when using opioids prescribed by a doctor. As part of this same training, Defendant Janssen trained sales representatives to "establish that moderate to severe acute pain continues to be undertreated."[114]

205. Defendant Janssen did not provide its sales force with any training on opioid addiction.

206. As people became more and more hooked on prescription painkillers, many moved to heroin, and increasingly to fentanyl, which is even more potent and cheaper than heroin, and is increasingly mixed with or sold as heroin and, as set forth above, was also being deceptively marketed by Janssen.

**b) Johnson & Johnson**

207. Along with Manufacturer Defendant Janssen's opioids, Johnson & Johnson owned two companies that grew, imported, and processed the raw materials to make opioids and sold them to many of the other Manufacturer Defendants and non-joined manufacturers.

208. From the 1990s through at least 2016, Johnson & Johnson wholly owned Tasmanian Alkaloids Limited ("Tasmanian Alkaloids"), which was based in Tasmania and cultivated and processed opium poppy plants to manufacture narcotic raw materials to be imported into the U.S. to be processed and made into active pharmaceutical ingredients ("APIs") necessary to manufacture opioid drugs. It also wholly owned Noramco, Inc., which is based in Athens,

[113] See Jan-MS-00457581, P-CA-000619_0001
[114] *Id.*

Georgia, and imported the raw narcotic materials produced by Tasmanian Alkaloids, processed the materials into APIs, and then sold the APIs to other opioid manufacturers in the U.S.

209. Johnson & Johnson had acquired and formed Tasmanian Alkaloids and Noramco in the 1980s to ensure a "reliable source of [narcotic] raw materials" and "security of supply" for its Tylenol with codeine range of pain medications.

210. Until 2016, when Johnson & Johnson sold its Noramco/Tasmanian Alkaloids business, Tasmanian Alkaloids and Noramco were "sister companies," as both were members of Johnson & Johnson's "family of companies." Noramco employees did not believe Noramco maintained its own bank accounts, separate from Defendant Johnson & Johnson's treasury. Johnson & Johnson, Noramco, and Tasmanian Alkaloids shared employees and resources that were required to operate the business. Noramco employees physically worked at Johnson & Johnson's facilities in New Jersey at various times. Further, employees simultaneously held positions at multiple companies within Johnson & Johnson companies at times. During this time, Noramco and Tasmanian Alkaloids were key parts of Johnson & Johnson's "pain management franchise" or "pain franchise."

211. Johnson & Johnson, through these subsidiaries, supplied the following opioid API to other drug manufacturers in the U.S., including non-joined manufacturer Purdue and Defendant Teva: oxycodone, hydrocodone, morphine, codeine, fentanyl, sufentanil, buprenorphine, hydromorphone, and naloxone.

212. Noramco, located in the U.S., imports the narcotic raw materials produced by Tasmanian Alkaloids, like morphine or thebaine,[115] into the U.S., processes them into APIs, then sells them to drug manufacturers in the U.S. Noramco was an important part of Johnson &

[115] Thebaine is an opiate alkaloid, chemically similar to morphine and codeine, used as an intermediate in the biosynthesis of other opioids.

Johnson's business from the mid-1990s until at least 2010. Johnson & Johnson's ownership of these subsidiaries uniquely positioned its pain management franchise to provide U.S. drug manufacturers, including Defendant Johnson & Johnson itself, with "Security of Supply-Direct Access to Narcotic Raw Material - From Our Fields to Your Formulations."

213. In 1994, Johnson & Johnson, in concert with its subsidiary Tasmanian Alkaloids, anticipated demand for API oxycodone. Specifically, Johnson & Johnson scientists at Tasmanian Alkaloids began a project "in 1994 in order to develop a high thebaine poppy variety to meet the anticipated demand."[116] The result of the research project was the creation of a "high thebaine" poppy called the "Norman Poppy," which Johnson & Johnson internally described as "a transformational technology that enabled the growth of oxycodone."[117]

214. Through Noramco, Defendant Johnson & Johnson met the anticipated opioid demand by selling API and supplied other U.S. opioid manufacturers, including the Manufacturer Defendants, with opioid APIs, including oxycodone, hydrocodone, morphine, codeine, buprenorphine, hydromorphone, and naloxone.

215. Through Noramco, Defendant Johnson & Johnson supplied API via long-term agreements and had such agreements with all 7 of the top U.S. generic companies.

216. Noramco grew to become the number one narcotic API supplier of oxycodone, hydrocodone, codeine, and morphine in the United States.

[116] https://www.atg.wa.gov/news/news-releases/ag-ferguson-sues-opioid-manufacturer-johnson-johnson-over-state-s-opioid-epidemic#

[117] *Id.*

**(1) Defendants Johnson & Johnson and Janssen Failed to Monitor and Report Suspicious Sales Required by Federal Law.**

217. The CSA imposes on all "registrants" the obligation to design and operate a system to monitor suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *See* 21 C.F.R. § 1301.74(b); *see also* W. Va. Code R. § 15-2-5 *et seq*.

218. Defendants Johnson & Johnson and Janssen are both "registrants" under the CSA. 21 C.F.R. § 1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

219. Both Defendants Johnson & Johnson and Janssen failed to design and operate a system to monitor suspicious orders of controlled substances and/or failed to notify the appropriate DEA field division of suspicious orders nationwide and in West Virginia. They also failed to report sales of dangerous drugs subject to abuse. Their failure to timely report these and other suspicious sales violated the CSA.

**c) Teva**

220. Cephalon manufactured, marketed, distributed, or sold opioids, nationwide, and in West Virginia, including the following:

| | | |
|---|---|---|
| Actiq (fentanyl citrate) | Opioid analgesic; oral transmucosal lozenge; indicated only for the management of breakthrough pain ("BTP") in cancer patients – pain that for a short time "breaks through" medication that otherwise effectively controls a patient's persistent pain – in patients 16 and older with malignancies; commonly referred to as a lollipop because designed to look and perform like one; approved in 1998 with restricted distribution program. | Schedule II |
| Fentora (fentanyl buccal) | Rapid-release tablet for BTP in cancer patients who are already receiving and tolerant of around-the-clock opioid therapy; approved in 2006. | Schedule II |
| Generic of OxyContin (oxycodone hydrochloride) | Opiate agonist. | Schedule II |

221. Actiq is designed to resemble a lollipop and is meant to be sucked on at the onset of intense breakthrough pain ("BTP")[118] in cancer patients. It delivers fentanyl citrate, a powerful opioid agonist that is 80 times stronger than morphine,[119] rapidly into a patient's bloodstream through the oral membranes.[120] Because it is absorbed through those membranes, it passes directly

[118] Breakthrough pain, or BTP, is an intense spike of pain experienced by some cancer patients when the pain exceeds the level which is controlled by chronic pain medications.
[119] *See* John Carreyrou, *Narcotic "Lollipop" Becomes Big Seller Despite FDA Curbs*, Wall St. J. (Nov. 3, 2006), https://www.wsj.com/articles/SB116252463810112292 (hereinafter, "Carreyrou, *Narcotic Lollipop*").
[120] Actiq would later become part of a category of opioids now known as transmucosal immediate-release fentanyl ("TIRF") products. "Transmucosal" refers to how the opioid is delivered into a patient's bloodstream, across mucous membranes, such as inside the cheek, under the tongue, or in the nose.

into circulation without having to go through the liver or stomach, thereby providing faster relief.[121]

222. In November 1998, the FDA approved Actiq for only a very narrow group of people – cancer patients "with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[122]

223. Understanding the risks of introducing such an intense opioid analgesic to the market, the FDA provided approval of Actiq "*ONLY* for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[123] Further, the FDA explicitly stated that Actiq "*must not* be used in opioid non-tolerant patients," was contraindicated for the management of acute or postoperative pain, could be deadly to children and was "intended to be used only in the care of opioid-tolerant cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain."

224. The FDA also required that Actiq be provided only in compliance with a strict risk management program that explicitly limited the drug's direct marketing to the approved target audiences, defined as oncologists, pain specialists, their nurses and office staff.[124]

225. In October 2000, Cephalon acquired the worldwide product rights to Actiq and began marketing and selling Actiq in the United States.

226. Cephalon also purchased the rights to Fentora, an even faster-acting tablet formulation of fentanyl, from Cima Labs, and submitted a new drug application to the FDA in

---

[121] *Cephalon, Inc.*, Company-Histories.com, http://www.companyhistories.com/Cephalon-Inc-Company-History.html (last visited May 5, 2022).
[122] 1998 FDA Label, https://www.accessdata.fda.gov/drugsatfda_docs/nda/98/20747_Actiq_appltr.pdf.
[123] NDA 20-747 Letter from Cynthia McCormick, Center for Drug Evaluation and Research, to Patricia J. Richards, Anesta Corporation, http://www.accessdata.fda.gov/drugsatfda_docs/appletter/1998/20747ltr.pdf.
[124] Carreyrou, *Narcotic Lollipop*, *supra* n.119.

August 2005. In September 2006, Cephalon received FDA approval to sell Fentora as a faster-acting version of Actiq; but once again concerned about the power and risks inherent to fentanyl, the FDA limited Fentora's approval to the treatment of BTP in cancer patients who were already tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. Cephalon began marketing and selling Fentora in October 2006.

**(1) Teva Falsely and Aggressively Marked Cancer Drug Actiq to Non-Cancer Treating Physicians.**

227. Due to the FDA's restrictions, Actiq's consumer base was limited, as was its potential for revenue growth. In order to increase its revenue and market share, Cephalon needed to find a broader audience for the drug, and thus began marketing its opioid lollipop to treat headaches, back pain, sports injuries, and other chronic non-cancer pain. Cephalon targeted non-oncology practices, including, but not limited to, pain doctors, general practitioners, migraine clinics, anesthesiologists, and sports clinics. It did so in violation of applicable regulations prohibiting the marketing of medications for off-label use and in direct contravention of the FDA's strict instructions that Actiq be prescribed only to terminal cancer patients and by oncologists and pain management doctors experienced in treating cancer pain.

228. According to "[d]ata gathered from a network of doctors by research firm ImpactRx between June 2005 and October 2006" ("ImpactRx Survey"), Cephalon sales representatives' visits to non-oncologists to market Actiq increased six-fold between 2002 and 2005. Cephalon representatives would reportedly visit non-oncologists monthly, providing up to 60 or 70 coupons (each coupon was good for six free Actiq lozenges) and encouraging prescribers to try Actiq on their non-cancer patients.[125]

[125] *Id.*

229. Cephalon's efforts paid off. In 2000, Actiq generated $15 million in sales.[126] By 2002, it attributed a 92% increase in Actiq sales to "a dedicated sales force for ACTIQ" and "ongoing changes to [its] marketing approach including hiring additional sales representatives and targeting our marketing efforts to pain specialists."[127] By 2005, Actiq's sales total had jumped to $412 million, making it Cephalon's second-best-selling drug. By the end of 2006, Actiq's sales had exceeded $500 million.

230. Although Actiq is a drug approved for only a very narrow customer base, during the first six months of 2006, only 1% of the 187,076 prescriptions for Actiq filled at retail pharmacies were prescribed by oncologists. Results of the ImpactRx Survey suggested that "more than 80 percent of patients who use[d] the drug don't have cancer."[128]

**(2) Government Investigations Found Cephalon Inappropriately Marked Actiq for Off-Label Use.**

231. Beginning in or about 2003, former Cephalon employees filed four whistleblower lawsuits claiming the company had wrongfully marketed Actiq for unapproved, off-label uses. On September 29, 2008, Cephalon finalized and entered into a corporate integrity agreement with the Office of the Inspector General of HHS and agreed to pay $425 million in civil and criminal penalties for its off-label marketing of Actiq and two other drugs (Gabitril and Provigil). According to a U.S. Department of Justice ("DOJ") press release, Cephalon trained sales representatives to disregard restrictions of the FDA-approved label, employed sales representatives and healthcare

[126] *Id.*
[127] Cephalon, Inc. Annual Report (Form 10-K) at 28 (Mar. 31, 2003), http://getfilings.com/o0001047469-03-011137.html.
[128] Carreyrou, *Narcotic Lollipop*, *supra* n.119.

professionals to speak to physicians about off-label uses of the three drugs, and funded CME to promote off-label uses.[129]

232. Upon information and belief, documents uncovered in the government's investigations confirm that Cephalon directly targeted non-oncology practices and pushed its sales representatives to market Actiq for off-label use. For instance, the government's investigations confirmed:

- Cephalon instructed its sales representatives to ask non-cancer doctors whether they have the potential to treat cancer pain. Even if the doctor answered "no," a decision tree provided by Cephalon instructed the sales representatives to give these physicians free Actiq coupons.

- Cephalon targeted neurologists to encourage them to prescribe Actiq to patients with migraine headaches.

- Cephalon sales representatives used the assistance of outside pain management specialists when visiting non-cancer physicians to pitch Actiq. The pain management specialist would falsely inform the physician that Actiq does not cause patients to experience a "high" and carries a low risk of diversion toward recreational use.

- Cephalon set sales quotas for its sales and marketing representatives that could not possibly have been met solely by promoting Actiq for its FDA-approved indication.
- Cephalon promoted the use of higher doses of Actiq than patients required by encouraging prescriptions of the drug to include larger-than-necessary numbers of lozenges with unnecessarily high doses of fentanyl.

- Cephalon promoted Actiq for off-label use by funding and controlling CME seminars that promoted and misrepresented the efficacy of the drug for off-label uses such as treating migraine headaches and for patients not already opioid tolerant.[130]

---

[129] Press Release, U.S. Department of Justice, Pharmaceutical Company Cephalon To Pay $425 Million For Off-Label Drug Marketing (Sept. 29, 2008), https://www.justice.gov/archive/usao/pae/News/2008/sep/cephalonrelease.pdf.
[130] John Carreyrou, *Cephalon Used Improper Tactics to Sell Drug, Probe Finds*, Wall St. J. Nov. 21, 2006, at B1 (hereinafter, "Carreyrou, *Cephalon Used Improper Tactics*").

233. Still, the letters, the FDA's safety alert, the government's investigations, and the massive settlement seemed to have had little effect on Cephalon as it continued its deceptive marketing strategy for both Actiq and Fentora.

**(3) Cephalon Falsely and Aggressively Marked Cancer Drug Fentora to Non-Cancer Treating Physicians.**

234. From the time it introduced Fentora to the market in October 2006, Cephalon targeted non-cancer doctors; falsely represented Fentora as a safe, effective off-label treatment for non-cancer pain; and continued its disinformation campaign about the safety and non-addictiveness of Fentora specifically and opioids generally. In fact, Cephalon targeted the same pain specialists and non-oncologists that it had targeted with its off-label marketing of Actiq, simply substituting Fentora.

235. During an investor earnings call shortly after Fentora's launch, Cephalon's CEO described the "opportunity" presented by the use of Fentora for non-cancer pain:

> *The other opportunity of course is the prospect for FENTORA outside of cancer pain, in indications such as breakthrough lower back pain and breakthrough neuropathic pain.*
>
> * * *
>
> Of all the patients taking chronic opioids, 32% of them take that medication to treat back pain, and 30% of them are taking their opioids to treat neuropathic pain. In contrast only 12% are taking them to treat cancer pain, 12%.
>
> We know from our own studies that breakthrough pain episodes experienced by these non-cancer sufferers respond very well to FENTORA. And for all these reasons, we are tremendously excited about the significant impact FENTORA can have on patient health and well-being and the exciting growth potential that it has for Cephalon.
>
> In summary, we have had a strong launch of FENTORA and continue to grow the product aggressively. Today, that growth is coming from the physicians and patient types that we have identified through our efforts in the field over the last seven

years. In the future, with new and broader indications and a much bigger field force presence, the opportunity that FENTORA represents is enormous.[131]

**(4) The FDA Warned Cephalon Regarding Its False and Off-Label Marketing of Fentora.**

236. On September 27, 2007, the FDA issued a public health advisory to address numerous reports that patients who did not have cancer or were not opioid tolerant had been prescribed Fentora and warned of death or life-threatening side effects. The FDA warned that Fentora should not be used to treat any type of short-term pain such as headaches or migraines, and that it should be used only under the close supervision of a doctor.[132]

237. Nevertheless, in 2008, Cephalon pushed forward to expand the target base for Fentora and filed a supplemental drug application requesting FDA approval of Fentora for the treatment of non-cancer BTP. In the application and supporting presentations to the FDA, Cephalon admitted both that it knew the drug was heavily prescribed for off-label use and that the drug's safety for such use had never been clinically evaluated.[133] An FDA advisory committee lamented that Fentora's existing risk management program was ineffective and stated that Cephalon would have to institute a risk evaluation and mitigation strategy for the drug before the FDA would consider broader label indications. In response, Cephalon revised Fentora's label and medication guide to add strengthened warnings.

238. But in 2009, the FDA once again informed Cephalon that the risk management program was not sufficient to ensure the safe use of Fentora for already approved indications.

---

[131] Seeking Alpha, Transcript of Q1 2007 Cephalon, Inc. Earnings Conference Call (May 1, 2007), http://seekingalpha.com/article/34163-cephalon-q1-2007-earnings-call-transcript.
[132] FDA safety page: How to use Fentora safely, Drug Topics, https://www.drugtopics.com/fda/fda-safety-page-how-use-fentora-safely (last accessed May 6, 2022).
[133] *FENTORA (fentanyl buccal tablet) CII, Joint Meeting of Anesthetic and Life Support Drugs and Drug Safety and Risk Management Advisory Committee*, U.S. Food & Drug Administration (May 6, 2008).

239. On March 26, 2009, the FDA warned Cephalon against its misleading advertising of Fentora ("Warning Letter"). The Warning Letter described a Fentora Internet advertisement as misleading because it purported to broaden "the indication for Fentora by implying that any patient with cancer who requires treatment for breakthrough pain is a candidate for Fentora . . . when this is not the case."[134] Rather, Fentora was indicated only for those who were already opioid tolerant. It also criticized Cephalon's other direct Fentora advertisements because they did not disclose the risks associated with the drug.

240. Flagrantly disregarding the FDA's refusal to approve Fentora for non-cancer BTP and its warning against marketing the drug for the same, Cephalon continued to use the same sales tactics to push Fentora as it did with Actiq.

241. For example, on January 13, 2012, Cephalon published an insert in *Pharmacy Times* titled, "An Integrated Risk Evaluation and Mitigation Strategy (REMS) for FENTORA (Fentanyl Buccal Tablet) and ACTIQ (Oral Transmucosal Fentanyl Citrate)."[135] Despite the repeated warnings of the dangers associated with the use of the drugs beyond their limited indication, as detailed above, the first sentence of the insert stated: "It is well recognized that the judicious use of opioids can facilitate effective and safe management of chronic pain."[136]

**(5) Cephalon Funded False Publications and Presentations.**

242. Along with its direct marketing, Cephalon indirectly marketed through third parties to change the way doctors viewed and prescribed opioids – disseminating the unproven and deceptive messages that opioids were safe for the treatment of chronic, long-term pain; that they

[134] See P-CA-000878

[135] *An Integrated Risk Evaluation and Mitigation Strategy (REMS) for FENTORA (Fentanyl Buccal Tablet) and ACTIQ (Oral Transmucosal Fentanyl Citrate)*, Pharmacy Times (Jan. 13, 2012), http://www.pharmacytimes.com/publications/issue/2012/january2012/r514-jan-12-rems.

[136] *Id.*

were non-addictive; and that they were woefully under-prescribed to the detriment of patients who were needlessly suffering. It did so by sponsoring pro-opioid front groups, misleading prescription guidelines, articles, and CME programs, as well as by paying physicians thousands of dollars every year to publicly opine that opioids were safe, effective, and non-addictive for many uses.

243. Cephalon sponsored numerous CME programs, which were made widely available through organizations like Medscape, LLC ("Medscape") and which disseminated false and misleading information to physicians across the country.

244. For example, a 2003 Cephalon-sponsored CME presentation titled "Pharmacologic Management of Breakthrough or Incident Pain" and posted on Medscape in February 2003 stated:

> [C]hronic pain is often undertreated, particularly in the noncancer patient population. . . . The continued stigmatization of opioids and their prescription, coupled with often unfounded and self-imposed physician fear of dealing with the highly regulated distribution system for opioid analgesics, remains a barrier to effective pain management and must be addressed. Clinicians intimately involved with the treatment of patients with chronic pain recognize that the majority of suffering patients lack interest in substance abuse. In fact, patient fears of developing substance abuse behaviors such as addiction often lead to undertreatment of pain. The concern about patients with chronic pain becoming addicted to opioids during long-term opioid therapy may stem from confusion between physical dependence (tolerance) and psychological dependence (addiction) that manifests as drug abuse.[137]

245. Another Cephalon-sponsored CME presentation titled "Breakthrough Pain: Treatment Rationale with Opioids" was available on Medscape starting September 16, 2003, and was given by a self-professed pain management doctor who "previously operated back, complex regional pain syndromes, the neuropathies, and interstitial cystitis." (One slide from that CME presentation is set forth below.) The presentation describes the pain process as a non-time-dependent continuum that requires a balanced analgesia approach using "targeted

[137] Michael J. Brennan et al., *Pharmacologic Management of Breakthrough or Incident Pain*, Medscape, https://www.medscape.org/viewarticle/449803 (last visited May 5, 2022).

pharmacotherapeutics to affect multiple points in the pain-signaling pathway."[138] The doctor lists fentanyl as one of the most effective opioids available for treating BTP, describing its use as an expected and normal part of the pain management process. Nowhere in the CME is cancer or cancer-related pain even mentioned.




246. Dr. Stephen H. Landy ("Landy") authored a 2004 CME manuscript available on Medscape titled, "Oral Transmucosal Fentanyl Citrate for the Treatment of Migraine Headache Pain In Outpatients: A Case Series." The manuscript preparation was supported by Cephalon. Landy describes the findings of a study of fentanyl citrate to treat migraine headache pain and concluded that "OTFC rapidly and significantly relieved acute, refractory migraine pain in

[138] Daniel S. Bennett, *Breakthrough Pain: Treatment Rationale With Opioids*, Medscape, https://www.medscape.org/viewarticle/461612 (last visited May 5, 2022).

outpatients . . . and was associated with high patient satisfaction ratings."[139] Based on an analysis of publicly available data, Cephalon paid Landy approximately $190,000 in 2009-2010 alone, and in 2015-2016, Cephalon paid Landy another $75,000.

247. In 2006, Cephalon sponsored a review of scientific literature to create additional fentanyl-specific dosing guidelines titled, *Evidence-Based Oral Transmucosal Fentanyl Citrate (OTFC®) Dosing Guidelines*.[140] The article purports to review the evidence for dosing and efficacy of oral transmucosal fentanyl citrate in the management of pain and produce dosing guidelines in both cancer and non-cancer patients. It states:

> Oral transmucosal fentanyl citrate has a proven benefit in treating cancer associated breakthrough pain in opioid-tolerant patients with cancer, which is the Food and Drug Administration (FDA)-approved indication for Actiq. *Pain medicine physicians have also used OTFC successfully to provide rapid pain relief in moderate to severe noncancer pain in both opioid-tolerant and opioid-nontolerant patients*.[141]

248. Later in the article, the authors attempt to assuage doctors' concerns regarding possible overdose and respiratory distress in non-cancer patients by arguing "*[t]here is no evidence that opioid safety and efficacy differs in opioid-tolerant patients with chronic non-cancer pain*." Regarding the use of fentanyl to treat non-opioid-tolerant patients, the article's authors stated:

> Alternatively, *OTFC might also be used cautiously and safely for* acute pain experienced by *patients who are not opioid tolerant*. *Parenteral opioids are routinely used for acute pain in patients who are not opioid tolerant*. Examples include episodic pain (*i.e.*, refractory migraine pain, recurrent renal calculi, etc.) and acute pain that follows surgery, trauma, or painful procedures (burn dressing change, bone marrow aspiration, lumbar puncture). Assuming that clinical experience with IV morphine in patients who are not opioid tolerant can be extrapolated, OTFC should be safe and efficacious in such settings as well.[142]

---

[139] Stephen H. Landy, *Oral Transmucosal Fentanyl Citrate for the Treatment of Migraine Headache Pain In Outpatients: A Case Series*, 44(8) Headache (2004), https://www.medscape.com/viewarticle/488337_2 (last visited May 6, 2022).
[140] Gerald M. Aronoff et al., *Evidence-Based Oral Transmucosal Fentanyl Citrate (OTFC) Dosing Guidelines*, 6(4) Pain Med. 305-14 (Aug. 2005).
[141] *Id.*
[142] *Id.*

249. Upon information and belief, through its sponsorship of FSMB, Cephalon continued to encourage the prescribing of opioid medication to "reverse . . . and improve" patient function, attributing patients' displays of traditional drug-seeking behaviors as merely "pseudoaddiction."

250. Cephalon also disseminated its false messaging through speakers' bureaus and publications. For example, at an AAPM annual meeting held February 22 through 25, 2006, Cephalon sponsored a presentation by Webster and others titled, "Open-label study of fentanyl effervescent buccal tablets in patients with chronic pain and breakthrough pain: Interim safety results."[143] The presentation purports to cover a study analyzing the safety of a new form of fentanyl buccal tablets in the chronic pain setting and promises to show the "[i]nterim results of this study suggest that FEBT is safe and well-tolerated in patients with chronic pain and BTP."

251. Cephalon sponsored another CME presentation written by Webster and M. Beth Dove titled, "Optimizing Opioid Treatment for Breakthrough Pain" and offered on Medscape from September 28, 2007, through December 15, 2008. The presentation stated that non-opioid analgesics and combination opioids containing non-opioids such as aspirin and acetaminophen are less effective at treating BTP than pure opioid analgesics because of dose limitations on the non-opioid component.

252. Fine authored a Cephalon-sponsored CME presentation titled, "Opioid-Based Management of Persistent and Breakthrough Pain," with Drs. Christine A. Miaskowski and Michael J. Brennan. Cephalon paid to have this CME presentation published as a "Special Report" supplement of the journal *Pain Medicine News* in 2009.[144] The CME presentation targeted various

---

[143] https://www.medscape.org/viewarticle/524538_2

[144] Perry G. Fine et al., *Opioid-Based Management of Persistent and Breakthrough Pain*, Special Report (2009), https://www.yumpu.com/en/document/view/11409251/opioid-basedmanagement-of-persistent-and-breakthrough-pain/9.

non-oncologist healthcare providers who treat patients with chronic pain to educate "health care professionals about a semi-structured approach to the opioid-based management of persistent and breakthrough pain," including the use of fentanyl. The CME presentation purported to analyze the "combination of evidence- and case-based discussions" and ultimately concluded:

> *All individuals with chronic, moderate to severe pain associated with functional impairment should be considered for a trial or opioid therapy, although not all of them will be selected.*[145]

253. Along with its co-conspirators, Cephalon sponsored the APF's guide, which warned against the purported *under*-prescribing of opioids, taught that addiction is ***rare,*** and suggested that opioids have "*no ceiling dose*" and are therefore the most appropriate treatment for severe pain. A summary of the February 12-16, 2008, AAPM annual meeting reinforced the message, promoted both by the AAPM and the APS, that "the undertreatment of pain is unjustified." It continued*, "Pain management is a fundamental human right* in all patients not only with acute postoperative pain but also *in patients suffering from chronic pain*."[146]

254. Cephalon was one of several opioid manufacturers who collectively paid 14 of the 21 panel members who drafted the 2009 APS-AAPM opioid treatment guidelines.[147]

255. In the March 2007 article titled "Impact of Breakthrough Pain on Quality of Life in Patients with Chronic, Noncancer Pain: Patient Perceptions and Effect of Treatment with Oral Transmucosal Fentanyl Citrate,"[148] published in the nationally circulated journal *Pain Medicine*, physicians paid by Cephalon (including Webster) described the results of a Cephalon-sponsored study seeking to expand the definition of BTP to the chronic, non-cancer setting. The authors stated

---

[145] *Id*.
[146] Mohamed A. Elkersh & Zahid H. Bajwa, *Highlights From the American Academy of Pain Medicine 24th Annual Meeting*, 2(1) Advances in Pain Management 50-52 (2008).
[147] *See* Chou, *Clinical Guidelines*, *supra* n.69.
[148] Donald R. Taylor et al., *Impact of Breakthrough Pain on Quality of Life in Patients With Chronic, Noncancer Pain: Patient Perceptions and Effect of Treatment With Oral Transmucosal Fentanyl Citrate (OTFC, ACTIQ)*, 8(3) Pain Med. 281-88 (Mar. 2007).

that the "OTFC has been shown to relieve BTP more rapidly than conventional oral, normal-release, or 'short acting' opioids" and that "[t]he purpose of [the] study was to provide a qualitative evaluation of the effect of BTP on the [quality of life] of noncancer pain patients."[149] The number-one-diagnosed cause of chronic pain in the patients studied was back pain (44%), followed by musculoskeletal pain (12%) and head pain (7%). The article cited Portenoy and recommended fentanyl for non-cancer BTP patients:

> In summary, BTP appears to be a clinically important condition in patients with *chronic noncancer pain* and is associated with an adverse impact on QoL. This qualitative study on the negative impact of BTP *and the potential benefits of BTP-specific therapy* suggests several domains that may be helpful in developing BTP-specific, QoL assessment tools.[150]

256. Cephalon also sponsored, through an educational grant, the regularly published journal *Advances in Pain Management*. A single 2008 issue of the journal contained numerous articles from Portenoy, Dr. Steven Passik ("Passik"), Dr. Kenneth L. Kirsh ("Kirsh"), and Webster, all advancing the safety and efficacy of opioids. In an article titled, "Screening and Stratification Methods to Minimize Opioid Abuse in Cancer Patients," Webster expressed disdain for the prior 20 years of opioid phobia.

257. In another article from the same issue, "Appropriate Prescribing of Opioids and Associated Risk Minimization," Passik and Kirsh stated: "[c]hronic pain, currently experienced by approximately 75 million Americans, is becoming one of the biggest public health problems in the US." They assert that addiction is rare, that "[m]ost pain specialists have prescribed opioids for long periods of time with success demonstrated by an improvement in function" and that then-

---

[149] *Id.*
[150] *Id.*

recent work had shown "that opioids do have efficacy for subsets of patients who can remain on them long term and have very little risk of addiction."[151]

258. In November 2010, Fine and others published an article presenting the results of another Cephalon-sponsored study titled, "Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study."[152] In that article, Fine explained that the 18-month "open-label" study "assessed the safety and tolerability of FBT [Fentora] for the [long-term] treatment of BTP in a large cohort . . . of opioid-tolerant patients receiving around-the-clock . . . opioids for non-cancer pain." The article acknowledged that: (a) "[t]here has been a steady increase in the use of opioids for the management of chronic non-cancer pain over the past two decades"; (b) the "widespread acceptance" had led to the publishing of practice guidelines "to provide evidence- and consensus-based recommendations for the optimal use of opioids in the management of chronic pain"; and (c) those guidelines lacked "data assessing the long-term benefits and harms of opioid therapy for chronic pain."[153]

259. The article concluded: "[T]he safety and tolerability profile of FBT in this study was generally typical of a potent opioid. The [adverse events] observed were, in most cases, predictable, manageable, and tolerable." That article concluded that the number of abuse-related events was "small."[154]

---

[151] Steven D. Passik & Kenneth L. Kirsh, *Appropriate Prescribing of Opioids and Associated Risk Minimization*, 2(1) Advances in Pain Management 9-16 (2008).
[152] Perry G. Fine et al., *Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study*, 40(5) J. Pain & Symptom Management 747-60 (Nov. 2010).
[153] *Id.*
[154] *Id.*

260. From 2000 forward, Cephalon has paid doctors nationwide millions of dollars for programs relating to its opioids, many of whom were not oncologists and did not treat cancer pain. These doctors included Portenoy, Webster, Fine, Passik, Kirsh, Landy, and others.

261. Cephalon's payments to doctors have resulted in studies that support its sales but are biased or irreparably flawed. For instance, and upon information and belief, the governmental whistleblower investigation into Actiq revealed that two studies touted by Cephalon had tested fewer than 28 patients and had no control group.[155] A 2012 article evaluating the then status of transmucosal fentanyl tablet formulations for the treatment of BTP in cancer patients noted that clinical trials to date used varying criteria, that "the approaches taken . . . [did] not uniformly reflect clinical practice," and that "the studies ha[d] been sponsored by the manufacturer and so ha[d] potential for bias."[156]

262. Teva, which acquired Cephalon, has refused to produce information requested as part of a Senate investigation into opioid manufacturers and distributors, including Cephalon. Senator McCaskill issued requests on July 26, 2017, and September 28, 2017. In a letter to Teva Ltd. sent September 28, 2017, Senator McCaskill explained that "the company's decision to obstruct basic oversight on the opioid epidemic should deeply concern shareholders." On March 6, 2018, Senator McCaskill issued a press release castigating Teva Ltd. for its continued refusal to comply with her requests: "Teva's refusal to cooperate with Congressional requests strongly suggests they have something to hide."[157] As of July 12, 2018, the date Senator McCaskill's third

---

[155] Carreyrou, *Cephalon Used Improper Tactics*, *supra* n. 130.
[156] Eric Prommer & Brandy Fleck, *Fentanyl transmucosal tablets: current status in the management of cancer-related breakthrough pain*, 2012(6) Patient Preference and Adherence 465-75 (June 25, 2012).
[157] Press Release, U.S. Senate Committee on Homeland Security & Governmental Affairs, McCaskill: Teva Is Stonewalling a Senate Investigation (Mar. 6, 2018), https://www.hsgac.senate.gov/ media/minority-media/mccaskill-teva-is-stonewalling-a-senate-investigation.

report titled, *Fueling an Epidemic: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement*, was published, Teva Ltd. remained uncooperative.[158]

**(6) Teva Failed to Monitor and Report Suspicious Sales as Required.**

263. The CSA imposes on all "registrants" the obligation to design and operate a system to monitor suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *See* 21 C.F.R. § 1301.74(b); *see also* W. Va. Code R. § 15-2-5 *et seq*.

264. Teva is a "registrant" under the federal CSA. 21 C.F.R. § 1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

265. Teva failed to design and operate a system to monitor suspicious orders of controlled substances and/or failed to notify the appropriate DEA field division of suspicious orders. Cephalon's failure to timely report these and other suspicious sales violated the CSA.

**d) Actavis**

266. Actavis has manufactured, marketed, distributed, or sold pharmaceutical drugs nationwide and in West Virginia, including opioids. Until it sold its portfolio of generic opioids, Actavis was among the largest U.S. suppliers of opioid pain medications.

267. Among the drugs Actavis distributes or distributed during the times relevant to the Complaint — nationwide and in West Virginia — are the following:

---

[158] *Fueling an Epidemic, Report Three: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement*, U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Member's Office, at 1 (July 12, 2018), https://www.hsgac.senate.gov/ imo/media/doc/REPORT-Fueling%20an%20Epidemic-A%20Flood%20of%201.6%20Billion%20Doses%20of%20Opioids%20into%20Missouri%20and%20the%20Need%20for%20Stronger%20DEA%20Enforcement.pdf (hereinafter, "*July 2018 McCaskill Report*").

| | | |
|---|---|---|
| Kadian (morphine sulfate, extended release) | Opioid agonist indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatments are inadequate. 20 mg, 50 mg, and 100 mg strengths approved by the FDA in 1996. 30 mg and 60 mg strengths | Schedule II |
| Norco (hydrocodone bitartate and Acetaminophen | Opioid agonist initially indicated for the relief of moderate to moderately severe pain. Later, indication amended to treat acute pain sever enough to require opioid analgesic and for which alternative treatments are inadequate. Norco was initially approved by the FDA in 1997. | Schedule III (1997-2014) Schedule II (2014-present) |
| Oxymorphone | Generic equivalent of Opana ER. Launched in 2013. | Schedule II |
| Morphine | Generic equivalent of Kadian. Launched in 2013. | Schedule II |
| Fentanyl citrate | Generic equivalent of Duragesic. Launched in 2007. | Schedule II |

268. In 2008, Actavis acquired Kadian from King Pharmaceuticals for an amount up to $127.5 million, depending on quarterly sales-related milestones.

269. Actavis also manufactured, marketed, and sold generic opioids until it sold its generic opioid portfolio for $40.5 billion to Teva Ltd. in 2016.

**(1) The FDA Issued a Warning Letter to Actavis Concerning Extensive False and Misleading Claims in Kadian Marketing Materials.**

270. On February 18, 2010, the FDA's Division of Drug Marketing, Advertising, and Communications issued a warning letter ("2010 Warning Letter") to Actavis concerning the marketing of Kadian. The letter warned that certain marketing materials for Kadian "are false or misleading because they omit and minimize the serious risks associated with the drug, broaden

and fail to present the limitations to the approved indication of the drug, and present unsubstantiated superiority and effectiveness claims" in violation of the FDCA and regulations promulgated thereunder.[159] The 2010 Warning Letter addressed two marketing materials: a Comparison Detailer and a Co-Pay Assistance Program brochure.

271. According to the 2010 Warning Letter, the marketing materials "present several effectiveness claims for Kadian but fail to present any contraindications, and also omit several warnings, precautions, drug interactions and adverse events" including by failing to include "warnings regarding potentially fatal abuse of opioids [and] use by individuals other than the patient for whom the drug was prescribed."[160]

272. The 2010 Warning Letter also stated that the Comparison Detailer "fails to present risk information with a prominence and readability that is reasonably comparable to the presentation of benefit information."[161] Whereas "the first five of the six pages of the Comparison Detailer prominently present efficacy claims about Kadian using large, bolded headers and claims surrounded by a significant amount of white space . . . using colorful charts and graphs," "the only specific risk information presented is relegated to the back cover . . . in a small font . . . beneath a large, bolded headline claim that presents a benefit claim."[162]

273. The 2010 Warning Letter provided that the effect of these presentations "minimizes the risks associated with Kadian and misleadingly suggests that Kadian is safer than has been demonstrated."[163]

[159] *See* https://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf
[160] *Id.*
[161] *Id.*
[162] *Id.*
[163] *Id.*

274. Further, the 2010 Warning Letter states that Kadian promotional materials were misleading because they "present broad claims about the drug's use in treating pain, therefore implying that Kadian is appropriate for use in a broader range than it is approved to treat." The 2010 Warning Letter cites these examples from the Comparison Detailer:

- "Allow for less breakthrough pain and more consistent pain relief for patients."
- "Better pain control . . . ."
- "Improved pain control . . . ."
- "Allow patients to live with less pain . . . ."
- "Less Pain. More options."[164]

275. According to the 2010 Warning Letter, "[t]hese presentations in the Comparison Detailer suggest that Kadian is appropriate for patients with broader types of pain than the drug is indicated for."[165]

276. The 2010 Warning Letter found similar problems in the Co-Pay Assistance Program brochure, which included these statements (emphases in original):

- "**Why is pain management important?** Pain management is a large part of your overall health care plan. Many Americans suffer from chronic or ongoing pain . . . Managing your pain the right way begins by talking to your healthcare provider. Discover the cause of your pain by taking note of what makes your pain start and what makes it worse."

- "**What is chronic pain?** Chronic pain is ongoing and can last longer than 6 months. Chronic pain can be mild or severe. . . ."

- "**How can I treat my chronic pain?** To help manage your pain, your healthcare provider will determine what level of pain control you need. Depending on what kind of pain you have and how it affects your life, your healthcare provider will choose a drug that works just for you."[166]

277. The 2010 Warning Letter also stated that these statements "suggest[] that patients with broader types of chronic pain than the drug is indicated for are appropriate candidates for

[164] *Id.* at 2-3.
[165] *Id.* at 3.
[166] *Id.*.

Kadian therapy, when this is not the case. . . . Kadian is *only* appropriate for a very limited patient population who experience pain." (Emphasis in original.) It continues, "[i]n addition, the partial indication included on the back cover of the Co-Pay Assistance Program brochure, unlike the chronic pain information, is written in technical medical language that is not likely to be easily understood by consumers."[167]

278. Next, the 2010 Warning Letter identifies unsubstantiated superiority claims, including that Kadian "[a]llow[s] for less breakthrough pain and more consistent pain relief for patients" and asks, "Why settle for generic MS Contin tablets . . . When you can prescribe the benefits of KADIAN capsules?" According to the Letter, these "claims and presentations misleadingly imply that Kadian has been shown to be superior to MS Contin or generic controlled-release morphine" but the "FDA is not aware of ***any*** substantial evidence or substantial clinical expertise that supports these claims and presentations." (Emphasis in original).[168]

279. The 2010 Warning Letter also identified the following claims "supported by a historically controlled study of inadequate design, completely lacking any concurrent control"; "[b]etter pain control and improved sleep scores"; "[i]mproved pain control and sleep scores in patients treated with KADIAN who were previously on CR morphine tablets"; and "[a]llow patients to live with less pain and get adequate rest with less medication." The 2010 Warning Letter states that the trial identified in support of these claims "clearly do[es] not support any conclusion that Kadian is superior to alternative treatments in pain or sleep measures."[169]

280. Further, the 2010 Warning Letter focused on the Comparison Detailer's inclusion of dosing claims comparing Kadian with MS Contin and Avinza. The Detailer claims that Kadian

[167] *Id.* at 2.
[168] *Id.* at 3.
[169] *Id.* at 4.

presents “[f]ewer barriers to prescribing” because “[t]he unique dosing flexibility of KADIAN gives you more options with morphine” than does MS Contin or Avinza. However, “the FDA is unaware of any substantial evidence or substantial clinical experience to support the claim that the above dosing characteristics allow Kadian to have ‘fewer barriers to prescribing’ (the meaning of which is not clear) as compared to other extended-release morphine products.”[170]

281. In conclusion, the 2010 Warning Letter found that the Comparison Detailer and Co-Pay Assistance Program brochure “misbrand Kadian in violation of the [FDCA].”[171]

**(2) Actavis Failed to Monitor and Report Suspicious Sales as Required.**

282. The CSA imposes on all “registrants” the obligation to design and operate a system to monitor suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. “Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.” *See* 21 C.F.R. § 1301.74(b); *see also* W. Va. Code R. § 15-2-5 et seq..

283. Actavis is a “registrant” under the CSA. 21 C.F.R. § 1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

284. Actavis failed to design and operate a system to monitor suspicious orders of controlled substances and/or failed to notify the appropriate DEA field division of suspicious orders. Actavis’ failure to timely report these and other suspicious sales violated the CSA.

[170] *Id.*
[171] *Id.* at 5.

**e) Mylan n/k/a Viatris, Inc.**

285. On July 15, 2005, the FDA issued a public health advisory warning doctors of deaths resulting from the use of brand-name and generic fentanyl patches, such as those manufactured by Mylan. The advisory noted that the FDA had been "examining the circumstances of product use to determine if the reported adverse events may be related to inappropriate use of the patch" and noted the possibility "that patients and physicians might be unaware of the risks" of using the fentanyl transdermal patch, a potent opioid analgesic meant to treat chronic pain that does not respond to other painkillers.

286. As people became more and more hooked on prescription painkillers, many moved to heroin, and increasingly to fentanyl, which is even more potent and cheaper than heroin, and is increasingly mixed with or sold as heroin. This transition to heroin and fentanyl caused a dramatic spike in heroin overdose deaths after 2011 and in fentanyl overdose deaths in 2014:



[172]

[172] *See* https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates#:~:text=%2C%201999%2D2021.-,The%20figure%20above%20is%20a%20bar%20and%20line%20graph%20showing,and%209%2C173%20deaths%20in%202021.



**173**

**(1) Mylan Failed to Monitor and Report Suspicious Sales as Required.**

287. The CSA imposes on all "registrants" the obligation to design and operate a system to monitor suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *See* 21 C.F.R. § 1301.74(b); *see also* W. Va. Code R. § 15-2-5 *et seq*.

288. Mylan is a "registrant" under the CSA. 21 C.F.R. § 1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

[173] *See* https://www.axios.com/2023/05/03/fentanyl-overdose-death-rates-statistics

289. Mylan failed to design and operate a system to monitor suspicious orders of controlled substances and/or failed to notify the appropriate DEA field division of suspicious orders. Mylan's failure to timely report these and other suspicious sales violated the CSA.

**f) Indivior**

290. On July 24, 2000, Indivior solutions plead guilty to a one-count felony information and, together with its parent companies Indivior, Inc., and Indivior PLC, agreed to pay a total of $600 million to resolve criminal and civil liability associated with the marketing of the opioid-addiction-treatment drug Suboxone.[174]

291. Suboxone is a drug product approved for use by recovering opioid addicts to avoid or reduce withdrawal symptoms while they undergo treatment for opioid-use disorder. Suboxone contains buprenorphine, a powerful opioid.

292. In connection with its guilty plea, Indivior Solutions admitted to making false statements to promote the film version of Suboxone (Suboxone Film) to the Massachusetts Medicaid program (MassHealth) relating to the safety of Suboxone Film around children.

**G. The National Retail Pharmacy Defendants Failed to Uphold Their Obligations Both to Report Suspicious Orders and to Stop Filling "Red Flag" Prescriptions.**

293. National retail pharmacy chains earned enormous profits by flooding the country, including West Virginia, with prescription opioids. They were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and dispensaries. Yet they continued to participate in the oversupply and profit from it instead of taking any meaningful action to stem the flow of opioids into communities.

[174] https://www.justice.gov/opa/pr/indivior-solutions-pleads-guilty-felony-charge-and-indivior-entities-agree-pay-600-million

294. Each of the National Retail Pharmacy Defendants — CVS, Walgreens, Walmart, and Kroger — does substantial business throughout the United States and West Virginia. This business includes the distribution and dispensing of prescription opioids. The National Retail Pharmacy Defendants failed to take meaningful action to stop diversion despite their knowledge of it, which contributed substantially to the opioid epidemic.

295. The National Retail Pharmacy Defendants developed and maintained extensive data on opioids they distributed and dispensed. Through this data, the National Retail Pharmacy Defendants had direct knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in communities throughout the country, including West Virginia. They used the data to evaluate their own sales activities and workforce. On information and belief, the National Retail Pharmacy Defendants also provided other Defendants with data regarding, *inter alia*, individual doctors in exchange for rebates or other forms of consideration.

296. The National Retail Pharmacy Defendants' data is a valuable resource that they could have used to help stop diversion but failed to do so. As an example of this, in 2010, Defendant Walgreens' fiscal year 2010 SEC Form 10-K disclosed that it recognizes "purchased prescription files" as "intangible assets" valued at $749,000,000.[175] In addition, Walgreens' own advertising has acknowledged that Walgreens has centralized data such that customers' "complete prescription records" from Walgreens' "thousands of locations nationwide" are "*instantly available*."

297. Also as an example, similarly, Defendant CVS's Director of Managed Care Operations, Scott Tierney, testified that CVS's data vendors included IMS Health, Verispan, and Walters Kluwers and that CVS used the vendors for "analysis and aggregation of data" and "some

[175] Walgreen Co. and Subsidiaries Annual Report for the Year Ended August 31, 2010, SEC.gov, available at https://www.sec.gov/Archives/edgar/data/104207/000010420710000098/exhibit_13.htm (last visited Oct. 22, 2020).

consulting services." He also testified that CVS would provide the vendors with "prescriber level data, drug level data, plan level data, [and] de-identified patient data."[176]

298. Each of the National Retail Pharmacy Defendants had complete access to all prescription opioid dispensing data related to its pharmacies across the United States, and to the West Virginia Controlled Substance Monitoring Program ("CSMP").[177] The WV CSMP provides registrants complete access to information revealing the doctors who prescribed opioids to be dispensed by its pharmacies, the size and frequency of their prescriptions, and the customers who filled or sought to fill prescriptions for opioids in its pharmacies. Each of the National Retail Pharmacy Defendants likewise had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by its pharmacies.

**1. The National Retail Pharmacy Defendants Have a Duty to Prevent Diversion.**

299. Each participant in the supply chain of opioid distribution, which includes the National Retail Pharmacy Defendants, is responsible for preventing the diversion of prescription opioids into the illegal market by, among other things, monitoring and reporting suspicious activity and refusing to fill invalid prescriptions.

300. Pharmacists are the "last line of defense" in keeping drugs from entering the illicit market. Since they are the final point of sale for pharmaceuticals and the interface between the supply chain and the consumer, pharmacies generate the data that manufacturers, as well as wholesale distributors, rely upon to measure consumer activity for sales purposes. Moreover, pharmacists are meant to be the drug experts in the healthcare delivery system and as such have considerable duties and responsibility in the oversight of patient care. Pharmacists are the

[176] Joint Appendix in *Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 687134 (U.S.) *245-46 (Feb. 22, 2011).
[177] W.Va. Code §§ 30-5-7, 60A-9-4(a)(2)(A), (b)(1)-(9); W.Va. Board of Pharmacy § 15-8.

gatekeepers of a closed system of prescription drug distribution designed to protect the health, safety, and welfare of our citizens through limited access to drugs that can have serious and lethal adverse consequences. They cannot blindly fill prescriptions written by a doctor, even one registered under the CSA to dispense opioids, if the prescription is not for a legitimate medical purpose.

301. The National Retail Pharmacy Defendants, like the Manufacturer Defendants and non-joined distributors, must register under the CSA. *See* 21 C.F.R. § 1301.11. Under the CSA and West Virginia law, pharmacy registrants are required to design and operate a system to detect and report "suspicious orders" for controlled substances. *See* 21 C.F.R. § 1301.71(b); *see also* W. Va. Code R. § 15-2-5; W. Va. Code § 60A-3-303(a)(1). The CSA authorizes the imposition of a civil penalty of up to $10,000 for each violation of 21 C.F.R. § 1301.74(b). See 21 U.S.C. § 842(a)(5), (c)(1)(B).

302. Just as manufacturers and distributors must register under the CSA, so too must pharmacies. *See* 21 C.F.R. § 1301.11. Under the CSA, pharmacists are charged with a "corresponding responsibility" to dispense only legitimate prescriptions and implement effective controls and procedures to prevent diversion. *See* 21 C.F.R. §§ 1306.04(a), 1301.71(a). That "'corresponding responsibility' . . . means, among other things, that a pharmacist is obligated to refuse to fill a prescription if he knows or has reason to know that the prescription was not written for a legitimate medical purpose." *Medic-Aid Pharmacy, Revocation of Registration*, 55 Fed. Reg. 30,043, 30,044 (July 24, 1990) (emphasis added). Notably, "pharmacists do not need to practice medicine or independently examine a patient in order to determine in certain cases that a prescription was not issued for a legitimate medical purpose." *Jones Total Health Care Pharmacy, LLC v. Drug Enf't Admin.*, 881 F.3d 823, 832 (11th Cir. 2018). "When [pharmacists'] suspicions

are aroused as reasonable professionals . . . pharmacists are called upon to obey the law and refuse to dispense." *Ralph J. Bertolino*, 55 Fed. Reg. 4,729, 4,730 (Feb. 9, 1990); *see also Grider Drug #1 & Grider Drug #2*, Decision and Order, 77 Fed. Reg. 44,069 (July 26, 2012).

303. Pharmacy owners, including the National Retail Pharmacy Defendants, are also liable for their pharmacists' CSA violations. *See, e.g.*, *United States v. Appalachian Reg'l Healthcare, Inc.*, 246 F. Supp. 3d 1184, 1189 (E.D. Ky. Mar. 30, 2017); *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 209 & 5195*, Decision and Order, 77 Fed. Reg. 62,316, 62,323 (Oct. 12, 2012) ("[T]he fact that CVS is a large corporation provides no reason to excuse it from explicitly acknowledging the misconduct of Respondents and their pharmacists.").

304. The DEA, among others, has provided extensive guidance to pharmacies concerning their duties to the public. The guidance advises pharmacies on how to identify suspicious orders and other evidence of diversion.

305. In addition to the requirement of implementing a system for diversion control, the CSA and its implementing regulations require all registrants to: (1) report suspicious orders of prescription opioids to the DEA and (2) perform required due diligence prior to filling any suspicious orders. *See* 21 U.S.C. § 823(b)(1); 21 C.F.R. § 1301.74(b). A "suspicious order" is defined as including "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency, among others." *See* 21 C.F.R. § 1301.74(b).

306. Suspicious pharmacy orders are often termed "red flags" because they are evidence of diversion. Additional "red flags" include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances compared to other practitioners in the area; (2) prescriptions which should last for a specific period in time when legitimately used, but are being refilled on a shorter basis; (3)prescriptions for

antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions that look "too good" or where the prescriber's handwriting is too legible; (5) prescriptions with quantities or doses that differ from usual medical usage; (6) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (7) photocopied prescriptions; or (8) prescriptions containing different handwriting. Most of the time, these attributes are not difficult to detect and should be easily recognizable by pharmacies and their pharmacists.

307. Signs that a customer is seeking opioids for the purpose of diversion include customers who: (1) appear to be returning too frequently; (2) are seeking to fill a prescription written for a different person; (3) appear at the pharmacy counter simultaneously, or within a short time, all bearing similar prescriptions from the same physician; (4) are not regular patrons or residents of the community, and show up with prescriptions from the same physician; (5) drive long distances to have prescriptions filled; (6) seek large volumes of controlled substances in the highest strength in each prescription; (7) seek a combination of other drugs with opioids such as tranquilizers and muscle relaxers that can be used to create an "opioid cocktail"; and (8) pay large amounts of cash for their prescriptions rather than using insurance. Ignoring these signs violates industry standards and DEA guidelines.

308. Other signs of diversion can be observed through data gathered, consolidated, and analyzed by the National Retail Pharmacy Defendants themselves. That data allows them to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing. According to industry standards, if a pharmacy finds evidence of prescription diversion, the local Board of Pharmacy and DEA must be contacted. Despite this and legal

obligations as a registrant under the CSA, the National Retail Pharmacy Defendants allowed widespread diversion to occur – and they did so knowingly.

309. Performance metrics and prescription quotas adopted by the National Retail Pharmacy Defendants for their retail stores contributed to their failure. Under the National Retail Pharmacy Defendants Metrics System, for example, pharmacists were incentivized to meet high prescription-filling goals that made it difficult, if not impossible, to comply with applicable laws and regulations. These policies remained in place even as the epidemic raged. There was no measurement for pharmacy accuracy or customer safety. Moreover, the bonuses for pharmacists were calculated, in part, on how many prescriptions pharmacists filled within a year. The result is both deeply troubling and entirely predictable: opioids flowed out of the National Retail Pharmacy Defendants and into communities throughout the country, including West Virginia school districts.

310. Upon information and belief, this problem was compounded by the National Retail Pharmacy Defendants' failure to adequately train their pharmacists and pharmacy technicians on the following non-exhaustive topics: (a) what constitutes a proper inquiry into whether a prescription is legitimate; (b) whether an opioid prescription is likely for a an FDA approved condition; (c) what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal; and (d) how to respond to suspicious circumstances, including indications that pills are being illegally diverted, including into drug trafficking.

311. Upon information and belief, the National Retail Pharmacy Defendants also failed to adequately use data available to them to identify doctors, including those in West Virginia, who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to adequately use data available to them to do statistical analyses to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

312. Upon information and belief, the National Retail Pharmacy Defendants failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

313. Upon information and belief, the National Retail Pharmacy Defendants also failed to conduct adequate internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if they conducted such audits, they took no meaningful action as a result.

314. Upon information and belief, the National Retail Pharmacy Defendants also failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

315. The National Retail Pharmacy Defendants were, or should have been, fully aware that the quantity of opioids they were both distributing and dispensing was untenable, and in many areas patently absurd; yet, they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law on controlled substances.

316. The Pharmacy Defendants' policies of speed over accuracy were negligent. Adopting performance metrics and quotas placed significant and unrealistic time pressures on pharmacists. Many Pharmacy Defendants required pharmacists to fill one prescription every three minutes or more than 600 prescriptions per work shift. All measurements focus on productivity with the end goal of maximizing the Pharmacy Defendants' profits. Meeting such unrealistic goals would violate the law regarding professional responsibilities and governing practice rules. To satisfy these increased productivity demands with decreased staffing required pharmacists

employed by the Pharmacy Defendants to cut corners in their performance of due diligence obligations and violate their legal obligations under federal and state laws. The Pharmacy Defendants' high-volume-and-increased-profits business model also led to a greater number of errors in dispensing, which can result in significant harm to pharmacy customers.

317. The Pharmacy Defendants failed to adequately train their pharmacists and pharmacy techs on how to properly and adequately handle prescriptions for opioids, including what constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal.

**2. National Retail Pharmacy Defendants Failed to Maintain Effective Controls Against Diversion.**

318. Demonstrated by specific examples below, the National Retail Pharmacy Defendants failed to fulfill their legal duties and, instead, routinely distributed and/or dispensed controlled substances while ignoring red flags of diversion and abuse.

**a) CVS**

319. CVS is one of the largest companies in the world, with annual revenue of more than $150 billion. According to news reports and its website, it manages medications for nearly 90 million customers at 9,900 retail locations, with 55 in West Virginia. CVS could be a force for good in connection with the opioid crisis, but like the other Defendants, CVS sought profits over people.

**(1) CVS Lacked a Genuine Suspicious Order Monitoring System for Much of the Relevant Time.**

320. CVS distribution centers, in tandem with outside vendors, supplied opioids to CVS pharmacy stores until October 2014. CVS self-distributed hydrocodone and hydrocodone combination products to its own stores, of which CVS had approximately 6,000 by 2006 and 9,700 by 2014. Hydrocodone ("HCP") was rescheduled to FDA Schedule II status on October 6, 2014, and CVS ceased self-distributing HCP the same day.

321. CVS pharmacies nationwide placed orders with CVS distribution centers through CVS's central mainframe computer ordering system.

322. Before 2009, CVS lacked any meaningful suspicious order monitoring ("SOM") system. Instead, CVS relied on the gut instincts of Pickers and Packers of the drugs in the distribution center – workers responsible for pulling items off distribution shelves for delivery to pharmacy stores – to identify "really big" orders that they believed were too large to be legitimate.[178] This was not an effective SOM system.

323. CVS also lacked a training program to train its Pickers and Packers on how to identify orders of unusual size, frequency, or pattern. Upon information and belief, CVS also lacked any written policies, procedures, or protocols to provide the Pickers and Packers with their obligations under the CSA until August 2013. Additionally, there were no formal job requirements to be employed as a Picker or Packer.[179]

324. In 2007, with help from an outside consultant, CVS began work on a Standard Operating Procedure ("SOP") Manual intended to cover all facets of DEA controlled substances compliance, including suspicious order monitoring. However, as of the summer of 2010, neither

---

[178] *See* Deposition testimony of CVS employee Sherri Hinkle (January 25, 2019), *In re: National Prescription Opiate Litigation,* 1:17-MD-2804 at 75:8.
[179] *Id.; see also* Vernazza Dep. Tr. 197:1-9; 198-3; 199-2.

the final manual nor the SOM section was complete. Internal documents from that time acknowledge that CVS was "still in the process of writing the suspicious order monitoring section of this standard operating procedure."[180]

325. Drafts of the SOP Manual, meanwhile, show CVS understood or should have understood that the status quo was unacceptable. The draft manual provides that: "CVS is responsible for ensuring compliance with DEA regulatory requirements, and that responsibility cannot be abdicated or transferred to anyone else."[181]

326. Upon information and belief, despite this acknowledgment, when the first version of the SOP Manual was issued in December 2007 and for multiple revisions thereafter, the SOM section remained incomplete.

327. As John Mortelliti, CVS's Director of Loss Prevention, wrote in November 2009, this had become "a big issue with CVS and the DEA," and he was "trying to get a rough draft SOM SOP" before a DEA meeting.[182] Ultimately, CVS did not incorporate the final missing section until the end of August 2010, and even then, evidently did so only because of the need to respond to an apparent promise to provide it to the DEA.[183]

**(2) CVS Failed to Remedy Fatal Flaws in the System in Slowly Developed.**

328. It was only in 2009 that CVS began using a computer algorithm that flagged potentially suspicious orders needing additional investigation. CVS called the output of the flagged

[180] *See* email from A.L. Brown to A. Brumfield, et al., New RX DEA SOP (Nov. 27, 2007), CVS-MDLT1-000025204.
[181] CVS-MDLT1-000025206 at 207.
[182] *See* email from J. Mortelliti to C. Knight, RE: November 10, 2009 (Nov. 5, 2009), CVS-MDLTI-000087889.
[183] *See* Email from A. Propatier to A. Lamoureux, DEA SOP 08-25-10.doc (Aug. 26, 2010), CVS-MDLTI-000088956; Email from J. Mortelliti to F. Devlin, et al. RE: DEA SOP (Aug. 23, 2010) (referencing Mr. Devlin's earlier email to him stating "we promised this to DEA by Wednesday."), CVS-DLT1-000089188.

orders an Item Review Report ("IRR"). An outside vendor developed the program for CVS in December of 2008.[184]

329. CVS learned in 2010 that its SOM algorithm was not working properly because it monitored by drug, not active ingredient, meaning that changes in a drug's description or name caused historical data, necessary for valid calculations, to be lost.[185]

330. The IRRs were CVS's primary SOM process. As a CVS corporate representative explained on behalf of the company, for the most part, if an order was not flagged as suspicious under the IRR system, there would be no due diligence of that order.[186]

331. CVS's SOM algorithm failed to factor in outside vendor orders. In other words, CVS's SOM system would not track how many opioids CVS was ordering from third-party distributors such as Cardinal Health when evaluating whether to distribute opioids to one of its pharmacies. CVS knew this was a problem, as a "[s]tore may order a little from both the OV [outside vendor] and DC [CVS distribution center] to stay under the radar."[187] It also knew that excluding outside vendor data meant CVS "may ship a potentially reportable suspicious order from [its] DC."[188] Stores, including one that had a "68,000 hydrocodone pill loss," could also place telephone orders to outside vendors, into which there was "no visibility . . . until a later time."[189] This deficiency is particularly glaring because, at a corporate level, CVS had full access to the orders its pharmacies placed to outside vendors.

332. Acknowledging the ineffectiveness and deficiencies within its SOM system, CVS hired new consultants in 2012 to troubleshoot its existing SOM systems for the purpose of either

[184] Expert Report of Whitelaw, MDL 2804, filed at Doc. 1999-25.
[185] CVS-MDLT1-29864-29866.
[186] Vernazza Dep. Tr. 392:20-393:7.
[187] CVS-MDLT1-29864-29866; Mortelliti Depo., 129:11 – 131:11, Ex. 16; Vernazza Depo., pp. 400-455.
[188] CVS-MDLT1-000103327-000103328, at 28.
[189] *Id.*

fixing the deficient system or developing a new SOM system to attempt to become compliant with the law.[190]

333. Still, as late as July 2013, internal email reflects that CVS's primary tool for investigating suspicious orders relied on data that was months or even years old, making any analysis "for the most part, irrelevant and pointless."[191]

334. Not until mid to late 2014 did CVS fully implement a new SOM system[192], but even then, CVS encountered problems in evaluating suspicious orders for opioids.

**(3) CVS Failed to Perform Due Diligence.**

335. All orders that appeared on the IRR required a thorough due diligence investigation, but CVS only performed appropriate due diligence on a fraction of them. From early/mid-2009 through early 2011, one employee, Mortelliti, "was taking the first pass through the IRR himself."[193] According to CVS's corporate witness, "Mr. Mortelliti's practice would have been to review the report on a daily basis and determine whether items on the report warranted further review and due diligence and conduct review and due diligence as he deemed appropriate."[194] At certain times in 2013, CVS had only one full-time employee in the position of "SOM analyst" reviewing all potentially suspicious orders for every pharmacy in the country.[195] The SOM system would identify orders as potentially suspicious based on a number of factors, but the CVS SOM analyst would conduct an "in depth" dive on only a small subset of those orders. In fact, the SOM program could identify up to 1,000 suspicious orders a day, and the CVS employee would do a "deep dive" on only one to six orders per day. A single employee was responsible for reviewing

---

[190] Expert Report of Robert L. Hill, May 31, 2019, MDL-2804, Doc. 3122-2; CVS-MDLTI-000125136
[191] CVS-MDLTI-78116
[192] Baker Dep. Tr. 259:16-262;19; Ex. 27; Ex. 29
[193] Vernazza Dep. Tr. 365:6-13, Ex. 385; *see also id.* at 368:9-14.
[194] *Id.* at 371:15-23.
[195] CVS-MDLT1-000076114-76117, at 76115.

for IRR one half of the country over a period covering twelve days ranging from June 14, 2012 to September 6, 2012, during which time CVS investigated a total of seven controlled substance orders.[196] As of November 21, 2013, CVS reported only seven suspicious orders to the DEA across all of its distribution centers and pharmacies in the United States. The first suspicious order CVS ever reported to the DEA was on February 29, 2012. CVS reported no suspicious orders in West Virginia.

336. CVS's SOM policy specified that if multiple orders for the same store are flagged during the same month, all orders after the first order will not be investigated and will be automatically released based on the release of the first order.

#### (4) CVS Failed to Maintain Effective Controls Against Diversion and Contributed to the Oversupply of Opioids into West Virginia.

337. According to data form the ARCOS database, between 2006 and 2014, CVS distributed the equivalent of 48,201,629 10 mg oxycodone pills to its retail pharmacy locations in West Virginia, a state with a population of less than 2 million people.[197] This volume of opioids does not include the additional opioids CVS's pharmacies ordered from third-party distributors, which should have raised a red flag with CVS that not all of the prescriptions being ordered could be for legitimate medical uses, and that, as such, many of the opioids CVS distributed to its retail stores were being diverted.

338. For years, per capita opioid prescriptions in West Virginia far exceeded the national average and increased in ways that should have alerted CVS to potential diversion. Indeed, as a vertically-integrated, national retail pharmacy chain, CVS had the ability to detect diversion in

[196] Burtner Dep. Tr. 340-371; 505; Ex. 500.
[197] Morphine milligram equivalence or MME is the standard value given to an opioid based on its potency in comparison to morphine. For example, a 10 mg oxycodone tablet is the equivalent of 15 mg of morphine.

ways third-party wholesale distributors could not, by examining the dispensing data from its own retail pharmacy locations.

339. Given the volume and pattern of opioids it distributed in West Virginia, and its knowledge of the orders for opioids its pharmacies placed with other distributors, CVS knew that it was oversupplying opioids to its pharmacies in West Virginia and should have detected, reported, and rejected suspicious orders. Upon information and belief, it did not.

340. Despite its compliance obligations and requirements, CVS shipped far more opioids into West Virginia than could have been expected to serve legitimate uses. CVS ignored red flags of diversion, failed to investigate its retail pharmacies, failed to detect suspicious orders, and chose not to report or reject suspicious orders in violation of the laws and rules enacted to protect the public.

341. At all relevant times, CVS pharmacies sold controlled substances, including FDA Schedule II and FDA Schedule III controlled substances — opiate narcotics or opioids.[198]

342. Upon information and belief, CVS Pharmacy, Inc. instituted, ran, directed, and staffed with its own employees most SOM functions for its pharmacy stores.

343. Upon information and belief, CVS lacked meaningful policies and procedures to guide its pharmacy staff in maintaining effective controls against diversion, even as they evolved. It was not until 2012 that CVS created guidelines explaining in more detail the “red flags” or cautionary signals that CVS pharmacists should know about to prevent diversion and to uphold their corresponding responsibilities to ensure that all dispensed controlled substances were issued for a legitimate medical purpose.

[198] DEA ARCOS 2006-2014

344. Upon information and belief, CVS failed to use data held at the corporate level to assist pharmacists in evaluating red flags of diversion.

345. With respect to CVS's suspicious order monitoring system for its wholesale distribution, the MDL 2804 Court has denied a motion for summary judgment contesting the evidence regarding the inadequacy of its SOM system in that litigation.[199]

**b) Walgreens**

346. Walgreens is the second-largest pharmacy store chain in the United States behind CVS, with annual revenue of more than $118 billion. According to its website, Walgreens operates more than 8,100 retail locations, with 94 pharmacies in West Virginia — not accounting for the 103 Rite Aid pharmacies it purchased in 2018 — and filled 990 million prescriptions on a 30-day adjusted basis in fiscal 2017.

347. Acting as both a distributor and a retail pharmacy chain, Walgreens also self-distributed opioids to its own individual Walgreens pharmacies. Although Walgreens had visibility into red flags of diversion due to its vertically integrated distribution and dispensing practices, it failed to consider these factors in its SOM program during most of the time it was distributing prescription opioids. Moreover, its program was wholly inadequate and did not fulfill its duties to prevent diversion. Likewise, Walgreens also failed to maintain effective controls against diversion from its pharmacy stores.

---

[199] *See* Opinion and Order [Denying CVS's Motion for Summary Judgment], MDL No. 2804, Doc. 3099 (N.D. Ohio Jan. 27, 2020).

### (1) Walgreens Delayed Developing a SOMS Program and Instead Relied on After-the-Fact Reports of "Excessive" Orders While Ignoring Red Flags.

348. Though Walgreens had access to significant information about red flags, due to its vertical integration with its stores, Walgreens failed to use available information to monitor and effectively prevent diversion.

349. At least as early as 1998, and perhaps as early as 1988, Walgreens began to use a series of formulas to identify orders that Walgreens considered suspicious based on the orders' extraordinary size. These orders were listed on a report called the Suspicious Control Drug Order report.

350. Walgreens used two formulas: one from (at least) 1998 through 2007 and another from March 2007 through 2012. These formulas were alike in that they each used an average number based on historical orders, applied a three-times multiplier to that base number, and then considered certain orders greater than that number to be suspicious. Under the later formula, orders were only listed on the report as being suspicious if they exceeded the three-times multiplier for two consecutive months in a given time period. Walgreens based this second formula on the DEA's Chemical Handler's Manual's order monitoring system for listed chemicals.

351. The first variation on this formula was in place until March 2007, even though the DEA warned Walgreens that the "formulation utilized by the firm for reporting suspicious ordering of controlled substances was insufficient,"[200] via a May 2006 Letter of Admonition. The Letter cited Walgreens for controlled substances violations at its Perrysburg, Ohio Distribution Center, but highlighted problems that went far beyond that particular facility.

[200] WAGMDL00709508

352. The DEA also reminded Walgreens that its suspicious ordering "formula should be based on (size, pattern, frequency),"[201] though Walgreens failed to even examine anything other than the size of an order. When Walgreens did update its program some ten months later, however, it still did not perform the size, pattern, and frequency analysis prescribed by the DEA, continuing to use another "three times" formula.

353. Even with its ample threshold, Walgreens identified thousands of suspicious orders placed by pharmacies and listed them on the Suspicious Control Drug Order Report. Even then, however, a store would not necessarily be reported for a violation, as Walgreens required two consecutive months of exceeding thresholds to trigger reporting.[202]

354. Walgreens did not perform any due diligence on the thousands of orders identified as "suspicious" on the Suspicious Control Drug Order reports, but instead shipped the orders without review.

355. Upon information and belief, Walgreens did not report the suspicious orders listed on the Suspicious Control Drug Order report until after the orders were already filled and shipped. The report was generated on a monthly, nationwide basis, directly contravening the regulatory requirement that suspicious orders be reported when discovered. 21 C.F.R. § 1301.74(b). In some instances, months may have elapsed between an order's shipment and its subsequent reporting to the DEA, given the requirement, described above, of two consecutive months of exceeding the three-times multiplier to trigger reporting.

356. In September 2012, the DEA issued an immediate suspension order ("ISO") for one of Walgreens' three Schedule II distribution centers, finding Walgreens' distribution practices constituted an "imminent danger to the public health and safety" and were "inconsistent with the

[201] *Id.*
[202] WAGMDL00400357 (April 3, 2007).

public interest."[203] The DEA further found that Walgreens' Jupiter distribution center violated DEA regulations that required it to report to the DEA suspicious drug orders that Walgreens received from its retail pharmacies, resulting in at least tens of thousands of violations, particularly concerning massive volumes of prescription opiates.[204]

**(2) Walgreens Knew Its After-the-Fact Excessive Purchase Reports Failed to Satisfy Its Obligations to Identify, Report, and Halts Suspicious Orders.**

357. Walgreens knew its procedures were inadequate well before the 2012 ISO issued. In addition to the guidance described above, in 1988, the DEA specifically advised Walgreens that "[t]he submission of a monthly printout of after-the-fact sales does not relieve the registrant of the responsibility of reporting excessive or suspicious orders." The DEA further advised Walgreens that, while "[a]n electronic data system may provide the means and mechanism for complying with the regulations . . . the system is not complete until the data is carefully reviewed and monitored by the registrant."

358. Despite this instruction, there is no evidence that Walgreens ever took any action related to the Suspicious Control Drug Order report besides generating it and mailing it out. Walgreens has admitted that there is no evidence that it ever performed a due diligence review on any of the orders listed on the Suspicious Control Drug Order report before shipment. One of the managers for Walgreens' Pharmaceutical Integrity ("RX Integrity") Department stated that, when he was with the Loss Prevention Department, he "basically burned the data on a CD and sent it off. I didn't dive into each individual report or CD" and that he "would look at it briefly, but just to see if the data transferred to the CD, but that's about the extent."[205] In a document submitted in

[203] https://www.dea.gov/press-releases/2012/09/14/dea-serves-suspension-order-walgreens-distribution-center-jupiter-florida
[204] *Id.*
[205] E. Stahmann Dep. at 287: 16-23.

connection with a deposition in the MDL, Walgreens acknowledged that it "is currently unaware of due diligence that was performed based on orders being flagged…"[206]

359. As described above, in May 2006, the DEA told Walgreens again that the formula Walgreens was using to identify suspicious orders for the Suspicious Control Drug Order reports was "insufficient" and "inadequate."

360. Moreover, in September 2007, three Walgreens' senior employees (Dwayne Pinon, Senior Attorney; James Van Overbake, Auditor; and Irene Lerin, Audit Manager) attended the DEA Office of Diversion Control's 13th Pharmaceutical Industry Conference in Houston, Texas.[207] Michael Mapes, Chief, DEA, Regulatory Section, gave a presentation at this Conference relating to suspicious orders, which included the reminder that the CSA "requirement is to report suspicious orders, not suspicious sales after the fact."[208]

361. Similarly, handwritten notes on an internal document from July 2008 state that "DEA really wants us to validate orders and only report true suspicious orders or what was done to approve orders" and that "[j]ust reporting these orders is not good enough – need to document what happened."[209]

362. Internally, Walgreens admitted that its pre-2009 suspicious order procedures were insufficient. In a December 2008 Internal Audit of its Perrysburg, Ohio, Distribution Center, Walgreens admitted to systemic and longstanding failures in the systems surrounding DEA compliance, stating, "In our opinion internal controls that ensure compliance with DEA regulations at the Perrysburg DC require improvement. In addition, some of these issues pertain to all company

---

206 *See* E. Bratton 30(b)(6) Deposition Erratum No. 3, Ex. 333.
207 CAH_MDL_PRIORPROD_DEA07_01185382; CAH_MDL_PRIORPROD_DEA07_01185404-5.
208 CAH_MDL_PRIORPROD_DEA12_00011059; HDS_MDL_00002032 at 2040.
209 WAGMDL0006558242

DCs and should be addressed to avoid potential DEA sanctions. Specifically, our review found four issues previously cited in the DEA's May 2006 inspection report that are still open…"[210]

363. The team that performed the Internal Audit recommended discussion continue across multiple departments company wide. In that respect, it makes clear that the failures described are systemic. Yet the report states that the next meeting to address the problem would not occur for five months.[211]

**(3) Walgreens Lacked Meaningful Additional Systems to Address the Failures in Its System of After-the-Fact Reporting of Certain Orders.**

364. Walgreens nominally employed additional procedures within its distribution centers, but these systems did not address the failings of the Suspicious Control Drug Order reports. The system was not designed to detect suspicious orders of controlled substances, but rather was designed to detect typos or errors in order entry by the stores.

365. Upon information and belief, Walgreens required "pickers," the distribution center personnel who retrieved pill bottles off the shelves and placed them into totes for shipping, to look for "questionable" orders while picking.

366. Upon information and belief, the only review of the orders identified by the distribution-center level procedures was calling the pharmacy to make sure the order had not been entered in error.

367. Upon information and belief, there is no evidence that any orders were ever reported as suspicious or halted as a result of Walgreens' distribution-center level policies.

[210] WAGMDL00757193
[211] *Id.*

368. Upon information and belief, there is no evidence Walgreens' procedures resulted in the timely reporting of, due diligence on, or non-shipment of any order, including those listed as being "suspicious" on the Suspicious Control Drug Order reports.

369. Walgreens' documents effectively acknowledge that these were not true anti-diversion measures, and it recognized internally that it did not begin creating a suspicious order monitoring ["SOM"] system until March 2008. In March 2008, Walgreens finally formed a five department "team" to "begin creating" a SOM program.[212] The new SOM program was not piloted until more than a year later, in August 2009, and even then, the pilot included orders from just seven stores. Not until September 2010 would the program, implemented in pieces and phases, be rolled out chain-wide, and from that point it took several more years to fully implement.

370. Through 2012, Walgreens continued to populate the Suspicious Control Drug Order report with thousands of orders that exceeded Walgreens' "three times" test, showing that Walgreens' post-2009 SOM program did little to mitigate the extraordinary volume of controlled substances being shipped by Walgreens to its pharmacies.

**(4) Evan as It Rolled Out Its New SOM Program, Walgreens Left Significant Gaps and Loopholes in Place and Failed to Report and Perform Due Diligence on Orders It Flagged.**

371. Walgreens did not prioritize compliance when instituting its SOM system. MDL testimony from the Senior Director of the Walgreens Pharmaceutical Integrity Department, which is charged with supervising Walgreens' SOM system, revealed that even as late as 2012, 2013, and 2014, Walgreens treated the SOM system as an inventory control mechanism rather than as a compliance control mechanism.

---

[212] WAGMDL0066031; WAGMDL00709395

372. The SOM program had significant loopholes. For the first few years, the program did not include orders that Walgreens stores were also placing to outside vendors, like Cardinal Health and AmerisourceBergen, effectively permitting double-dipping.

373. The SOM system also allowed Walgreens' stores to transfer controlled substances between stores and did not review these transfers (known as "interstores") within the SOM program, so that these transfers were not factored into SOM analytics. Stores could also place ad hoc "PDQ" ("pretty darn quick") orders for controlled substances outside of their normal order days and outside the SOM analysis and limits. Walgreens could even remove a store entirely from SOM review.

374. Starting in 2010, certain orders that exceeded store-based limits imposed by Walgreens' new SOM system were reduced to the store limit and shipped out. These orders were not reported to the DEA as suspicious, nor were they halted for review. The DEA found that Walgreens' policy of reducing and then filling and shipping suspicious orders without reporting them violated the CSA.

375. Walgreens' post-2009 SOM system flagged thousands of items per month as being suspicious. Internal Walgreens documents indicate that, in July 2011 alone, up to 20,699 orders for controlled substances were "marked suspicious" by the new algorithm. However, very few of these orders received any review, and any review performed was nominal at best. Meanwhile, Walgreens failed to adequately staff the program and train its employees about its requirements.

376. Walgreens cited two people as being primarily responsible for performing due diligence on suspicious orders in the 2009-2012 time period under the new SOM system. The first was a representative from the Loss Prevention department who said her department was "not equipped" to handle review and data analysis for the hundreds of pages of reports being compiled

nationwide each week. The second was Barbara Martin, who estimated that she spent somewhere between one and three hours a week reviewing suspicious orders, reviewing only between 10 and 100 of the thousands of orders that were deemed suspicious under the new algorithm.

377. As a result of a DEA investigation, Walgreens formed the Pharmaceutical Integrity ("Rx Integrity") Team in 2012, purportedly to make sure that those types of failures did not continue. However, the group's true role was protecting Walgreens' Distribution Centers and stores from losing their DEA licenses. The effort was only for show. Upon information and belief, Walgreens never provided the Rx Integrity group the resources needed to achieve due diligence on the large number of orders identified by Walgreens' SOM program for the company's 5,000 plus stores.

378. In December 2012, the further enhanced SOM system flagged "14,000 items that the stores ordered across the chain that would have to be investigated" before they could be shipped.[213] Walgreens admitted that, yet again, it lacked sufficient resources to timely review these orders. Walgreens noted that "[t]he DEA would view this as further failures of our internal processes, which could potentially result in additional pharmacies and distribution centers being subjected to regulatory actions and ultimately prohibited from handling controlled substances." When these 14,000 orders were flagged, Walgreens' Rx Integrity Team consisted of fewer than five people.[214] Even at its height, Rx Integrity had only eleven employees. Instead of sufficiently staffing the SOM program, Walgreens recognized it had the ability to control its due diligence workload by increasing the stores' ceiling levels, and thereby reducing the number of orders that would hit that ceiling and result in a flag.

---

[213] (WAGMDL000659270)
[214] *Id*. at 73, n.49 (Polster Dep., at 24:3-15).

379. Yet, even in 2013, orders being flagged as suspicious for review before shipment were "a week old" before they made it to the review team, often "ha[d] already been shipped," and were not being reported.

380. Walgreens never equipped its distribution operations to monitor, report, and halt suspicious orders, or otherwise effectively prevent diversion. When it became clear Walgreens would need to devote significant resources to achieve compliance, Walgreens chose instead to cease controlled substance distribution altogether.

381. Indeed, with respect to Walgreens' suspicious order monitoring system for its wholesale distribution, the MDL 2804 Court has denied a motion for summary judgment contesting the evidence regarding the inadequacy of its SOM system in that litigation.[215]

**(5) Walgreens Failed to Put in Place Adequate Policies to Guard Against Diversion at the Pharmacy Level.**

382. Although Walgreens purported to have in place "Good Faith Dispensing" ("GFD") Policies for many years, it failed to meaningful apply policies and procedures, or to train employees in its retail pharmacies on identifying and reporting potential diversion.

383. Despite knowing that prescribers could contribute to diversion, and having a separate and corresponding duty with respect to filling prescriptions, from at least 2006 through 2012, Walgreens' "Good Faith Dispensing" policies explicitly instructed pharmacists who "receive[] a questionable prescription" or otherwise were "unable to dispense a prescription in good faith" to "contact the prescriber" and, if "confirm[ed]" as "valid" by the prescriber, to then "process the prescription as normal." Walgreens provided only vague criteria for suspicious circumstances, which became meaningless if a prescriber "confirm[ed]" the prescription as

[215] See Order [Denying Walgreens' Motion for Summary Judgment], MDL No. 2804, Doc. 2569 (N.D. Ohio Sept. 4, 2019).

"valid," by calling the prescriber. Despite internally recognizing that "a prescriber of a controlled substance prescription [may be] involved in diversion," Walgreens' GFD policies continued to endorse calling the doctor as a greenlight to any "questionable" prescription.

384. In 2012, Walgreens finally removed the "process the prescription as normal" language from its formal GFD policies, admitting that under the law "it is not enough to get confirmation that the prescriber wrote the prescription." However, Walgreens still failed to ensure it complied with its duties.

385. Upon information and belief, Walgreens failed to adequately train its pharmacists and pharmacy technicians on how to prevent diversion, including what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or when other suspicious circumstances are present.

386. Indeed, during a 2009 DEA investigation into Walgreens dispensing noncompliance, Walgreens internally noted that it currently had "no training" for employees dispensing controlled substances. Meanwhile, Walgreens corporate officers turned a blind eye to these abuses. In fact, a Walgreens corporate attorney suggested, in reviewing the legitimacy of prescriptions coming from Florida, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens' attitude that profit outweighed compliance with the law or protecting public health.

387. Ultimately, in 2011, Walgreens and the DEA entered a Memorandum of Agreement regarding all "Walgreens . . . pharmacy locations registered with the DEA to dispense controlled substances," requiring Walgreens to implement significant nationwide controls lacking in its operations. Walgreen Co. was required to create a nationwide "compliance program to detect and

prevent diversion of controlled substances as required by the … (CSA) and applicable DEA regulations." Pursuant to the MOA, the "program shall include procedures to identify the common signs associated with the diversion of controlled substances including but not limited to, doctor shopping and requests for early refills" as well as "routine and periodic training of all Walgreens walk-in, retail pharmacy employees responsible for dispensing controlled substances on the elements of the compliance program and their responsibilities under the CSA." Further, Walgreens was required to "implement and maintain policies and procedures to ensure that prescriptions for controlled substances are only dispensed to authorized individuals pursuant to federal and state law and regulations."

388. Walgreens would also make more promises in a 2013 MOA with the DEA, described further below, related to failures that led to the ISOs described above.

389. Even after the development and a relaunch of its GFD policy in response to settlements with the DEA, however, Walgreens' "RxIntegrity" presentation focused on certain Walgreens markets, but also assessing "average market" trends, reporting that "pharmacists [were] not being too strict with GFD, nor [were] they losing volume."

390. As with distribution, Walgreens failed to allocate appropriate resources to dispensing compliance and supervision. Walgreens has approximately 26,000 pharmacists, each of whom may receive as many as 400-500 prescriptions a day. In 2013, however, Walgreens internally reported that its District Managers and Pharmacy Supervisors were "challenged to get into the stores" and in a 90-day period, more than a thousand stores did not receive a visit from the managers or supervisors. These supervisory personnel were assigned a "high number of stores," and their time was consumed with "people processes, business planning, market and district

meetings," such that supervision in-store was being handled informally by "community leaders" who have "limited formal authority."

391. A Walgreens internal audit performed after the 2013 DEA settlement confirms that Walgreens' supervision and compliance failures continued. Among other failings, the audit team noted no formal monitoring program existed to confirm that pharmacies across the chain are complying with controlled substance documentation and retention requirements, no monitoring outside the deficient "store walk program" existed to monitor target drug Good Faith Dispensing requirements and no corporate reporting was being generated, and employees were failing to timely complete Good Faith Dispensing training, such that, at the time of the audit, over 35,000 employees had not completed their required training for that year. Management's response largely was to seek to incorporate additional compliance measures into the store walk procedure. However, documents from 2016 regarding monthly store compliance walks indicate that during the monthly "Compliance Walks" to "verify compliance … [with] regulatory requirements in… pharmacy areas," substantially no dispensing compliance supervision occurred outside of ensuring the pharmacy was verifying the patient's address on five sample prescription fills.

392. Unsurprisingly, compliance with GFD and TD GFD has been poor. For example, in 2014 Walgreens discovered a pharmacist who failed to follow GFD for five to six months without being discovered by supervisors. In 2014, Rx Integrity noted dozens of stores dispensing opioids without performing the required checks. In certain cases, the pharmacists were unaware of the GFD procedures or had been told by supervisors to disregard them.

393. In 2015, Walgreens performed a "business continuity" audit of a random sample of approximately 2,400 pharmacies to determine whether Walgreens was "compliant with the policies/procedures put in place" regarding dispensing pursuant to Walgreens' agreement with the

DEA. In Walgreens' own words, the "[r]esults were unfavorable." Fewer than 60% of stores were complying with TD GFD with respect to filled prescriptions, 1,160 stores did not have a single refused prescription, and an additional 1,182 stores had refused fewer than 25 prescriptions total in a nine-month period. Only 63 out of 2,400 pharmacies had refused 26 or more prescriptions during that same nine-month period in 2015.

**c) Walmart**

394. Walmart is the largest private employer in the United States by far. It employs more than 1.5 million people. But for years, Walmart chose not to assign a single employee to design or operate a system to detect suspicious orders of controlled substances. Walmart chose to do nothing while hundreds of thousands of people were dying, and Walmart waited until 2014 to begin to take meaningful action. By that time, it was too late.

**(1) Walmart Lacked a Suspicious Order Monitoring System for Most of the Relevant Period.**

395. Like other National Retail Pharmacy Defendants, Walmart self-distributed opioids to its pharmacies in its retail stores, including its 39 stores in West Virginia. Specifically, Walmart operated registered distribution centers to supply its own pharmacies with controlled substances from the early 2000's until 2018 when it ceased self-distributing controlled substances. Walmart's conduct is particularly troubling given that it acted both as a self-distributing and dispensing pharmacy for such a long period of time.

396. Prior to 2011, Walmart had designed no formal system to identify suspicious orders of controlled substances and, thus, totally failed to meet its statutory obligations.

397. Walmart has claimed that its hourly employees and associates—who were also responsible for filling orders at Walmart Distribution Centers—monitored the orders they were filling for unusual size, pattern, and frequency. Typically, this "review" involved approximately

40,000 line items of controlled substances a day.[216] Walmart has also claimed that these hourly associates were instructed to alert a supervisor if an order appeared unusual based on their experience and memory.

398. Upon information and belief, Walmart can produce no written evidence of any such instructions to Walmart associates, no evidence of any training that would be required to implement such a procedure, or anyone actually being alerted about an unusual order or performing any follow up inquiry.

399. Upon information and belief, Walmart failed to provide any guidance to the associates as to what constitutes a "suspicious" order. Instead, Walmart emphasized its associates' subjective judgment based on their "knowledge and experience" as distribution center employees.[217] There is no evidence that any Walmart employee ever flagged an order as suspicious prior to 2011.

400. Upon information and belief, Walmart purportedly implemented a "monitoring program" that would identify suspicious orders of controlled substances in 2011. This system purportedly was in place until 2015.

401. Walmart's monitoring program was insufficient to identify suspicious orders of controlled substances. The program flagged only very large orders of controlled substances. Specifically, it flagged weekly orders for controlled substances of 50 bottles (5,000 dosage units) or more and orders or more than 20 bottles (2,000 dosage units) that were 30% higher than a rolling four-week average for that item. Orders under 2,000 units per week were never flagged, meaning that a pharmacy could order 8,000 units per month without ever being flagged. Moreover, that

[216] WMT_MDL_0000006511; *see also* Sullins Dep. at 56:6-57:5, Jan. 1, 2019; Abernathy Dep. at 25:1-4, July 23, 2019 ("[T]he ladies who were physically printing those forms, they looked at those orders…").
[217] *See*, *e.g.*, Hilland Dep. at 52:2-13, 170:17-171:6.

meant that even if an order was more than 30% greater than the four-week average, it could not draw an alert unless it also was more than 20 bottles.

402. Under this system, an alert did not mean Walmart would report the order or halt it pending necessary due diligence. To the contrary, upon information and belief, Walmart never reported an order flagged by its monitoring program to the DEA as suspicious. In addition, rather than halting the order, Walmart simply cut the order to the amount of the 50 bottles threshold and shipped it. Walmart never reported cut orders to the DEA. Although information regarding flagged orders was available and sent daily to Walmart's headquarters in Arkansas (the "Home Office"), no one from the Home Office ever reviewed or took any action regarding flagged orders.

403. This practice continued until mid-2012, when Walmart implemented "hard limits" on opioid orders. Under this approach, weekly orders of Oxycodone 30 mg ("Oxy 30") were automatically reduced to 20 bottles. Still, Walmart failed to report the orders to the DEA.

404. During this time period, Walmart also monitored weekly orders of other controlled substances in quantities of more than 20 bottles. Specifically, an "Over 20 Report" was provided to the Home Office in the morning and, if nothing was done by mid-afternoon, the orders were filled and shipped. Upon information and belief, there is no evidence of any order, in fact, being held or reviewed pursuant to this practice.

405. Further, cutting the order did not mean that the Walmart pharmacy would not receive the full supply. Walmart pharmacies also purchased opioids from outside suppliers, including McKesson and AmerisourceBergen. Pharmacies could place another order with these outside vendors to make up the difference, or in some cases, have orders fulfilled by both Walmart and a third-party distributor at the same time. Thus, even though Walmart had the ability to monitor

such orders, it chose not to, which allowed its pharmacies to surpass its already high thresholds by simply ordering drugs from a third party.

406. Walmart knew that its monitoring program could not fulfill its obligations to prevent diversion. For example, in 2013, Walmart acknowledged in an internal presentation that it had not yet designed a compliant system for suspicious order identification, monitoring, and reporting.[218] It also stated that it was "TBD" when Walmart could develop such a system. In June 2014, Walmart again acknowledged that it lacked a compliant monitoring program.[219] Moreover, Walmart acknowledged in 2014 that it had "no process in place" to comply with government regulations and that this created the "severe" risk of "financial or reputational impact to the company."[220]

407. It was not until 2014 that Walmart's written policies and procedures required a suspicious order be held until it was verified as appropriate.

**(2) Walmart's "Enhanced" Monitoring Program Falls to Remedy Deficiencies in Its Monitoring Program.**

408. In 2015, Walmart enhanced its suspicious order monitoring policy by implementing store-specific thresholds. Upon information and belief, it based these thresholds on the standard deviation of a specific pharmacy's order history for each controlled substance. The thresholds also included minimum amounts, below which no orders were flagged under any circumstance, regardless of pattern or frequency.

409. Walmart's corporate designee, testifying on its behalf in the MDL, conceded that thresholds were set for business purposes, not for the purpose of "main[taining] of effective controls against diversion . . . into other than legitimate . . . channels . . . ." 21 U.S.C. § 823(a)(1),

---

[218] WMT_MDL_000052997
[219] WMT_MDL_000048100; WMT_MDL_000048101
[220] WMT_MDL_000048101

(b)(1). Further, for almost all Walmart pharmacies, this minimum was set at 2,000 dosage units per week (or 8,000 dosage units per month). Accordingly, even when Walmart implemented a store specific policy that took into consideration a pharmacy's order history, the program was still woefully deficient because it did not account for changes in ordering patterns. A pharmacy could, for example, go from ordering 10 dosage units of Oxycodone 10 mg per month to 7,999 per month without any order being flagged or reviewed.

410. As for Walmart's suspicious order monitoring system for its wholesale distribution, the MDL Court has denied a motion for summary judgment contesting the evidence regarding the inadequacy of Walmart's suspicious order monitoring efforts in that litigation.[221] In doing so, it "noted[d] the record evidence suggests obvious deficiencies that a layperson could plainly recognize."[222]

#### d) Kroger

411. As described further below, Defendant Kroger failed to fulfill its legal duties and failed to develop compliance programs that identified and stopped suspicious and routinely distributed and/or dispensed controlled substances while ignoring red flags of diversion and abuse.

##### (1) Kroger Failed to Maintain an Effective Suspicious Order Monitoring System or to Complete Necessary Due Diligence.

412. Kroger failed to implement an effective suspicious order monitoring program. Kroger self-distributed hydrocodone and other controlled substances to its retail pharmacies in West Virginia and elsewhere through its distribution centers called Peyton's. Kroger pharmacies obtained opioids not only through Kroger's self-distribution, but also through outside supplier,

[221] *See* Opinion and Order Denying Walmart's Motion for Summary Judgment, MDL No. 2804, Doc. 3102 (N.D. Ohio Jan. 27, 2020).
[222] *Id.* at 4, n.12.

Cardinal Health, which supplied Kroger with Schedule II products such as oxycodone, among other drugs. The amount of prescription opioids Kroger distributed and dispensed into West Virginia could not have been expected to serve legitimate medical uses and ignored other indicia of suspicious orders. This information, along with the information known only to distributors such as Kroger (especially with its pharmacy dispensing data), would have alerted Kroger to potential diversion of opioids. Yet, upon information and belief, Kroger did not report a single suspicious order in West Virginia between at least 2007 and 2014.

**(2) Kroger Failed to Maintain an Effective Suspicious Order Monitoring System or to Complete Necessary Due Diligence.**

413. Upon information and belief, Kroger failed to implement an effective suspicious order monitoring program. Kroger self-distributed hydrocodone and other controlled substances to its retail pharmacies in Kentucky and elsewhere through its distribution centers called Peyton's.

414. Kroger's failure to report suspicious orders is not surprising given Kroger's failure to have a formal SOMS program until 2013. Prior to that time, Kroger had no SOMS standard operating procedures, written SOMS guidelines, employee training, or written SOMS policies. Kroger's review of suspicious orders prior to its SOM program occurred at its Peyton distribution centers. However, the reviewing orders was for purposes of inventory management and ensuring that orders were correctly filled, not for the purpose of suspicious order monitoring.[223]

415. Kroger conducted a monthly manual review of orders that had been shipped during the previous month to identify orders that were excessive. However, as the DEA has said repeatedly, this after-the-fact review (which was done by one employee for all of the orders from Kroger pharmacies nationwide) was not a sufficient procedure for monitoring suspicious orders

223 Brehm Dep.; Gerber Dep.

because the orders had already been shipped. The procedure could not and did not block suspicious or excessive orders. Furthermore, there were no objective criteria or guidelines the employee followed to identify which orders were excessive and orders of unusual frequency and pattern were not identified.[224]

416. [redacted].[225]

417. Upon information and belief, in 2013, Kroger developed a SOMS program with the assistance of an outside consultant and began implementation of the program in September of 2013. The system included a suspicious order monitoring algorithm that was supposed to flag potentially suspicious orders that would then be pended for investigation. However, upon information and belief, the SOM system was not effective in that it flagged too many orders, then flagged too few orders, and had no mechanism to determine which orders should be stopped and investigated. Furthermore, upon information and belief, Kroger stores were still able to place orders through outside vendors, such as Cardinal, if Kroger's internal system pended the order.

418. Upon information and belief, in August of 2014, Kroger determined that the SOM system was working properly, but by then it was too late. Two months later, in October of 2014, Kroger stopped self-distributing hydrocodone after the drug was rescheduled. Thus, with the exception of two months, for the entire relevant time period, Kroger distributed opioids to its West Virginia pharmacies under a nonexistent SOMS program, or an inadequate and ineffective one.

224 Gerber Dep.
225 KrogerSmithNMAG00006475

419. Kroger had a responsibility under state and federal law to identify the suspicious orders that flowed from its distribution facilities. Kroger failed to implement a system that would identify, investigate, and report suspicious orders despite its actual knowledge of drug diversion. Upon information and belief, Kroger did not report any suspicious orders for controlled substances that it distributed or dispensed into West Virginia.

420. Given Kroger's retail pharmacy operations, in addition to its role as a wholesale distributor, Kroger knew or reasonably should have known about the disproportionate flow of opioids into West Virginia.

421. Kroger was, or should have been, fully aware that the opioids it distributed into West Virginia were not monitored by a suspicious order monitoring system nor were they reviewed for indicia of diversion. Upon information and belief, Kroger did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations under the CSA, including its responsibility to identify and report suspicious orders, and to not ship such orders unless and until due diligence allayed the suspicion.

**(3) Kroger Failed to Protect Against Diversion at Its Retail Pharmacies.**

422. Before 2005, the inadequacy of Kroger's policies and procedures was particularly glaring. DEA began investigating King Soopers and City Market, part of the "Kroger Co. Family of Stores"[226] in response to information concerning potential diversion. Audits at seven Colorado pharmacies revealed "a pattern of non-compliance" with the CSA and federal regulations.[227] Because of record-keeping and security problems, the DEA could not determine from the audit

[226] https://www.kingsoopers.com/i/kroger-family-of-companies
[227] https://www.dea.gov/press-releases/2005/10/24/record-7-million-dollar-settlement

"how many drugs had been lost or diverted," but could tell that "many of the CSA violations were the result of systemic weaknesses present in all King Soopers and City Market pharmacies."[228]

423. Ultimately, the parent corporation, Kroger Co., agreed in October 2005 to a then-record $7 million settlement for the "systemic violations of the Controlled Substances Act (CSA) by the company's pharmacies."[229] Kroger also "agreed to implement a pharmacy compliance program estimated to cost over $6 million dollars in all 1,900 of its pharmacies nationwide."[230] The changes included the Kroger stores in West Virginia. Kroger promised national reforms because it imposed its procedures at a national level across its "family" of stores, such that the same systemic failures also existed in West Virginia.

424. A DEA press release concerning the settlement highlighted the trust Americans place in "corporations like Kroger" to "ensure that controlled substances aren't diverted to the illicit market."[231] Kroger understood the vital importance of its role as the last line of defense. "As the last person that has the opportunity to speak with a patient or caregiver prior to handing over a medication that has been known to end the lives of so many when diverted or misused, no one can overestimate the responsibility of the pharmacist." Kroger also recognized the "legislative and social intent of regulating controlled substances" as consistent with its mission in "serving the public good."

425. [redacted]

---

[228] *Id.*
[229] https://www.dea.gov/press-releases/2005/10/24/record-7-million-dollar-settlement
[230] *Id.*
[231] *Id.*

[redacted][233]

426. Upon information and belief, Kroger developed tools to assist pharmacists in identifying red flags, but only required those tools to be used in pharmacy branches that were flagged by outside vendor Cardinal Health's metrics.

427. Discovery will reveal that Kroger knew or should have known that its pharmacies in West Virginia, and the surrounding states were (a) filling multiple prescriptions to the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets. Kroger had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

[232] New Mexico Opening documents from slides 118-123.
[233] *Id.*

### 3. The National Retail Pharmacy Defendants Put Profits Before Safety.

#### a) National Retail Pharmacy Defendants Employed Performance Metrics That Inevitably Led to Diversion.

428. Not only have the National Retail Pharmacy Defendants lacked (and failed to implement) adequate policies and procedures to guard against diversion, but the National Retail Pharmacy Defendants, upon information and belief, and other chain pharmacies compounded this problem by implementing performance metrics and prescription quotas for retail stores that contributed to supplying of a black market.

429. Using Walgreens by example, in connection with the DEA's investigations described above, the DEA found evidence that Walgreens had a corporate policy encouraging increased sales of oxycodone.[234] As the DEA's September 2012 Order to Show Cause and Immediate Suspension of Registration explains:

> In July 2010, Walgreens' corporate headquarters conducted an analysis of oxycodone dispensing for the prior month at its Florida retail pharmacies and produced an 11 page spreadsheet, ranking all Florida stores by the number of oxycodone prescriptions dispensed in June. The spreadsheet was sent to Walgreens' market pharmacy supervisors in Florida on July 29, 2010, with the admonition that they "look at stores on the bottom end .... We need to make sure we aren't turning legitimate scripts away. Please reinforce." A corporate market director of pharmacy operations did reinforce this message to Florida market pharmacy supervisors, highlighting that their "busiest store in Florida" was filling almost 18 oxycodone prescriptions per day, yet "We also have stores doing about 1 a day. Are we turning away good customers?"

430. In 2011, a Walgreens project to "Increase Rx Sales and Prescription Counts" instructed its pharmacies to "improve C2 business" —*i.e.*, dispense more Schedule II controlled substances. This focus on increasing controlled substance dispensing—including opioids—continued even after the DEA investigation and $80 million fine.

---

[234] WAGMDL00387654-666 (September 13, 2012 Order to Show Cause and Immediate Suspension of Registration to Walgreens's Jupiter, Florida Distribution Center).

431. In 2014, Walgreens' Rx Integrity department created a "Pharmacist Controlled Substance Dispensing Opportunities" tool to "identify pharmacists that are dispensing a low rate of controlled substances," and help pharmacists "feel more comfortable in filling controlled substances," specifically focusing on pharmacists dispensing low rates of opioids like "hydromorphone, oxycodone, methadone … hydrocodone," and the cocktail drugs comprising the rest of the "holy trinity" of abuse, such as "carisoprodol… [and] alprazolam."

432. Walgreens also had a bonus program that factored prescription volume into bonus calculations and served as an incentive for pharmacies and pharmacy technicians to ignore the "red flags" of diversion. The corporate push for speed (or volume) deterred pharmacists from taking the time to properly examine the prescriptions before them and exercising their corresponding responsibility to prevent diversion.

433. Indeed, Walgreens had a tool, the "PhLOmometer" that tracked the time to fill a prescription. A March 2013 memo confirms that volume targets included controlled substances as late as 2013 and even after adopting the GFD policy. Specifically, the memo states, as the response to an "[a]nticipated question" that "GFD concerns doesn't relieve you from trying to attain the numbers that have been set for you." When considering high Schedule II dispensing at a particular pharmacy in New Jersey in 2012, as the opiate crisis raged, the pharmacy supervisor pushed back against any attempt to reduce the oxycodone supply, focusing on the impact the reduction would make on filled prescriptions and "the bonus tied to" one pharmacy employee.

434. Only as part of its 2013 settlement with the DEA did Walgreens agree to exclude controlled substances calculations from bonus calculations from 2014 forward. This resulted in a 21% reduction in the number of stores purchasing the 80 mg OxyContin – evidence that a minimal effort to implement common sense controls had a tangible impact on sales of the most potent

controlled substances (although that reduction did not last, as described above, and Walgreens' volume by 2014 had increased again).

435. Also by example, CVS used performance metrics related to its own profits, which would rely, in part, upon the number of prescriptions dispensed. By 2010, CVS had implemented performance metrics that remain publicly available online. CVS's metrics system lacked any measurement for pharmacy accuracy or customer safety. They did, however, prioritize speed and volume, including by requiring pharmacists to meet wait- or fill-time expectations. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year. Opioid prescriptions were even included in the volume goals until 2013. Even in 2020, pharmacists described CVS as the "most aggressive chain in imposing performance metrics."[235]

436. This pressure and focus on profits has necessarily deterred the National Retail Pharmacy Defendants pharmacies from carrying out their obligations to report and to decline to fill suspicious prescriptions and to exercise due care in ascertaining whether a prescription is legitimate.

437. In 2013, the National Association of Boards of Pharmacy ("NABP"), passed a resolution which stated that "performance metrics, which measure the speed and efficiency of prescription work flow by such parameters as prescription wait times, percentage of prescriptions filled within a specified time period, number of prescriptions verified, and number of immunizations given per pharmacist shift, may distract pharmacists and impair professional judgment" and "the practice of applying performance metrics or quotas to pharmacists in the practice of pharmacy may cause distractions that could potentially decrease pharmacists' ability

---

[235] Ellen Gabler, How Chaos at Pharmacies Is Putting Patients at Risk, New York Times, (Jan. 31, 2020), https://www.nytimes.com/2020/01/31/health/pharmacists-medication-errors.html.

to perform drug utilization review, interact with patients, and maintain attention to detail, which could ultimately lead to unsafe conditions in the pharmacy."[236]

438. Still, according to a 2016 investigation by the Chicago Tribune, as chain pharmacies increasingly promote quick service, "pharmacists frequently race through legally required drug safety reviews — or skip them altogether," missing dangerous drug combinations in the process.[237]

439. As yet another example, in March 2020, journalists revealed that Walmart not only ignored reports of suspicious activity from pharmacists concerned that they were filling prescriptions for pill mills, but the company considered these pharmacists' focus misdirected. One internal email, reviewed by ProPublica, showed that in response to a question from a regional manager in 2015 about documenting pharmacists' concerns about doctors believed to be operating pill mills, Walmart's director of Health and Wellness Practice Compliance, Brad Nelson, wrote that "We have not invested a great amount of effort in doing analysis on the data since the agreement [requiring such reporting] is virtually over. Driving sales and patient awareness is a far better use of our Market Directors' and Market Managers' time."[238]

**b) The National Retail Pharmacy Defendants Worked Together to Increase Their Profits and Lobbied Against Restrictions on Opioid Use and DEA Enforcement.**

440. Like the Manufacturer Defendants, the National Retail Pharmacy Defendants recognized the importance of controlling and influencing trade groups such as the National

[236] NAPB, Performance Metrics and Quotas in the Practice of Pharmacy (Resolution 109-7-13) (June 5, 2013), https://nabp.pharmacy/newsroom/news/performance-metrics-and-quotas-in-the-practice-of-pharmacy-resolution-109-7-13/

[237] Sam Roe, Ray Long, and Karisa King, Contract Reporters, Pharmacies Miss Half of Dangerous Drug Combinations, Dec. 15, 2016, https://www.chicagotribune.com/investigations/ct-drug-interactions-pharmacy-met-20161214-story.html.

[238] Jesse Eisinger and James Bandler, Walmart Was Almost Charged Criminally Over Opioids. Trump Appointees Killed the Indictment., ProPublica, (March 25, 2020), https://www.propublica.org/article/ walmart-was-almost-charged-criminally-over-opioids-trump-appointees-killed-the-indictment.

Association of Chain Drugstores ("NACDS") in the context of influencing policy related to opioid drug abuse and diversion. The efforts taken by the NACDS and other trade groups on behalf of Defendants were so important to their bottom line that no expense was spared in supporting such groups. Walgreens took a particularly aggressive view of this mutually beneficial relationship, at times being its top donor across the country.

441. NACDS worked with the Healthcare Distribution Alliance ("HDA"), the Alliance to Prevent the Abuse of Medicines ("APAM"), and the Pharmaceutical Compliance Forum ("PCF") to support the Marino Blackburn Bill, also known as S.483 or the "Marino Bill." Upon information and belief, NACDS and the Pharmacy Defendants intended the Marino Bill to "tie the hands" of the DEA to "actively and aggressively address diversion and compliance with the CSA." NACDS worked together with others in the opioid supply chain to influence the language in the bill to make it most favorable for them and more restrictive on the DEA. Notably, masking the influence of industry, when APAM was asked to sign on to a 2014 letter of support it was "signed by the Alliance, not the individual members." The final letter that was sent to Senators Hatch and Whitehouse was signed by the members of the Pain Care Forum as well as APAM, NACDS, American Academy of Pain Management, and U.S. Pain Foundation.

442. The Marino Bill effectively removed the DEA's ability to issue immediate suspension orders regarding manufacturer or distributor registrations. The Marino Bill permitted a non-compliant registrant an opportunity to cure its noncompliance before the DEA could take enforcement action and changed the standard on which revocation occurred. In the midst of a growing opioid crisis, the Marino Bill removed the most effective deterrent and constrained DEA enforcement actions.

443. In August 2011, NACDS worked with others on a joint letter opposing DEA fee increases for registrants intended to fund the "hir[ing of] more agents and do[ing] more inspections."

444. HDA's Crisis Handbook, developed in 2013, was a direct response to the "threats" perceived by HDA's members and affiliates, including National Retail Pharmacy Defendants, to their bottom line: profits derived from the distribution and sale of prescription opioids.[239] The National Retail Pharmacy Defendants did, and continue to, rely on and employ the strategies discussed in the Crisis Playbook. Curiously, there are no slides on how best HDA and its members, including National Retail Pharmacy Defendants, might work to curb the crisis that is the opioid epidemic.

445. In 2016, the NACDS Policy Council discussed ongoing efforts to shape opioid legislation, including their success in removing a requirement that pharmacists have to check their state drug monitoring program before filling controlled prescriptions.[240]

**c) National Retail Pharmacy Defendants Worked with the Manufacturer Defendants to Promote Opioids and Bolster Their Profits at the Expense of Communities.**

446. National Retail Pharmacy Defendants also worked in concert with Manufacturer Defendants, non-joined manufacturers and non-joined distributors to ensure that the false messaging surrounding the treatment of pain and the true addictive nature of opioids was consistent and geared to increase profits for all stakeholders.

447. For example, as early as 2001, CVS worked closely with non-joined manufacturer Purdue and its un-branded marketing arm, Partners Against Pain ("PAP") to "fight back" against allegations (later proved to be true) that Purdue's Oxycontin was being abused at alarming rates.

[239] (ABDCMDL00278063).
[240] *Id.*, (WAGMDL00605718) (including Defendants Walgreens & Walmart).

It was Purdue's Partners Against Pain website that Purdue, and its "Partners" including CVS, used to make the claims that the risk of addiction associated with Oxycontin was very small.

448. Non-joined manufacturer Purdue worked together with CVS to ensure that CVS's own pharmacists were trained by Purdue on many of the misleading marketing messages that would later sustain a 2007 criminal guilty plea and $600 million fine between Purdue and the DOJ for misleading regulators, doctors, and patients about Oxycontin's risk of addiction and its potential for abuse. CVS's ties to PAP were so deep that CVS even put CVS's own logo communications from its "partner."

449. CVS was so eager to ally itself with non-joined manufacturer Purdue and its partners that it solicited Purdue for its participation in co-hosting Continuing Education programs for healthcare providers and pharmacists regarding training on diversion of prescription opioids.

450. CVS's role was not limited to expanding the market for prescription opioids. CVS worked hard to ensure that demand for prescription opioids was not only sustained but multiplied. It did so through its marketing, advertising, and promotional efforts both on its own and in concert with other stakeholders.

451. CVS also worked with non-joined manufacturer Endo to increase patient adherence to continuing their use of opioids. In fact, CVS played such an important part in the promotion of Endo's Opana ER that it was included as having a crucial role in carrying out one of key sales tactics included in Endo's 2012 Business Plan.

452. Through a company called Catalina Health ("Catalina"), non-joined defendant Endo was able to target Oxycontin patients in areas where Opana ER, a highly abused opioid manufactured by Endo, had preferred formulary status. Catalina in turn worked to create a brand loyalty program that kept new patients on Endo's opioids. CVS, through its pharmacy retention

programs, sent letters to the patients' homes to encourage them to stay on Opana – even though prolonged use of opioids increases the risk of addiction, and even though patients in pain presumably need no reminder to continue to take their pain medications. CVS formalized its agreement to promote, market, and advertise Endo's opioid products via its "CVS Carecheck Plus Patient Education Service." CVS also disseminated materials promoting Opana ER nationwide and in West Virginia.

453. CVS likewise helped Actavis promote its opioids by participating with Cardinal Health's Marketing and Business Development team in programs designed to offer rebates and off-invoice discounts on products, with the aim being to "move product."

454. Upon information and belief, CVS made at least one pitch to non-joined manufacturer Insys to help sell its incredibly potent opioid, Subsys, a liquid form of fentanyl.

455. Working with non-joined manufacturer Purdue as early as 2001, Walgreens played a pivotal role in expanding the market and ensuring the demand and supply for prescription opioids would grow exponentially. Non-joined manufacturer Purdue was particularly interested in using what Walgreens described to Purdue as its Regional Level Market Programs to educate pharmacists and patients on the benefits of Purdue's OxyContin. In fact, non-joined manufacturer Purdue leveraged its relationship with Walgreens and their mutually beneficial goal of growing the opioid business to ensure that Purdue had input into Walgreens "corporate guidelines" to which Walgreens pharmacists were "expected to follow" when it came to the dispensing of prescription opioids.

456. Walgreens also used its corporate oversight abilities to identify stores it believed were not filling enough oxycodone to make sure they weren't "turning away good customers" and

encouraging stores to use continuing education created by opioid manufacturers to inform their decisions regarding dispensing.

457. Starting in at least 1999, non-joined manufacturer Purdue sponsored Walgreens' pharmacy continuing education programs designed to encourage stores to "get on the Pro Pain Management Band Wagon." Non-joined manufacturer Purdue was thrilled with the response and assistance it received from Walgreens when Purdue presented on "Pain Management for the Pharmacist."

458. Walgreens' use of pro-opioid continuing education continued as the opioid crisis grew. For example, Walgreens' Market Director of Pharmacy Operations recommended that Walgreens District Managers and Pharmacy Supervisors attend a continuing education program titled ""The Pharmacists' Role in Pain Management: A Legal Perspective," which was available online at RxSchool.com. This program was one in a long line of pharmacist "education" programs that Purdue developed as part of its strategy to disseminate "a new school of thought" about opioids. Through these programs, non-joined manufacturer Purdue and the National Retail Pharmacy Defendants disseminated fraudulent information that redefined the red flags of abuse or diversion in an effort to correct pharmacists' "misunderstanding" about pain patients and the practice of pain management. Purdue took what it called an "aggressive role" in the education of Walgreens' and other National Retail Pharmacy Defendants' pharmacists on pain management issues.

459. Upon information and belief, Walgreens' Market Director of Pharmacy Operations also recommended a second continuing education program titled "Navigating the Management of Chronic Pain: A Pharmacist's Guide," which Endo sponsored. One of the presenters was Kenneth Jackson, a co-author of the CE program titled "Use of Opioids in Chronic Noncancer Pain," which

Purdue sponsored. Released in April 2000, it was designed to eliminate "misconceptions about addiction, tolerance and dependence" and contained many of the same messages as the pharmacist guide he authored.

460. Walgreens also presented the video "The Pharmacist's Role in Pain Management - A Legal Perspective" at mandatory meetings for pharmacy managers. This continuing education program was also sponsored by non-joined manufacturer Purdue, was similar to the earlier presentations, and was also disseminated to Walgreens' pharmacists in June 2011. Released in 2009, the program was presented by Jennifer Bolen, J.D. Ms. Bolen was a frequent speaker for Purdue and other opioid manufacturers, and served as Special Counsel for the American Academy of Pain Medicine (a known front group for opioid manufacturers).

461. The meeting caused Walgreens' pharmacists who had stopped filling prescriptions for controlled substances to start filling them again.

**4. Multiple Enforcement Actions Against the National Retail Pharmacy Defendants Confirms Their Compliance Failures.**

462. The National Retail Pharmacy Defendants have long been on notice of their failure to abide by state and federal law and regulations governing the distribution and dispensing of prescription opioids. Indeed, several of the National Retail Pharmacy Defendants have been repeatedly penalized for their illegal prescription opioid practices. Upon information and belief, based on the widespread nature of these violations, these enforcement actions are the product of, and confirm, national policies and practices of the National Retail Pharmacy Defendants, including the policies and practices used in West Virginia.

463. Numerous state and federal prosecutions have occurred in which prescription opioid pills were procured from National Retail Pharmacy Defendants. The allegations in this Complaint do not attempt to identify all these prosecutions and the information below is just

provided as examples that demonstrate national policies and practices of the National Retail Pharmacy Defendants.

**a) CVS**

464. CVS is a repeat offender and recidivist: the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the DOJ. It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.

465. Confirming its systemic failures to implement and adhere to adequate controls against diversion, Defendant CVS has repeatedly faced enforcement actions. In May 2020, CVS's Omnicare subsidiary agreed to pay a $15.3 million civil penalty as part of a settlement with the DEA resolving allegations that it improperly dispensed opioids and other controlled substances to long-term care facilities without a valid prescription.

466. In March 2019, CVS Pharmacy, Inc. (including all of its relevant subsidiaries and affiliates) entered into a $535,000 settlement with the U.S. Attorney's Office for the District of Rhode Island, acting on behalf of the United States, and the DEA's Providence Office. In connection with the settlement, a DEA agent stated: "Pharmacies put patients at risk when they dispense Schedule II narcotics, which have the highest potential for abuse, without a valid and legal prescription.[241]

[241] Press Release: CVS to pay $535,000 for filling invalid prescriptions, U.S. Drug Enforcement Administration (Apr. 16, 2019), https://www.dea.gov/press-releases/2019/04/16/cvs-pay-535000-filling-invalid-prescriptions.

467. In August 2018, CVS paid $1 million to resolve allegations that CVS pharmacies throughout the Northern District of Alabama violated record-keeping requirements under the CSA and its implementing regulations, the largest civil fine paid in Alabama by a DEA registrant.[242]

468. In June 2018, CVS paid $1.5 million to resolve allegations that CVS pharmacies in Long Island, New York failed to timely report the loss or theft of controlled substances, including hydrocodone, recognized as one of the most commonly diverted controlled substances.[243]

469. In July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances. The fine followed numerous others throughout the country.[244]

470. In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008 to 2012, CVS stores and pharmacists in Maryland violated their duties under the CSA and filling prescriptions with no legitimate medical purpose.[245]

471. In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.[246]

472. In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General in which CVS agreed to require pharmacy staff to access the state's prescription

---

[242] https://www.justice.gov/usao-ndal/pr/cvs-pharmacy-pays-1-million-penalty-settlement-doj-violations-controlled-substances-act

[243] https://www.justice.gov/usao-edny/pr/cvs-pharmacy-inc-pay-15-million-settle-civil-penalty-claims-violations-controlled

[244] https://www.justice.gov/usao-edca/pr/cvs-pharmacy-inc-pays-5m-settle-alleged-violations-controlled-substance-act

[245] https://www.justice.gov/usao-md/pr/united-states-reaches-8-million-settlement-agreement-cvs-unlawful-distribution-controlled#

[246] https://www.justice.gov/usao-ct/pr/cvs-pharmacy-pays-600000-settle-controlled-substances-act-allegations#

monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.[247]

473. In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances—mostly addictive painkillers—more than 500 times between 2011 and 2014.[248]

474. In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, even though these practitioners were not legally permitted to prescribe that drug. The government also alleged that CVS had recordkeeping deficiencies.[249]

475. In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida had dispensed prescription opioids "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."[250]

476. In 2013, CVS agreed to pay $11 million to resolve allegations it violated the CSA and related federal regulations at its retail stores in Oklahoma and elsewhere by: (1) creating and

---

[247] https://www.boston.com/news/local-news/2016/09/01/cvs-will-pay-795000-strengthen-policies-around-dispensing-opioids-in-agreement-with-state/
[248] https://www.justice.gov/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filled-fake-prescriptions
[249] https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved-450000-civil-settlement#
[250] https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22-million-settlement-agreement-cvs-unlawful-distribution#

using "dummy" DEA registration numbers on dispensing records, including records provided to state prescription drug monitoring programs; (2) filling prescriptions from prescribers who lacked current or valid DEA numbers; and (3) substituting the DEA number of non-prescribing practitioners for the DEA numbers of prescribers on prescription records.[251]

**b) Walgreens**

477. Governmental agencies and regulators have repeatedly penalized Walgreens for its serious and flagrant violations of the CSA in distributing opioids. These actions demonstrate Walgreens' knowledge of, and disregard for, its obligations to prevent diversion.

478. In April 2011, Walgreens entered into an Administrative Memorandum of Agreement ("2011 MOA") with the DEA in relation to its San Diego facility and expressly agreed that it would "maintain a compliance program to detect and prevent diversion of controlled substances as required under the Controlled Substances Act ("CSA") and applicable DEA regulations."[252]

479. On September 14, 2012, however, the DEA also issued an Order to Show Cause *and Immediate Suspension Order* ("ISO"), against Walgreens' Distribution Center in Jupiter, Florida, as well as ISOs related to certain Walgreens pharmacies. Evidencing the existence of systemic failures, the ISO suspended the distribution center's ability to handle controlled substances until a final decision was made by the DEA.[253] Upon information and belief, Walgreens' Jupiter, Florida distribution center distributed controlled substances to Walgreens pharmacies in West Virginia.

---

[251] https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penalty-claims-involving-violations-controlled#
[252] https://www.justice.gov/archive/usao/fls/PressReleases/Attachments/130611-01.WalgreensMOA&Addendum.pdf
[253] https://www.dea.gov/press-releases/2013/02/22/dea-serves-order-show-cause-walgreens-pharmacy-fort-myers#

480. In 2013, Walgreens agreed to the largest settlement in the DEA history at the time - $80 million – to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription painkillers to be diverted for abuse and illegal black-market sales. In addition to the monetary payment, the Jupiter, Florida distribution center lost its authority to distribute or dispense controlled substances, including opioids, for two years. The Department of Justice, in describing the settlement, explained that the conduct at issue included Walgreens' "alleged failure to sufficiently report suspicious orders was a systematic practice that resulted in at least tens of thousands of violations and allowed Walgreens' retail pharmacies to order and receive at least three times the Florida average for drugs such as oxycodone."[254] The settlement resolved investigations into, and allegations of, CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

481. As part of the 2013 MOA described above, Walgreens "acknowledge[d] that certain Walgreens retail pharmacies did on some occasions dispense certain controlled substances in a manner not fully consistent with its compliance obligations under the CSA… and its implementing regulations."[255] The 2013 MOA required Walgreens to, among other things, "maintain a compliance program in an effort to detect and prevent diversion of controlled substances" as required by law.[256]

482. An August 2013 email shows Walgreens understood the consequences of its actions, explaining that Walgreens' "previous system would continue to send additional product

[254] https://www.dea.gov/press-releases/2013/06/11/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under
[255] WAGMDL00490963 – WAGMDL00490964
[256] *Id.*; WAGMDL00490968

to the store without limit or review which made possible the runaway growth of dispensing products like Oxycodone."[257]

**c) Walmart**

483. Walmart paid a $637,000 fine to settle an action by federal prosecutors against five Walmart and Sam's Club Pharmacies in Texas, alleging that they failed to keep records required to help prevent diversion of controlled substances as required by the CSA. Specifically, "accountability audits did not match the drugs on hand, revealing major overages and shortages in the accountability of controlled substances, and there were missing invoices for controlled substances all in violation of the CSA."[258] A U.S. Attorney further explained that "[b]ecause of the pharmacies' lack of proper record keeping, a variety of Schedule II, III, IV and V controlled substances were lost or stolen and possibly diverted."[259]

484. September 2018 minutes of an Oklahoma State Board of Pharmacy meeting reflect that an Oklahoma "Wal-Mart Pharmacy was charged with multiple violations of state and federal regulations and rules including establishing and maintaining effective controls against diversion of prescription drugs."[260] Walmart agreed to pay a fine to resolve those alleged violations.

485. A prosecution against a Virginia prescriber revealed failures at Walmart pharmacies from 2007 to 2012. A Decision and Order in that case revealed that a Walmart pharmacy would fill prescriptions pursuant to a telephone message from a staff member of the prescriber, purportedly on behalf of the prescriber even though the staff member failed to provide this prescriber's DEA number.[261] By mid-November 2008, three Walmart pharmacies had

---

[257] WAGMDL00021425
[258] Associated Press, *Wal-Mart Settles Drug Records Accusation*, (Jan. 7, 2009), http://prev.dailyherald.com/story/?id=262762.
[259] *Id.*
[260] Minutes September 26, 2018, Oklahoma State Board of Pharmacy, https://www.ok.gov/pharmacy/documents/Min%20September%202018.pdf (last visited Oct. 22, 2020).
[261] DOJ, DEA, Docket No. 15-26, [FR Doc. No. 2017-13158] Peter F. Kelly, D.P.M.; Decision

dispensed more than 200 hydrocodone prescriptions and refills on behalf of this prescriber. In 2012, this prescriber learned that someone was fraudulently using his DEA number. The prescriber called a Walmart pharmacy regarding refill requests faxed from his office and advised "that somebody was fraudulently using [his] DEA number."[262] Although the prescriber asked that his DEA number be blocked, the same Walmart pharmacy filled another two prescriptions after this alert. Although Walmart did not face sanctions for its conduct, the Opinion and Order described "the fact that prescriptions which were missing [the] Respondent's DEA number were routinely filled notwithstanding that they were facially invalid," and "that the prescriptions were for hydrocodone in quantities and dosings that were clearly outside the scope of what is usually prescribed by podiatrists" as "deeply disturbing."[263]

**d) Kroger**

486. Before 2005, the inadequacy of Kroger's policies and procedures was particularly glaring. DEA began investigating King Soopers and City Market, part of the "Kroger Co. Family of Stores"[264] in response to information concerning potential diversion. Audits at seven Colorado pharmacies revealed "a pattern of non-compliance" with the CSA and federal regulations.[265] Because of record-keeping and security problems, the DEA could not determine from the audit "how many drugs had been lost or diverted," but could tell that "many of the CSA violations were the result of systemic weaknesses present in all King Soopers and City Market pharmacies."[266]

487. Ultimately, the parent corporation, Kroger Co., agreed in October 2005 to a then-record $7 million settlement for the "systemic violations of the Controlled Substances Act (CSA)

---

and Order, https://www.deadiversion.usdoj.gov/fed_regs/actions/2017/fr0623.htm.

[262] *Id.*

[263] *Id.*

[264] https://www.kingsoopers.com/i/kroger-family-of-companies

[265] https://www.dea.gov/press-releases/2005/10/24/record-7-million-dollar-settlement

[266] *Id.*

Case 5:24-cv-00207-JPB Document 1 Filed 10/28/24 Page 156 of 180 PageID #: 960

by the company's pharmacies."[267] Kroger also "agreed to implement a pharmacy compliance program estimated to cost over $6 million dollars in all 1,900 of its pharmacies nationwide."[268] The changes included the Kroger stores in West Virginia. Kroger promised national reforms because it imposed its procedures at a national level across its "family" of stores, such that the same systemic failures also existed in West Virginia.

488. A DEA press release concerning the settlement highlighted the trust Americans place in "corporations like Kroger" to "ensure that controlled substances aren't diverted to the illicit market."[269] Kroger understood the vital importance of its role as the last line of defense. "As the last person that has the opportunity to speak with a patient or caregiver prior to handing over a medication that has been known to end the lives of so many when diverted or misused, no one can overestimate the responsibility of the pharmacist." Kroger also recognized the "legislative and social intent of regulating controlled substances" as consistent with its mission in "serving the public good,"

489. [redacted][270]

[267] https://www.dea.gov/press-releases/2005/10/24/record-7-million-dollar-settlement
[268] *Id.*
[269] *Id.*
[270] New Mexico Opening docs from slides 118 – 123.

### H. Plaintiffs' School Districts Have Been Damaged as A Result of Defendants' Illegal Conduct.

490. West Virginia has been hit hard by the opioid epidemic. Indeed, West Virginia has the highest rate of opioid-related overdose deaths in the country. In 2017, there were 833 drug overdose deaths involving opioids in West Virginia — a rate of 49.6 deaths per 100,000 persons. This is double the rate in 2010 and threefold higher than the national rate of 14.6 deaths per 100,000 persons. Nationwide, fatal overdoses from prescription opioids more than doubled between 2005 and 2016. West Virginia was specifically targeted with aggressive opioid marketing to doctors and pharmacists, with over 780 million doses of prescription painkillers transported into the state over the course of six years.[271]

491. In 2010, approximately 15 out 1,000 babies born in West Virginia hospitals were diagnosed with NOWS. In 2017, approximately 56 out 1,000 babies born in West Virginia hospitals were diagnosed with NOWS — nearly a fourfold increase in just seven years.[272] Researchers examined a 15-month period from October 1, 2016 to December 31, 2017, and found NOWS in 52.6 per 1000 live births among West Virginia residents.[273]

492. West Virginia's public school boards have not been spared the ravages of the opioid epidemic either — far from it. Staff, parents, and students have fallen victim to opioid addiction. And children born to opioid-addicted parents are innocent victims of the epidemic, with their lives permanently impaired by addiction from time *in utero*. About 75 to 90 percent of children exposed to opioid use in the womb are born with NOWS.[274] A disproportionate number of these children

---

[271] Eric Eyre, *Drug firms poured 780M painkillers into WV amid rise of overdoses*, Charleston Gazette-Mail (Dec. 17, 2016), https://www.wvgazettemail.com/news/health/drug-firms-poured- m-painkillers-into-wv-amid-rise-of/article_78963590-b050-11e7-8186-f7e8c8a1b804.html

[272] HCUP Fast Stats- Neonatal Abstinence Syndrome (NAS) Among Newborn Hospitalizations, Agency for Healthcare Research and Quality, https://www.hcup-us.ahrq.gov/faststats/NASServlet?setting1=IP& location1=WV

[273] Amna Umer, et al., Capturing the statewide incidence of neonatal abstinence syndrome in real time: the West Virginia experience, 86 Pediatric Research 5 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC6435397/

[274] Denise J. Maguire, et al., Long-Term Outcomes of Infants with Neonatal Abstinence Syndrome, 35 Neonatal

require enhanced educational services, including but not limited to special education programs. Post-birth exposure to family members' addiction to opioids, and often death, also causes children to require enhanced educational services. And of course, students addicted to opioids themselves will require the same enhanced educational services.

493. Opioid-exposed and NOWS children have 2.7 times the odds of having a severe intellectual disability;[275] 2.43 times the odds of having autism spectrum disorder;[276] are 2.5 times more likely to fail to meet educational standards in third through seventh grade;[277] and they are more than 10 times more likely to be diagnosed with ADHD.[278]

494. Plaintiffs' school districts are required by state and federal law to make significant expenditures to accommodate and educate students with special learning needs.

495. Federal law also requires Plaintiffs' school districts to expend resources to actively seek out and identify all children from birth through age 21 in their districts who may be eligible for special education and related services; to evaluate such children; and to provide them with appropriate services.[279]

---

Network 5 (2016).

[275] Su Lynn Yeoh; John Eastwood, FRACP, Ph.D.; Ian M. Wright, MBBS, FRACP; Rachael Morton, MScMed, Ph.D.; Edward Melhuish, Ph.D.; Meredith Ward, MBBS, FRACP, Ph.D.; Ju Lee Oei, MBBS, FRACP, MD, *Cognitive and Motor Outcomes of Children With Prenatal Opioid Exposure: A Systematic Review and Meta-analysis*, 2 JAMA Network Open 7 (2019), doi:10.1001/jamanetworkopen.2019.7025.

[276] Rubenstein, E., Young, J. C., Croen, L. A., DiGuiseppi, C., Dowling, N. F., Lee, L-C., ... Daniels, J., *Brief Report: Maternal Opioid Prescription from Preconception Through Pregnancy and the Odds of Autism Spectrum Disorder and Autism Features in Children*, 49 Journal of Autism and Developmental Disorders (2018), https://doi.org/10.1007/s10803-018-3721-8.

[277] Oei JL, Melhuish E, Uebel H, et al. *Neonatal abstinence syndrome and high school performance*, 139 Pediatrics 2 (2017).

[278] Eivind Sirnes, Leif Oltedal b,c, Hauke Bartsch d, Geir Egil Eide, Irene B. Elgen, Stein Magnus Aukland. Brain morphology in school-aged children with prenatal opioid exposure: A structural MRI study, Early Human Development 106–107 (2017). In addition, eighty percent of children with ADHD receive school-based services via federally mandated Individual Education Plans (IEP) or services under Section 504 of the Rehabilitation Act. Melissa L. Danielson, MSPH, Susanna N. Visser, DrPH, Andrea Chronis-Tuscano, Ph.D., and George J. DuPaul, Ph.D. A National Description of Treatment among United States Children and Adolescents with Attention-Deficit/Hyperactivity Disorder. 192 J Pediatr. 240–46.e1. (2018), doi: 10.1016/j.jpeds.2017.08.040.

[279] 34 C.F.R. § 300.111.

496. Plaintiffs' school districts have shouldered the increased cost of educating students who were exposed to prescription opioids *in utero,* who were affected by their family members' opioid addition or death, and who themselves are addicted to opioids as a result of the opioid epidemic that Defendants purposely caused. Plaintiffs' school districts will continue to bear the financial burden of educating these students for the foreseeable future, as subsequent birth cohorts reach school age. And because of Defendants' schemes undertaken to increase opioid sales, Plaintiffs' school districts have had to divert significant resources away from other essential functions. Both monetary and personnel resources that would ordinarily be devoted to classroom instruction have been directed toward addressing behavioral disruptions caused by students whose ability to self-regulate has been compromised by the opioid epidemic.

## V. CLASS ALLEGATIONS

497. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all independent public school boards in the state of West Virginia.

498. Plaintiffs are members of the Class they seek to represent.

499. The proposed class definition is intended to be subject to revision if facts adduced in discovery suggest desirable or necessary refinements to it.

500. The members of the Class are sufficiently numerous that joinder of all members is impracticable. There are 55 county public school boards in West Virginia.

501. Questions of fact and law common to the members of the Class that are both well-suited to class-wide adjudication and predominate over any questions affecting only individual West Virginia school boards. These common, predominating questions include, but are not limited to: a) whether Defendants were, or reasonably should have been, aware that prescription opioids were highly addictive, not proper for long-term treatment, were being over-prescribed, and were

causing an addiction epidemic leading to joblessness, homelessness, and death among users; b) whether Defendants were, or reasonably should have been, aware that use of prescription opioids in pregnant women leads to NOWS and that children born with NOWS exhibit higher rates of behavioral and emotional disorders and cognitive disabilities, necessitating special education services; c) whether children living in opioid-afflicted households disproportionately require and qualify for enhanced educational services, including special education services; d) whether students who are opioid addicted themselves require enhanced educational services, including special education services; e) whether Manufacturer Defendants misrepresented that prescription opioids were not highly addictive and were in fact proper for long term use; f) whether Defendants took reasonable steps to warn West Virginia doctors, pharmacists, pregnant women, and the public of the highly addictive qualities of prescription opioids and the potentially catastrophic results of opioid use during pregnancy; and g) whether Defendants were negligent.

502. Plaintiffs' claims are typical of the claims of other Class members in that they have experienced a measurable increase in rates of 1) opioid-related learning disabilities among children of opioid-addicted parents, for whom they are required to provide enhanced education and services, including under the Americans with Disabilities in Education Act, Section 504 of the Rehabilitation Act of 1973, and Individuals with Disabilities Act, to provide special education resources; and 2) addiction among students, for whom they provide counseling, special education, and crisis intervention. All Class members bear the steadily rising costs associated with these developments, and Class members will continue to incur significant costs in the years to come, as current future cohorts of adversely impacted children move throughout the school system with special needs all along the way.

503. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained experienced and accomplished counsel who are able and prepared to expend the resources necessary to litigate this case, and who are experienced in litigating class actions.

504. A class action is superior to other methods for fairly and efficiently adjudicating this controversy, as joinder of all Class members is impracticable. Class litigation will also avoid the possibility of inconsistent and conflicting adjudication of the claims asserted herein. Alternatively, class-wide liability under the theories advanced in this complaint could properly be certified under Rule 23(c)(4).

## CAUSES OF ACTION

### COUNT I:
### CIVIL CONSPIRACY to DECEIVE the PUBLIC and VIOLATE CONTROLLED SUBSTANCE LAWS
### (ALL DEFENDANTS)

505. Plaintiffs incorporate and re-allege the foregoing allegations as if they were fully set out herein.

506. Count I is brought by Plaintiffs on behalf of themselves and the Class.

507. West Virginia law recognizes a cause of action for civil conspiracy. *See Sheehan v. Saoud*, 650 F. App'x 143, 153 (4th Cir. 2016) (citing *Kessel v. Leavitt*, 511 S.E.2d 720, 753 (W. Va. 1998)). A civil conspiracy is "a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff." *Dunn v. Rockwell*, 689 S.E.2d 255, 268 (W. Va. 2009).

508. Defendants engaged in a civil conspiracy in their unlawful marketing and selling of opioids, and/or in their efforts to boost the sale of opioids in West Virginia and Plaintiffs' and the

Class's school board communities. Defendants agreed to increase the sales of opioids by unfair, deceptive, and unconscionable means, in violation of federal and West Virginia controlled-substances laws.

509. Defendants engaged in a civil conspiracy to commit fraud and misrepresentation in conjunction with their unlawful marketing and selling of opioids in Plaintiffs' and the Class's school board communities.

510. As described above, Defendants intentionally contributed to the prescription drug abuse epidemic in Marshall and Wetzel counties and the counties of the Class, throughout the entire State of West Virginia, through repeated intentional actions that violated the West Virginia Uniform Controlled Substances Act and through reckless disregard for the safety and well-being of the citizens of Marshall and Wetzel counties and the counties of the Class, including:

a. Defendants conspired to intentionally and improperly distribute prescription drugs, contrary to W. Va. Code § 60A-3-308;

b. Defendants conspired to intentionally engage in prohibited acts, contrary to W. Va. Code §§ 60A-4-401 through -403;

c. Defendants conspired in deceiving and attempting to deceive medical practitioners in order to promote prescriptions, in violation of W. Va. Code § 60A-4-401;

d. Defendants conspired to violate the requirements of W. Va. Code § 60A-8-1 et seq.;

e. Defendants conspired to intentionally violate the West Virginia Uniform Controlled Substances Act;

f. Defendants conspired to intentionally violate industry standards;

g. Defendants conspired to intentionally violate West Virginia law and regulations;

and

h. Defendants conspired and intentionally turned a blind eye toward industry standards by enabling Defendant Manufacturers to sell excessive quantities of commonly-abused, highly addictive controlled substances to entities serving a population of individuals who were abusing prescription medications — many of whom were addicted, or could reasonably have been expected to become addicted or to engage in illicit drug transactions.

511. The intentional acts and omissions by Defendants led to the dispensing of controlled substances for illegitimate purposes and fueled a prescription drug abuse epidemic in West Virginia.

512. Defendants conspired to maximize their profits and to expand overall opioid sales.

513. Defendants' unconscionable, unfair, and deceptive acts and practices offend West Virginia's public policy; are immoral, unethical, oppressive, and unscrupulous, as well as malicious, wanton, and manifesting of ill will; and they caused substantial injury to Plaintiffs and the Class. Defendants' intentional acts and omissions taken in furtherance of the conspiracy ultimately supplied millions of doses of frequently abused and highly addictive controlled substances to West Virginia patients. In all of this, Defendants were reckless and consciously indifferent to the consequences of their actions and inactions.

514. In addition, Defendants' overt acts in furtherance of this conspiracy include, but are not limited to:

a. Designing and implementing marketing messages that comprised untrue, false, unsubstantiated, and misleading marketing, directly and with and through third parties, in violation of 21 C.F.R. § 202.1(e), thereby causing opioid drugs to be misbranded;

b. Designing and implementing marketing messages that promoted other purported advantages of prescription opioids, including but not limited to improved function and quality of life, in violation of FDA regulations, including 21 C.F.R. § 202.1(e);

c. Promoting higher sales, higher dose sales, and targeting the highest volume West Virginia prescribers of a highly abusable, addictive, and dangerous drug;

d. Promoting higher dose opioid prescriptions, known to pose greater risks; and

e. Targeting the highest West Virginia prescribing physicians, without addressing whether those prescribers may be engaged in abuse and diversion and should not be targeted, to induce them to increase prescriptions of opioids further.

515. The conspiracy was the product of an agreement made through Defendants' close collaboration.

516. Defendants' conduct in furtherance of the conspiracy described herein was not mere parallel conduct. Defendants encouraged one another to act directly against their ordinary commercial interests: in not reporting the unlawful practices of each other and competitors to the authorities and in seeking to avoid "strict" regulation.

517. Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, and acted purposely, intentionally, and without a reasonable or lawful excuse, which directly caused the injuries alleged herein.

518. Defendants' conspiracy, as well as their actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

519. Defendants' actions demonstrated malice, recklessness, and a conscious disregard for the rights and safety of other persons, even though their conduct had a great probability of causing substantial harm.

520. Defendants' misconduct alleged in this case was ongoing and persistent for many years.

521. Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a school board would reasonably expect to occur, and is not part of the normal and expected costs of a public school board's existence.

522. The Defendants' conspiracy was the direct and proximate cause of Plaintiffs and the Class suffering damages including, but not limited to, significant expenses for special education programs for (a) students exposed to opioids *in utero* (NOWS), (b) students with emotional and behavioral damages resulting from living in households afflicted by opioids, and (c) students addicted to opioids themselves, for which Plaintiffs and the Class demand compensatory and punitive damages and all damages and relief allowed by law.

**COUNT II:**
**COMMON LAW PUBLIC NUISANCE**
**(ALL DEFENDANTS)**

523. Plaintiffs incorporate and re-allege the foregoing allegations as if they were fully set out herein.

524. Count II is brought by Plaintiffs on behalf of themselves and the Class.

525. A public nuisance is "an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons." *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d 901, 921 (W. Va. 1997) (citation omitted); *Duff v. Morgantown Energy Assoc.*, 421 S.E.2d 253, 257 n.6 (W. Va. 1992); *see also* Restatement (Second) of Torts § 821B

(1979) ("A public nuisance is an unreasonable interference with a right common to the general public."); *City of Huntington, W. Va. v. AmerisourceBergen Drug Corp.*, 96 F.4th 642, 649 (4th Cir. 2024) (emphasizing the "broad language used by the Supreme Court of Appeals [of West Virginia] in describing public nuisance claims" and citing "decisions by West Virginia trial courts holding that common law claims of public nuisance are cognizable against distributors of opioids").

526. "Nuisance is a flexible area of the law that is adaptable to a wide variety of factual situations," *Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 621 (W. Va. 1985), and "it is the duty of the proper public officials to vindicate the rights of the public" by bringing suit to abate a public nuisance where interferences with common rights are at stake, *Hark v. Mountain Fork Lumber Co.*, 34 S.E.2d 348, 354 (W. Va. 1945).

527. Defendants' conduct has created a foreseeable, ongoing, significant, unlawful, and unreasonable interference with numerous rights "common to the general public," including the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs' and the Class's school board communities. Defendants have done so through their work in manufacturing, marketing, promoting, and selling massive doses of opioids near and throughout the school districts where Plaintiffs and the Class are located, fueling an opioid epidemic in those communities.

528. Reasonably prudent entities in the prescription opioid supply chain would not have misrepresented the risks of prescription opioids, nor would they have overstated their benefits through publications, CMEs, and other forms of direct and indirect marketing. Such reasonably prudent entities would have implemented basic controls—required under federal law—to prevent opioid diversion in the supply chain.

529. Defendants intentionally, unlawfully, recklessly, and negligently either manufactured, marketed, promoted, sold or dispensed prescription opioids that Defendants knew, or reasonably should have known, would be diverted, to the employees, parents, and students of the Plaintiffs' school boards and those of the Class, resulting in children born after damaging exposure to opioids before birth; students being damaged by living in opioid-afflicted households; and student addiction to opioids, all imposing the nuisance burdening Plaintiffs and the Class and resulting in direct costs to Plaintiffs and the Class.

530. Defendants' unlawful and/or intentional dispensing of opioids without maintaining effective controls against diversion include Defendants' failure to effectively monitor for suspicious orders; to report suspicious orders; and/or to stop the shipment of suspicious orders of opioids, all imposing the nuisance burdening Plaintiffs and the Class, and resulting in direct costs to Plaintiffs and the Class.

531. Defendants' actions have been continuing and have produced a significant effect upon the public's rights to education, health, and safety.

532. Defendants' selling and/or dispensing of opioids while failing to maintain effective controls against diversion was prohibited by federal and West Virginia law.

533. Defendants' ongoing conduct produced an ongoing nuisance, as the prescription opioids that Defendants allowed and/or caused to be unlawfully possessed nationwide and in West Virginia — including in and around Plaintiffs' public school districts and those of the Class — were diverted, leading to abuse, addiction, crime, health costs, and lasting damage to the mental and emotional health of children born of opioid-addicted parents, with opioid-addicted family members, or addiction to opioids themselves, all of which Plaintiffs and the Class must seek to abate.

534. Defendants' conduct has an ongoing detrimental effect upon West Virginia public health, safety, and welfare; upon West Virginia public school boards; and upon West Virginia communities' freedom from disturbance and reasonable apprehension of danger to person and property, present and future.

535. Defendants are, have been, or should be aware of the unreasonable interference that their conduct has caused for the Plaintiffs and the Class, as they are in the business of manufacturing, marketing, selling and/or dispensing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous under federal and West Virginia law.

536. Defendants' conduct in manufacturing, marketing, selling and/or dispensing prescription opioids — which the Defendants knew, or reasonably should have known, would and will likely be diverted for non-legitimate, non-medically appropriate use — creates a strong likelihood that these diverted opioids will cause death and injury within Plaintiffs' and the Class's public school districts. Defendants' conduct in this regard otherwise significantly and unreasonably interferes with West Virginia public health, safety, and welfare, and with Plaintiffs' and the Class's ability to educate West Virginia children as mandated by law.

537. It was and is reasonably foreseeable to Defendants that their conduct would cause injuries to students and employees of Plaintiffs and the Class, and would otherwise significantly and unreasonably interfere with the public health, safety, and welfare, and with Plaintiffs' and the Class's ability to educate West Virginia children as mandated by law.

538. The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes, due to the Defendants' unlawful actions or inactions, not only caused West Virginia deaths and injuries, but also created a palpable climate of fear among West Virginia students, parents, and employees of Plaintiffs' and the Class's public

school boards where opioid diversion, abuse, and addiction are present, and where diverted opioids tend to be used frequently.

539. Stemming the flow of illegally distributed prescription opioids — and abating the nuisance caused by the illegal flow of opioids — will help to alleviate these problems, save lives, prevent injuries, and make Plaintiffs' and the Class's public school districts safer and more effective places to work and receive an education.

540. Defendants' conduct is a direct and proximate cause of injuries to Plaintiffs and the Class, including the costs borne by Plaintiffs and the Class for increased special education needs. Defendants' conduct is a significant and unreasonable interference with Plaintiffs' and the Class's ability to educate West Virginia children as mandated by law.

541. Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety, and welfare of the students and employees of Plaintiffs' and the Class's public school boards, threatening the ability of Plaintiffs and the Class to educate West Virginia children as mandated by law. Plaintiff and the Class have a clearly ascertainable right to seek to abate the nuisance and must address the damages caused by this nuisance to the public school boards of West Virginia.

542. Defendants created the nuisance of the abuse of opioids in West Virginia, and the ensuing, associated plague of prescription opioid and heroin addiction. Defendants knew of the dangers to public health and safety that diversion of opioids would create. However, Defendants intentionally and/or unlawfully failed to maintain effective controls through proper monitoring, reporting, and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully continued to ship, and failed to halt, suspicious orders of opioids, and/or caused such

orders to be shipped. Defendants intentionally and/or unlawfully marketed opioids in manners they knew to be false and misleading. Such actions were inherently dangerous.

543. Defendants also knew that prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that, where Defendants marketed, sold and/or dispensed prescription opioids, or caused such opioids to be marketed, sold and/or dispensed, in West Virginia without maintaining effective controls against diversion — including monitoring, reporting, and refusing shipment of suspicious orders — the opioids would be diverted and would create an opioid abuse nuisance in West Virginia and nationwide, including in and around Plaintiffs' and the Class's public school boards.

544. Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, as such conduct plainly had a great probability of causing substantial harm.

545. As a direct result of Defendants' conduct, Plaintiffs and the Class have suffered actual injuries and damages, including, but not limited to, significant expenses for special education programs and services for students (a) exposed to opioids *in utero* (NOWS), (b) with emotional and behavioral damages resulting from living in households afflicted by opioids, and (c) addicted to opioids themselves.

546. Plaintiffs and the Class seek to abate the damages that have resulted to the West Virginia public school boards from the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions.

547. The public nuisance created by Defendants' actions is substantial and unreasonable — it has caused and continues to cause significant harm to West Virginia public school boards, which are required to educate West Virginia children damaged by this nuisance, and the harm

inflicted outweighs any offsetting benefit. The staggering rates of opioid and heroin use resulting from the Defendants' abdication of their gatekeeping and diversion prevention duties, and the Defendants' fraudulent marketing activities, have caused harm to Plaintiffs and the Class.

548. Plaintiffs and the Class seek all legal and equitable relief as allowed by law, including, *inter alia*: injunctive and abatement relief; restitution; disgorgement of profits; compensatory and punitive damages; all damages allowed by law to be paid by the Defendants; attorneys' fees and costs; and pre- and post-judgment interest.

**COUNT III:**
**NEGLIGENCE**
**(ALL DEFENDANTS)**

549. Plaintiffs incorporate and re-allege the foregoing allegations as if they were fully set out herein.

550. Count III is brought by Plaintiffs on behalf of themselves and the Class.

551. To prevail on a negligence claim under West Virginia law, a plaintiff must show that defendants "owed the plaintiff some duty of care; that by some act or omission the defendant breached that duty; and that the act or omission proximately caused some injury to the plaintiff that is compensable by damages." *City of Charleston v. Joint Comm'n*, 473 F. Supp. 3d 596, 614 (S.D. W. Va. 2020) (quoting *Hersh v. E-T Enters., Ltd. P'ship*, 752 S.E.2d 336, 341 (2013)).

552. Defendants owed Plaintiffs, the Class, and West Virginia residents a duty to act with reasonable care in the manufacturing, marketing, promoting, selling and/or dispensing of opioids. Defendants specifically owed Plaintiffs, the Class, and West Virginia residents a duty not to cause or encourage the over-marketing, over-prescribing, over-dispensing or excessive sale of controlled substances — including opioids, which were known at all times relevant to this Complaint to be addictive and to be a threat to public health.

553. Defendants breached this duty in their manufacturing, marketing, promoting, dispensing and/or selling of opioids in West Virginia, as described herein.

554. Reasonably prudent entities in the prescription opioid supply chain would not have misrepresented the risks of prescription opioids, nor would they have overstated their benefits through publications, CMEs, and other forms of direct and indirect marketing. Reasonably prudent entities in the prescription opioid supply chain would further have implemented basic controls—required under federal law—to prevent opioid diversion in the supply chain.

555. Defendants knew that opioids were highly addictive and inappropriate and unsafe for the treatment of chronic pain. Defendants knew of widespread prescription opioid addiction and abuse, and of diversion to illegal channels. Defendants also knew that the dangerous qualities of opioids being diverted bore a direct relationship to the volume of opioids being ordered, authorized, and dispensed.

556. Nonetheless, Defendants persisted in spreading misinformation and burying the truth about the safety and efficacy of opioids while making opioids readily available to West Virginians without regard to the likely harm they would cause.

557. Defendants' misinformation campaign was intended to and did encourage West Virginia patients to ask for, West Virginia doctors to prescribe, and payors to pay for opioid therapy.

558. Defendants' conduct was reckless and evinced a conscious disregard for and indifference to the consequences of their actions.

559. Defendants knew of or should have known of the foreseeable injuries to Plaintiffs and the Class caused by their failure to act with reasonable care. Defendants were aware that their goal of significantly expanding the marketplace for opioids depended in part on comprehensive

coverage of opioids by insurers and third-party payors. Defendants also knew that their goal of increasing profits by promoting and dispensing unnecessary and inappropriate prescriptions of opioids for chronic pain would lead directly to damaging exposure to opioids *in utero* and damage to children exposed to opioids.

560. Defendants' breach of the duty they owed to Plaintiffs and the Class directly and proximately caused the injuries and damages suffered by Plaintiffs and the Class as alleged above. Defendants' conduct specifically caused Plaintiffs and the Class to pay for increased costs for special education and related services for those students exposed to opioids before birth (NOWS), those with emotional and behavioral damages resulting from living in households afflicted by opioids, and those addicted to opioids themselves.

**COUNT IV:**
**NEGLIGENCE**
**VIOLATION OF STATUTORY DUTIES**

561. Plaintiffs incorporate and re-allege the foregoing allegations as if they were fully set out herein.

562. Count IV is brought by Plaintiffs on behalf of themselves and the Class.

563. Reasonably prudent entities in the prescription opioid supply chain would not have misrepresented the risks of prescription opioids, nor would they have overstated their benefits through publications, CMEs, and other forms of direct and indirect marketing. Reasonably prudent entities in the prescription opioid supply chain would further have implemented basic controls—required under federal law—to prevent opioid diversion in the supply chain.

564. As "registrants" under the CSA, Defendants were charged with being vigilant in deciding whether a customer, be it a pharmacy, wholesaler, or end customer, can be trusted to

deliver or use controlled prescription narcotics only for lawful purposes.[280] Specifically, drug manufacturers, distributors, and pharmacies are required to maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels."[281]

565. Instead, Defendants violated their statutory duties related to marketing, selling and dispensing controlled substances, and their duties to maintain effective controls against the diversion of opioids; to design and operate systems to identify suspicious orders of opioids; to halt unlawful sales of suspicious orders of opioids; and to notify the DEA of these suspicious orders. As massive quantities of prescription opioids flowed into Plaintiffs' and the Class's public school districts, Defendants failed to meet the standards of care established by statute and regulation. *See, e.g.*, the Controlled Substances Act, 21 U.S.C. § 801 *et seq*.; 21 C.F.R. § 1301.74(b). In West Virginia, "a violation of a statute is prima facie negligence." *Gillingham v. Stephenson*, 551 S. E. 2d 663, 670 (W. Va. 2001).

566. Defendants thus breached their statutory and regulatory duties to exercise due care in the business of manufacturing, marketing, and selling prescription opioids, including by repeatedly filling unreasonably suspect opioid orders and by failing to impose basic controls to monitor, identify, investigate, limit, and report suspicious orders for opioids. The very purpose of these duties is to prevent the harms that have directly followed: the diversion of highly addictive opioids for illegal and/or non-approved purposes. Defendants' conduct was negligent, and the causal connection between their conduct and the ensuing harm to Plaintiffs and the Class was entirely foreseeable.

---

[280] *See* 21 U.S.C. § 823(e).

[281] *Id*. § 823(b)(1); *see also id*. § 823(a)(1).

567. Defendants' conduct was reckless, evincing a conscious disregard for and indifference to the consequences of their actions.

568. Defendants' breach of their statutory and regulatory duties was the direct and proximate cause of Plaintiffs and the Class suffering damages including, but not limited to, significant expenses for special education programs and services for students (a) exposed to opioids *in utero* (NOWS), (b) with emotional and behavioral damages from living in households afflicted by opioids, and (c) addicted to opioids themselves, for which Plaintiffs and the Class demand compensatory and punitive damages, as well as all damages and relief allowed by law.

**COUNT V:**
**NEGLIGENCE**
**FAILURE TO WARN**
**(ALL DEFENDANTS)**

569. Plaintiffs incorporate and re-allege the foregoing allegations as if they were fully set out herein.

570. Count V is brought by Plaintiffs on behalf of themselves and the Class.

571. A failure-to-warn cause of action "covers situations when a product may be safe as designed and manufactured, but which becomes defective because of the failure to warn of dangers which may be present when the product is used in a particular manner." *Wilkinson v. Duff*, 575 S. E. 2d 335, 340 (W. Va. 2002).

572. Defendants had knowledge of the risks and harms likely to result from the long-term use of prescription opioids and knew or should have known that harm would result from such use, including to West Virginia children exposed to opioids *in utero,* to those living in households afflicted by opioids, and to those addicted to opioids themselves.

573. Defendants knew of widespread prescription opioid addiction and abuse, and knew that opioid addiction and abuse was harmful to the individuals consuming opioids, their unborn

children, their friends, families, and communities, and those — like Plaintiffs and the Class — who are responsible for paying for federally-mandated special education related services for children exposed to opioids *in utero*, for children affected by family members' opioid addition or death, and for children addicted to opioids themselves.

574. Defendants therefore had a duty to exercise reasonable care in the marketing, promoting, selling and/or dispensing opioids. Defendants' duty to exercise reasonable care included the duty to warn adequately of the potential dangers associated with the use of opioids.

575. To expand the market for opioids, however, Defendants engaged in a misinformation campaign to alter public perception of opioids, and to deceive doctors, federal regulators, and the public — including in West Virginia — about their addictive and unsafe qualities. Defendants perpetrated virtually uniform misrepresentations, concealments, and material omissions regarding (a) the safety and efficacy of opioids for the treatment of chronic pain and (b) their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

576. Because of barriers to prescribing opioids associated with their regulation as controlled substances, Defendants knew that West Virginia doctors would not treat patients with common chronic pain complaints with opioids, and that insurers and other third-party payors would not cover such treatment, unless they were persuaded that opioids had real benefits and minimal risks.

577. Accordingly, Defendants spent millions of dollars on promotional activities and materials that falsely denied or minimized the risks of opioids while overstating the benefit of using them to treat chronic pain.

578. Defendants did not disclose to West Virginia prescribers, West Virginia patients, their third-party payors, or the West Virginia public that evidence in support of their promotional claims was inconclusive, non-existent, or unavailable, though providing such warnings and accurate information would not have imposed a burden. Rather, Defendants and the non-joined manufacturers disseminated misleading and unsupported messages that caused the target audience to believe those messages were corroborated by scientific evidence.

579. Defendants' misinformation campaign was intended to and did encourage West Virginia patients to ask for, West Virginia doctors to prescribe, and their payors to pay for inappropriate chronic opioid therapy.

580. Plaintiffs and the Class thus, both directly and indirectly, were harmed by the misrepresentations as to the efficacy and safety of opioid drugs for the treatment of chronic pain as promoted by Defendants. Because Defendants controlled knowledge of the supposed tests on which the claims of opioid drugs' efficacy and safety were based, Plaintiffs and the Class, as well as other third-party payors, members of the West Virginia medical community, and the West Virginia public, were obligated to rely on Defendants' representations about opioids. Further, Defendants perpetuated this reliance by taking the steps set out above to suppress the dissemination of any critical information about the use of opioids for treatment of chronic pain, and to ensure that they were authorized for coverage and broadly distributed.

581. In addition to Defendants' conspiracy alleged elsewhere in this Complaint, Defendants knew, or should have known, that opioids were highly addictive and inappropriate and unsafe for the treatment of chronic pain, yet failed to warn of those dangers, and Defendants also knew that the dangerous qualities of opioids bore a direct relationship to the volume of opioids

being ordered, distributed, authorized, prescribed, and/or dispensed, yet failed to warn of those dangers.

582. Defendants' conduct was reckless, evincing a conscious disregard for and indifference to the consequences of their actions.

583. By failing to abide by their duty to warn the West Virginia public, including prescribing West Virginia doctors, and Plaintiffs and the Class, of the dangers of opioids, Defendants' conduct directly injured Plaintiffs and the Class. Because of Defendants' misinformation campaign and failure to warn, Plaintiffs and the Class are suffering, and continue to suffer, damages including, but not limited to, significant expenses for special education programs for students (a) exposed to opioids *in utero* (NOWS), (b) with emotional and behavioral damages resulting from living in households afflicted by opioids, and (c) addicted to opioids themselves, for which Plaintiffs and the Class demand compensatory and punitive damages, as well as all damages and relief allowed by law.

## VI. PRAYER FOR RELIEF.

**WHEREFORE,** Plaintiffs, on behalf of themselves and the Class, pray that summons be issued notifying Defendants of this Complaint, and that after all legal delays, Defendants be required to answer same, and after all proceedings and a jury trial, there be a judgment in favor of Plaintiffs for all amounts commensurate with Plaintiffs' and the Class's damages, including but not limited to:

(1) past, present, and future costs associated with increased educational services, including but not limited to special education needs, services, and programs for children with opioid-related learning disabilities or needs;

(2) past, present, and future costs associated with increased educational services, including but not limited to special education needs, services, and programs for children damaged by living in households afflicted by opioids;

(3) disgorgement of profits;

(4) all of the hundreds of millions of dollars in costs and means to abate the effects in West Virginia public schools caused by the opioid epidemic created by Defendants' wrongful and/or unlawful conduct;

(5) all other costs and damages specified herein;

(6) attorneys' fees, costs, and expenses of suit;

(7) pre- and post- judgment interest; and

(8) such other relief as the Court deems appropriate.

Plaintiffs further request all injunctive and equitable relief that the Court deems appropriate and may be permitted by law.

Plaintiffs demand a jury trial on all issues so triable.

Dated: October 28, 2024

Respectfully submitted,

_/s/Benjamin L. Bailey_
Benjamin L. Bailey (WVSB No. 200)
John W. Barrett (WVSB No. 7289)
J. Lincoln Wolfe (WVSB No. 14117)
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555 (phone)
(304) 342-1110 (fax)
bbailey@baileyglasser.com
jbarrett@baileyglasser.com
lwolfe@baileyglasser.com

James F. Humphreys
James F. Humphreys & Associates, L.C.
112 Capitol Street, 2nd Floor
Charleston, West Virginia 25301
Telephone: (304) 347-5050
jhumphreys@jfhumprheys.com

Neil Henrichsen
Henrichsen Law Group, PLLC
655 15th Street, N.W. Suite 800
Washington, DC 20005
Telephone: (202) 423-3649
nhenrichsen@hslawyers.com

Cyrus Mehri
Joshua Karsh
Mehri & Skalet, PLLC
2000 K Street NW, Suite 325
Washington, DC 20006
Telephone: (202) 822-5100
cmehri@findjustice.com
jkarsh@findjustice.com

Wayne Hogan
Terrell Hogan Yegelwel, P.A.
233 East Bay Street, 8th Floor
Jacksonville, FL 32202
Telephone: (904) 722-2228
hogan@terrellhogan.com

*Counsel for Plaintiffs*